**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| _____ ) | |
| CAYUGA NATION ) | |
| AND JOHN DOES 1-20, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No.:  5:14-CV-1317[DNH/ATB] |
| ) | |
| HOWARD TANNER, VILLAGE ) | |
| OF UNION SPRINGS CODE ENFORCEMENT ) | |
| OFFICER, IN HIS OFFICIAL CAPACITY; ) | |
| EDWARD TRUFANT, VILLAGE OF UNION ) | |
| SPRINGS MAYOR, IN HIS OFFICIAL ) | |
| CAPACITY; CHAD HAYDEN, VILLAGE OF ) | |
| UNION SPRINGS ATTORNEY, IN HIS ) | |
| OFFICIAL CAPACITY; BOARD OF ) | |
| TRUSTEES OF THE VILLAGE OF UNION ) | |
| SPRINGS, NEW YORK; AND THE VILLAGE ) | |
| OF UNION SPRINGS, NEW YORK ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     This is an action by the Cayuga Nation ("the Nation") and unnamed Nation officers, employees, and representatives against the Village of Union Springs and certain of its officials to prevent their interference with the Nation's federally protected rights.

2.     To promote tribal economic development, the Indian Gaming Regulatory Act ("IGRA") gives the Nation the right to conduct certain gaming activities on its reservation lands free of interference from state or local authorities, and sets up a comprehensive scheme of federal and tribal regulation of those activities.  IGRA also

prohibits state and local officials from bringing criminal enforcement actions under state or local gambling laws in "Indian country" – a statutorily defined term that includes the Nation's federally recognized reservation land – even with respect to Indian gambling activities that are not authorized by IGRA.  The Nation, for its part, has fully complied with the requirements of IGRA and the regulations of the National Indian Gaming Commission ("NIGC").   In spite of this, the Village of Union Springs has issued multiple "Orders to Remedy Violations" and has threatened legal action, including criminal proceedings, if the Nation does not come into compliance with a 1958 Village anti-gambling ordinance that IGRA plainly preempts.  To prevent these unlawful actions, the Nation seeks declaratory and injunctive relief, including a temporary restraining order and a preliminary injunction.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362.

4.      Venue is proper under 28 U.S.C. § 1391(b)(1) because all defendants reside in this district and in New York State.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district (namely, in the Village of Union Springs, where Lakeside Entertainment is located).

## FACTUAL BACKGROUND

The Parties

5.      Plaintiff Cayuga Nation ("Nation") is a federally recognized Indian tribe. *See* 77 Fed. Reg. 47,868 (Aug. 10, 2012).  The federal government recognizes the Nation as the same entity with which it entered the Treaty of Canandaigua in 1794 (7 Stat. 44).

6.     Plaintiffs John Does 1 through 20 are unknown officers, employees, and/or representatives of the Nation who are at risk of criminal or civil penalties for conduct relating to the operation of the Lakeside Entertainment gaming facility at 271 Cayuga Street, Union Springs, New York.

7.     Defendant Edward Trufant is the Mayor of the Village of Union Springs and is sued in his official capacity.

8.     Defendant Howard Tanner is the Code Enforcement Officer of the Village of Union Springs and is sued in his official capacity.

9.     Defendant Chad Hayden is the Village Attorney of the Village of Union Springs and is sued in his official capacity.

10.     Defendant Board of Trustees of the Village of Union Springs is the governing body of the Village of Union Springs.

11.     Defendant Village of Union Springs is a municipal corporation chartered under the laws of New York State.

12.     All of the Defendants' conduct described in this complaint has been undertaken, or will be undertaken, under color of state law.

The Indian Gaming Regulatory Act

13.     In furtherance of the federal policy of Indian economic self-sufficiency, Congress enacted IGRA in 1988 to explicitly allow, and to provide a comprehensive scheme for the regulation of, certain Indian gaming activities.  25 U.S.C. §§ 2701-02.

14.     The provisions of IGRA preempt any contrary state or local law.  Thus, if gaming is permitted by IGRA, a state or local law may not punish or restrict it.  *See, e.g.*, *Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 539-40 (9th Cir. 1994).

15.     IGRA divides Indian gaming into three categories.

16.     Class I gaming consists of traditional and social games played for no significant financial stakes.  25 U.S.C. § 2703(6).  Indian nations maintain exclusive control over Class I gaming.  *Id.* § 2710(a)(1).

17.     Class II gaming includes "the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith)" and similar games if played in the same location.  *Id.* § 2703(7)(A)(i).  Class II gaming is regulated by Indian nations pursuant to tribal ordinances approved by the National Indian Gaming Commission ("NIGC"), an independent federal regulatory commission located within the Department of the Interior.  *Id*. §§ 2704, 2710(a)(2), (b).

18.     Class III is a residual category, consisting of any games not included in Classes I and II.  Class III gaming includes casino-style games, slot machines, and lotteries, 25 U.S.C. § 2703(8), and must be conducted in conformance with a "Tribal-State compact entered into by the Indian tribe and the State."  25 U.S.C. § 2710(d)(1)(C).

19.     Only Class II gaming is at issue in this case.  IGRA permits Indian nations to engage in Class II gaming on "Indian lands within such tribe's jurisdiction" if the "gaming is located within a State that permits such gaming for any purpose by any person," and "the governing body of the Indian tribe adopts an ordinance or resolution" that is approved by the Chairman of the NIGC.  25 U.S.C. § 2710(b).

20.     In addition to preempting state and local laws prohibiting Class II gaming, IGRA also bars state and local officials from bringing criminal proceedings under state or local gambling laws in Indian country, even with respect to Indian gambling activities that are *not* authorized by IGRA.  Instead, IGRA vests the United States with "exclusive jurisdiction" over "criminal prosecutions" under "State gambling laws that are made

applicable under this section to Indian country."   25 U.S.C. § 1166(d).   That section covers "all State laws pertaining to the licensing, regulation, or prohibition of gambling," *id*. § 1166(a), thus allowing the federal government (and only the federal government) to prosecute violations of state gambling laws, except that even the federal government may not prosecute violations of state gambling laws where IGRA authorizes Indian gaming, *id.* § 1166(c).

The Nation's Operation of Lakeside Entertainment

21.     Pursuant to IGRA's regulatory scheme, in 2004 the Nation opened a business known as Lakeside Entertainment, sometimes referred to as a "bingo hall." Lakeside Entertainment is located at 271 Cayuga Street, Union Springs, New York, within the boundaries of the Nation's historic reservation.  The Nation temporarily closed Lakeside Entertainment in October 2005. The Nation reopened Lakeside Entertainment in the same location on July 3, 2013.

22.     The gaming taking place at Lakeside Entertainment consists of bingo, conducted with the technological aid of machines.  IGRA classifies this form of gaming as Class II.   25 U.S.C. § 2703(7)(A)(i).

23.     The gaming activities taking place at Lakeside Entertainment are ones that New York State permits for at least some classes of persons.  *See* N.Y. Const. Art. I, § 9(2) ("any city, town or village within the state may . . . authorize, subject to state legislative supervision and control, the conduct of . . . games of chance commonly known as . . . bingo or lotto [by] . . . bona fide religious, charitable or non-profit organizations of veterans, volunteer firefighter and similar non-profit organizations…").

24.     The Nation also is in compliance with the statutory requirement that it

adopt, and receive NIGC approval of, a Class II gaming ordinance.  On November 12, 2003, the Nation's Council adopted a Class II gaming ordinance, and on November 18, 2003, NIGC approved the ordinance.  The ordinance remains in effect, as does NIGC's approval.

25.    Lakeside Entertainment satisfies IGRA's requirement that the Nation's Class II gaming occur on "Indian lands within such tribe's jurisdiction."  25 U.S.C. § 2710(b).

a.  With respect to the "Indian lands" requirement, IGRA defines this term to include "all lands within the limits of any Indian reservation." 25 U.S.C. § 2703(4)(A);  *see*  25 C.F.R. § 502.12.   The land on which Lakeside Entertainment is located is within the limits of the Cayuga Nation's reservation, which continues to exist as a matter of federal law.  Indeed, the New York Court of Appeals – as well as "every federal court" to consider the question – has held that the Nation's reservation in New York State continues to exist.  *Cayuga Indian Nation of New York v. Gould*, 930 N.E.2d 233, 247 (N.Y. 2010), *cert. denied*, 131 S. Ct. 353 (2010) (collecting authority).

b.  The lands in question also satisfy the requirement that they be "within such tribe's [i.e., the Nation's] jurisdiction," 25 U.S.C. § 2710(b).  NIGC has repeatedly made clear that this phrase requires only that an Indian nation's gaming occur within the boundaries of its *own* territory, rather than the territory of another Indian nation.

26.    When Lakeside Entertainment was open in 2004 and 2005, NIGC

conducted regulatory oversight of the Nation's gaming activities there.

27.    In 2013, in the hope of furthering the Nation's economic development, the Nation's Council authorized the reopening of Lakeside Entertainment.

28.    In compliance with NIGC regulations, the Nation renewed the facility license for Lakeside Enterprises, and on May 8, 2013, the Nation provided NIGC with notice of that renewal.    At the same time, the Nation submitted the required environmental, public health, and safety attestation for that facility.  *See* 25 C.F.R. §§ 559.3, 559.4.

29.    The Nation has similarly complied with IGRA and NIGC regulations regarding the licensing of "primary management officials" and "key employees."  *See* 25 U.S.C. § 2710 (b)(2)(F).

a.    On May 21, 2013, the Nation submitted to the NIGC background check materials, including fingerprints, for personnel whom the NIGC's regulations require to be licensed.  *See* 25 C.F.R. §§ 556.4, 522.2(h).

b.    NIGC, in turn, assisted in processing those fingerprints and provided the resulting Criminal History Record Information (CHRI) to the Nation.

c.    On review of the CHRI, the Nation: (i) determined that the individuals were eligible to be licensed; and (ii) informed NIGC of its actions, as required by the agency's regulations.  *See* 25 C.F.R. Parts 556, 558.

d.    As part of this process, NIGC approved the Nation's request for access to its secure, restricted Tribal Access Portal (https://tap.nigc.gov).

e.    On July 17, 2013, NIGC stated that it had no objection to the issuance of gaming licenses to the personnel whose information the Nation submitted

on May 21.

    f.   On July 23, 2013, the Nation submitted to NIGC information for four additional employees who require licenses.

    g.   Following the same procedures outlined above, the NIGC processed this information and returned the CHRI to the Nation, which determined that each of those four individuals were eligible for a gaming license, and so notified the NIGC.

    h.   On August 29, 2013, NIGC responded that it had no objection to the licensing of three of the individuals.

    i.   After discussions with the Nation, on September 6, 2013, NIGC informed the Nation that it had no objection to the licensing of the fourth individual.

    j.   Since then, the Nation and NIGC have followed similar procedures with respect to the licensing of numerous other individuals.

30.    The Nation resumed gaming operations at Lakeside Entertainment on July 3, 2013.  Upon reopening, the Nation initially offered only paper bingo and pull-tabs at the facility.

31.    Prior to its reopening of Lakeside Entertainment, the Nation took steps to comply with all local zoning requirements.  In particular, in 2010, the Nation received a detailed architect's report stating that its use of Lakeside Entertainment for Class II gaming would comply with state and local zoning, land use, and building laws and codes, including the Village of Union Springs Zoning Ordinance.

32.    Consistent with the Nation's desire to act openly and in compliance with all applicable laws and regulations, the Nation's counsel informed various State and local

officials by letter that it was reopening Lakeside Entertainment.  A true and correct copy of that letter is attached to this complaint as Exhibit A.

33.     Nation counsel's letter noted, among other things, that the Nation had received a formal legal opinion from the law firm of Dorsey & Whitney, LLP, confirming the legality of the Nation's reopening of Lakeside Entertainment.  The letter offered to make the Dorsey & Whitney legal opinion available upon request, and twice urged law enforcement to contact Nation counsel should they have any concerns about the Nation's activities.

The Village of Union Springs' Efforts to Prevent the Nation from Gaming

34.     On July 3, 2013, Defendant Howard Tanner, the Code Enforcement Officer for the Village of Union Springs, visited the Lakeside Entertainment facility and expressed concern about whether the Nation's conduct of Class II gaming activities was permissible under local law.  At that time, Mr. Tanner also stated that the Nation would need a Certificate of Occupancy for the facility.  Nation counsel provided Mr. Tanner with copies of the letter described in paragraph 33 above and with the Dorsey & Whitney opinion letter.

35.     On July 8, 2013, the Village of Union Springs Board of Trustees met in executive session.  At that meeting, the Board determined that it would enforce a 1958 Village anti-gambling ordinance against the Nation.  A true and correct copy of that ordinance is attached to this complaint as Exhibit B.

36.     On July 9, 2013, the Nation was served with an Order to Remedy Violations, which cited the Nation for "operating Bingo without a license Issued [sic] by the Village of Union Springs" in violation of "Games of chance ordinance dated May 19,

1958," as well as unspecified portions of the Union Springs Zoning Ordinance.   On information and belief, the Order to Remedy Violations was signed by Defendant Tanner. The Order stated: "YOU ARE THEREFORE DIRECTED AND ORDERED to comply with the law and to remedy the conditions above mentioned forewith [sic] no later than the 26th day of July 2013."   The Order continued: "Failure to remedy the conditions aforesaid with notice in writing of compliance to the Village of Union Springs, Factory St., Union Springs, NY 13160, and to comply with the applicable provisions of law may constitute an offense punishable by fine or imprisonment or both.   PURSUANT to section 268 of the Village Law of the State of New York, the Village of Union Springs also may seek injunctive relief in the New York Supreme Court."   A true and correct copy of the Order to Remedy Violations is attached to this complaint as Exhibit C.

37.     On July 23, 2013, Nation counsel wrote to Defendant Village Attorney Chad Hayden to address the Order to Remedy Violations.   Counsel explained that the Nation's gaming activities were lawful under IGRA, which preempts any state or local regulation of Indian gaming.

38.     On August 8, 2013, Betty Jane Radford, the Manager of Lakeside Entertainment, wrote to Mr. Tanner, enclosing a completed application for a Certificate of Occupancy.   Ms. Radford explained that because Lakeside Entertainment is located on the Nation's federally recognized reservation, the Nation did not believe that it was subject to the laws of other governments.   Ms. Radford further explained that the structure in question complies with the Cayuga Nation's own health and safety ordinance, which incorporates the requirements of the International Building Code, which in turn are at least as stringent as the state and local codes that govern in Union Springs.   Ms.

Radford also noted, with respect to the State and local building code, that "a professional architect retained by the Nation recently determined that the Lakeside Entertainment facility is code-compliant in all respects."   Ms. Radford concluded that "the Nation always stands ready to work cooperatively with County and town officials on a government-to-government basis"; for that reason, and "without waiving any of the Nation's rights," Ms. Radford enclosed a completed application for a Certificate of Occupancy.

39.   Defendant Tanner did not grant the Certificate of Occupancy.  Instead, Defendant Tanner requested additional information, including costly construction documents and site plans.

40.   Even though the Nation already believed itself to be in full compliance with all applicable local regulations, the Nation worked diligently to comply with Defendant Tanner's requests.  In particular, the Nation retained an architect to complete *another* full code compliance review.  On December 19, 2013, the Nation provided the results of that review to Defendant Tanner.

41.   Also on December 19, 2013, the Nation added 86 electronic bingo machines to Lakeside Entertainment.  These machines constitute Class II gaming under IGRA, and thus do not alter the legal status of the gaming taking place at the facility.

42.   Once again, consistent with the Nation's desire to act openly and to work with local authorities, on December 19, 2013, the Nation's counsel informed various State and local officials (including Defendant Tanner) about the addition of the electronic gaming machines.  The Nation further highlighted that the plain text of IGRA, as well as clearly established case law from the Second Circuit applying IGRA, bars state and local

officials from bringing criminal proceedings for violations of state and local gambling laws in Indian country.   True and correct copies of those letters are attached to this complaint as Exhibit D.

43.   In a newspaper article published on December 20, 2013, Village Attorney Hayden was reported as saying that Village would move to shut down the gaming hall and seize the electronic bingo machines.   "Initially, we'll send them a notice of violation," the article quoted Hayden as saying.   "That will give them a reasonable time to comply and then we'll proceed to court."   A copy of that article is attached to this complaint as Exhibit E.

44.   On December 23, 2013, the Nation was served with two further Orders to Remedy Violations, which were dated December 20, 2013.   One order stated that "operating games of chance is not permitted in the Village of Union Springs," again citing the "Games of chance ordinance dated May 19, 1958," as well as unspecified portions of the Union Springs Zoning Ordinance.   The second order claimed a violation of Section 1202.3 of Title 19 of the New York Code of Rules and Regulations, which provides that "[n]o change shall be made in the nature of an existing building unless a certificate of occupancy authorizing the change has been issued.   The owner or occupant of such building must demonstrate that such change will conform with all applicable provisions of the Uniform Code before a certificate of occupancy will be issued."   Both orders required the Nation to comply "no later than the 28th day of December, 2013," and both orders again stated that failure to remedy "may constitute an offense punishable by fine or imprisonment or both," and that the Village "also may seek injunctive relief in the New York Supreme Court."   On information and belief, the Orders to Remedy

Violations were signed by Defendant Tanner.  True and correct copies of the Orders to Remedy Violations are attached to this complaint as Exhibit F.

45.     Because the Nation had duly applied for a certificate of occupancy and provided Defendant Tanner with documentation that Lakeside Entertainment complied with all applicable code requirements, the Nation sent Defendant Tanner a letter inquiring whether he asserted any justification other than 1958 "Games of Chance" Ordinance for his refusal to issue a certificate of occupancy.  Defendant Tanner did not respond.  On information and belief, the sole reason that Defendant Tanner has refused to issue a certificate of occupancy is the Nation's non-compliance with the 1958 "Games of Chance" Ordinance.

46.     To forestall the imminent violation of its federally protected rights that the Village's actions threatened, the Nation on December 27, 2013, informed Village officials that it would seek a temporary restraining order, as well as preliminary and permanent injunctive relief.

47.     Subsequently, on December 30, 2014, the Village and the Nation entered a Standstill Agreement, which provided that the Village would take no action against Lakeside Entertainment without providing 48 hours notice, and that the Nation would not change the nature of the gaming offered at the facility.  The agreement was effective until April 30, 2014, and was subsequently extended for one month.

48.     Since then, the Nation has continued to operate Lakeside Entertainment in compliance with the Standstill Agreement and all applicable laws.

49.     On February 21, 2014, Defendant Tanner again inspected the facility, identifying three minor building-code issues he wished to see addressed, including confirmation of Lakeside Entertainment's most recent fire alarm test.

50.     The Nation resolved the issues identified by Defendant Tanner in his February 21 visit.  When Defendant Tanner returned on March 7, he said that he would issue a Certificate of Occupancy the following week.

51.     Defendant Tanner did not issue the Certificate of Occupancy.  Instead, on March 24, Defendant Tanner sent a letter reiterating his contention that Lakeside Entertainment violated the Zoning Law and the 1958 Ordinance, "which prohibits bingo in the Village."   He further stated that "[u]ntil this matter is resolved I cannot grant a certificate of occupancy."   The letter gave the Nation 10 days to commence permit applications to the zoning board of appeals and the Village Board, and it identified no basis for requiring such applications other than the Village's plainly preempted ordinances.  A true and correct copy of Defendant Tanner's letter is attached to this complaint as Exhibit G.

52.     As of the date of the filing of this complaint, the Nation has continued to conduct its Class II gaming activities at Lakeside Entertainment, and the Village of Union Springs has refused to issue a Certificate of Occupancy for the facility.

53.     Although the Standstill Agreement was extended until May 30, 2014, it expired as of that date.  On October 27, 2014, outside counsel for the Village advised counsel for the Nation that the Village intends to proceed with enforcement action against the Lakeside Entertainment facility.

54.     Neither Defendant Tanner nor any other Union Springs official has withdrawn the Village's threats to seek criminal penalties in connection with the Lakeside Entertainment facility.

### COUNT ONE
### (IGRA PREEMPTION)[1]

55.     Paragraphs 1 through 54 are realleged as if set forth in full herein.

56.     The Nation's Class II gaming activities at Lakeside Enterprises are legal under IGRA.  In particular, the gaming takes place on Indian lands within the Nation's jurisdiction; it is the type of gaming permitted in at least some circumstances by New York State; and it is conducted pursuant to the Nation's Class II gaming ordinance, which has been approved by the Chairman of the NIGC.

57.     Accordingly, IGRA preempts the application of State and local laws that prohibit the Nation, its officers, its employees, or its other representatives from conducting Class II gaming at Lakeside Entertainment, including but not limited to the 1958 Village of Union Springs Anti-Gambling Ordinance; and including but not limited to the zoning and land use law of the Village of Union Springs insofar as it incorporates the 1958 Anti-Gambling Ordinance.

58.     The civil proceedings threatened by the Village of Union Springs to enjoin gaming activities authorized by federal law, and the prosecution of the Nation and its employees for gaming activities authorized by federal law, would cause irreparable injury to Plaintiffs.

---

[1] For each count in this Complaint, all plaintiffs seek relief directly under the Supremacy Clause of the United States Constitution and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 and *Ex Parte Young*, 209 U.S. 123 (1908), while the John Doe plaintiffs also seek relief under 42 U.S.C. § 1983.

59.    Plaintiffs are therefore entitled to declaratory relief declaring the lawful right of the Nation, its officers, and its employees to conduct Class II gaming at Lakeside Enterprises.

60.    Plaintiffs are also entitled to preliminary and permanent injunctive relief preventing Defendants from taking any steps to apply state and local gambling laws (including but not limited to the 1958 Games of Chance Ordinance) with respect to the Nation's Class II gaming activities at Lakeside Enterprises and ordering that the 1958 Games of Chance Ordinance cannot serve as a lawful basis for denying the Nation a certificate of occupancy.

**COUNT TWO**
**(ILLEGAL PROSECUTION PREEMPTED UNDER IGRA)**

61.    Paragraphs 1 through 60 are realleged as if set forth in full herein.

62.    Defendant Tanner's threatened criminal proceedings with respect to Lakeside Entertainment are illegal under IGRA regardless of whether the Nation's activities are authorized by IGRA.  Under 18 U.S.C. § 1166(d), the United States has "exclusive jurisdiction" to prosecute violations of state laws pertaining to the licensing, regulation, or prohibition of gambling, if those violations occur in Indian country.

63.    These threatened prosecutions would allege violations of state gambling laws that pertain to the licensing, regulation, or prohibition of gambling, and would seek to punish conduct that occurred at Lakeside Entertainment, which sits within the Nation's federally recognized reservation, and thus is within "Indian country" as that term is defined by federal statute, *see* 18 U.S.C. § 1151(a).

64.    As a result, any prosecution by state or local officials of the Nation, its officers, its employees, or its other representatives for gaming activities at Lakeside

Entertainment is prohibited by the express terms of IGRA and by clearly established federal case law applying IGRA. *See United States v. Cook*, 922 F.2d 1026, 1033–34 (2d Cir. 1991).

65.     A criminal proceeding against Plaintiffs that is expressly prohibited by federal law would cause Plaintiffs irreparable injury.

66.     Plaintiffs are therefore entitled to declaratory and preliminary and permanent injunctive relief to protect the Nation and its officers, its employees, and its other representatives from illegal prosecution.

## COUNT THREE
## (SOVEREIGN IMMUNITY FROM SUIT)

67.     Paragraphs 1 through 66 are realleged as if set forth in full herein.

68.     The Nation is a federally recognized Indian tribe and therefore possesses sovereign immunity from suit.

69.     Any court proceedings to punish or restrict gaming at Lakeside Entertainment (including but not limited to proceedings to enforce the Orders to Remedy Violations) would violate the Nation's sovereign immunity.

70.     For that reason, such proceedings would exceed the jurisdiction of state courts.

71.     Plaintiffs therefore are entitled to declaratory and injunctive relief barring defendants from commencing or pursuing such proceedings.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court issue an order:

(A)     Declaring that the Village of Union Springs' 1958 Games of Chance Ordinance and all other state and local laws prohibiting gambling are preempted by

federal law as applied to the Nation's Class II gaming activities at Lakeside Entertainment; declaring that the 1958 Games of Chance Ordinance cannot lawfully serve as a basis for denying the Nation a certificate of occupancy; declaring that federal law prohibits Defendants from taking any steps to restrict, interfere with, punish, prosecute, or otherwise penalize actions taken by the Nation, its officers, its employees, or its other representatives in furtherance of Class II gaming activities at Lakeside Enterprises; and declaring that the Nation enjoys immunity to any suit to enforce the Ordinance.

(B)     Enjoining Defendants from taking any steps to restrict, interfere with, punish, prosecute, or otherwise penalize actions taken by the Nation, its officers, its employees, or its other representatives in furtherance of Class II gaming activities at Lakeside Enterprises, including but not limited to the enforcement of  the 1958 Union Springs Games of Chance Ordinance or other local and state laws concerning gambling, whether independently through a civil or criminal action, or through civil or criminal enforcement of the Village of Union Spring's zoning law; or through a civil or criminal action to enforce the Order to Remedy Violations dated July 9, 2013 or the Orders to Remedy Violations dated December 20, 2013.

(C)     Awarding attorney's fees to the John Doe Plaintiffs pursuant to 42 U.S.C. § 1988;

(D)     Awarding costs to Plaintiffs; and

(E)     Granting such other relief as this Court deems just and proper.

Respectfully submitted,

/s/  John G. Powers
John G. Powers (Bar No. 508934)
Hancock Estabrook LLP
1500 AXA Tower I
100 Madison Street
Syracuse, New York 13202
(315) 565-4500

David W. DeBruin (*pro hac vice* application to be submitted)
Joshua M. Segal (*pro hac vice* application to be submitted)
Matthew E. Price (*pro hac vice* application to be submitted)
Jenner & Block LLP
1099 New York Ave., N.W.
Washington, DC  20001
*Attorneys for the Cayuga Nation*

DATED: October 28, 2014

Exhibit A

CHICAGO   LOS ANGELES   NEW YORK   WASHINGTON, DC                    J E N N E R & B L O C K LLP

July 3, 2013

**David W. DeBruin**
Tel  202 639-6015
Fax 202 637-6375
ddebruin@jenner.com

Dear State and Local Officials:

We represent the Cayuga Indian Nation of New York ("the Nation"), along with other counsel listed below.  We are writing to advise you that, pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"), the Nation has resumed "Class II" gaming operations at its licensed facility in Union Springs, New York.  If you have any questions regarding those operations, we would be pleased to discuss them with you.

IGRA authorizes Class II gaming "on Indian lands within such tribe's jurisdiction," if the "gaming is located within a State that permits such gaming for any purpose by any person, organization, or entity," and the gaming is conducted pursuant to an ordinance approved by the Chair of the National Indian Gaming Commission ("NIGC").  25 U.S.C. § 2710 (b)(1).  As reflected in a formal legal opinion provided by the firm Dorsey & Whitney, LLP, each of those conditions is satisfied here.  We would be happy to provide a copy of that legal opinion upon request.

IGRA defines "Indian lands" to include "all lands within the limits of any Indian reservation."  25 U.S.C. § 2710(4)(A).  The New York Court of Appeals recently confirmed that the Nation's reservation still exists as a matter of federal law, observing that "every federal court to consider the question" has reached the same conclusion, and noting that the United States has consistently supported that position.  *See Cayuga Nation v. Gould*, 930 N.E. 2d 233, 247 (N.Y. 2010).

In 2003, the Nation enacted, and the NIGC approved, a Class II Gaming Ordinance (No. 2003-06).  Thereafter, the Nation issued a license for its Union Springs facility as required by NIGC regulations and notified NIGC of the issuance of that license.  The Nation conducted Class II gaming at the facility from 2004 to 2005.

Although the Nation temporarily and voluntarily suspended gaming operations at the Union Springs facility in 2005, the Nation's Class II Gaming Ordinance remains in effect.  The Nation has taken steps to resume its Class II gaming activities in accordance with IGRA and applicable NIGC regulations.  On May 8, 2013, the Nation provided the NIGC with notice that it had renewed the license for the Union Springs facility; concurrently, it submitted the required environmental, public health, and safety attestation for that facility.  *See* 25 C.F.R. §§ 559.3, 559.4.  The Nation has provided the NIGC with background check materials, including fingerprints, for personnel required to be licensed.  *See* 25 C.F.R. §§ 556.4, 522.2(h).  NIGC, in turn, has assisted in processing those fingerprints and has provided the resulting Criminal History Record Information (CHRI) to the Nation.  On review of the CHRI, the Nation has: (i) determined that the individuals were eligible to be licensed, (ii) licensed them, and (iii) informed NIGC of its actions, as required by the agency's regulations.  *See* 25 C.F.R. Parts 556, 558.  As part of this process, the NIGC has approved the Nation's request for access to its secure, restricted Tribal Access Portal (https://tap.nigc.gov).

The Cayuga Nation's Class II gaming operations are consistent with the ongoing gaming activities of the Oneida Indian Nation in nearby Madison County, New York.  The Oneida Nation's lands are identically situated to the Cayuga Nation's lands in all material respects:  both Nations' reservations were recognized in the 1794 Treaty of Canandaigua; both Nations' reservation lands

July 3, 2013
Page 2

were unlawfully purchased by New York without federal consent; and neither reservation has been diminished nor disestablished by Congress. *See Solem v. Bartlett*, 465 U.S. 463, 470 (1984); *Oneida Indian Nation of N.Y. v. Madison County*, 665 F.3d 408, 443 (2d Cir. 2011); *Gould*, 930 N.E. 2d at 247-48. Moreover, the Oneida Nation's lands, like those of the Cayuga Nation, are not yet held in trust by the United States, as the Secretary of the Interior's approval of the Oneida Nation's trust application has been stayed in light of ongoing litigation. *See Order Granting Stipulation, New York v. Salazar*, No. 6:08-644 (N.D.N.Y. Sept. 3, 2008). The Cayuga Nation similarly has applied for certain of its lands to be taken into trust, and the Regional Director of the Bureau of Indian Affairs recently recommended that the trust application be approved, forwarding it to the Department of the Interior for final approval. The Oneida Nation has conducted gaming activities – both Class II and Class III – on its non-trust, reservation lands at Turning Stone Casino Resort since 1993.

The provisions of IGRA preempt any contrary state or local law. *See, e.g., Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 539-40 (9th Cir. 1994). State and local officials are potentially liable for injunctive relief and monetary damages under 42 U.S.C. § 1983 for interference with or violations of established federal law. *See, e.g., Pembaur v. Cincinnati*, 475 U.S. 469 (1986); *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978); *Salahuddin v. Coughlin*, 781 F.2d 24, 27 (2d Cir. 1986).

The Cayuga Nation seeks at all times to comply with all applicable federal, state, and local laws and to work cooperatively with federal, state, and local law enforcement officials. The Nation will conduct all gaming operations at its Union Springs facility in full compliance with the detailed regulations and requirements established by NIGC – as well as the Nation's own ordinance – for Indian gaming under IGRA. If you have any questions or concerns about the Nation's gaming operations, I urge you to notify us at once.

Thank you for your consideration.

Sincerely,

David W. DeBruin

To:   Hon. Eric T. Schneiderman, Attorney General, State of New York
      Howard Glaser, Director of State Operations, New York State Office of the Governor
      Robert Williams, Acting Executive Director, New York State Gaming Commission
      Hon. Jon E. Budelmann, Cayuga County District Attorney
      Hon. David S. Gould, Cayuga County Sheriff

cc.   Tracie Stevens, Chairwoman, National Indian Gaming Commission
      Cindy Altimus, Region Director, National Indian Gaming Commission
      Michael Hoenig, Senior Counsel, National Indian Gaming Commission
      Hilary Tompkins, Solicitor, United States Department of the Interior
      Paula L. Hart, Director, Office of Indian Gaming, United States Department of the Interior
      Richard S. Hartunian, United States Attorney, Northern District of New York
      Craig Alexander, Chief, Indian Resources Section, United States Department of Justice

      Cahill Gordon & Reindel LLP, Cayuga Nation Counsel
      Kilpatrick Townsend & Stockton LLP, Cayuga Nation Counsel
      French Alcott PLLC, Cayuga Nation Counsel
      Eric Facer, Cayuga Nation Counsel

Exhibit B

## ORDINANCE OF THE VILLAGE OF UNION SPRINGS FOR THE CONDUCT OF CERTAIN GAMES OF CHANCE BY CERTAIN ORGANIZATIONS

At a regular meeting of the Board of Trustees of the Village of Union Springs in the State of New York held at the Village Hall in said village on the 24 day of April, 1958, on motion by Trustee Mosher, seconded by Trustee Robbins, and unanimously carried, it is hereby

RESOLVED: That pursuant to Article 14-G of the General Municipal Law, the Village of Union Springs hereby enacts an ordinance for the conduct of certain games of chance by certain organizations as follows:

Section 1. It shall be lawful for any bona fide religious, charitable or non-profit organization of veterans, volunteer firemen and similar non-profit organizations, upon obtaining a license therefor, as hereinafter provided, to conduct the game of bingo within the territorial limits of the Village of Union Springs, subject to the provisions of this ordinance, of Article 14-G of the General Municipal Law of the State of New York and the provisions of the state lottery control law.

Section 2. No person, firm, association, corporation or organization, other than a bona fide religious, charitable or non-profit organization of veterans, volunteer firemen and similar non-profit organizations licensed under the provisions of this ordinance shall be permitted to conduct such games.

Section 3. The entire net proceeds of any game shall be exclusively devoted to the lawful purposes of the organization permitted to conduct the same.

Section 4. No single prize shall exceed the sum or value of $250.00.

Section 5. No series of prizes on any one occasion shall aggregate more than $1,000.00.

ROBERT D. JONES
ATTORNEY AT LAW
AUBURN, N. Y.

Section 6. No person, except a bona fide member of any such organization, shall participate in the management or operation of such game.

Section 7. No person shall receive any remuneration for participating in the management or operation of any such game.

Section 8. The unauthorized conduct of a bingo game and any willful violation of any provision of this ordinance shall constitute and be punishable as a misdemeanor.

Section 9. Each applicant for a license shall file with the Clerk of the Village of Union Springs a written application therefor in the form prescribed in the rules and regulations of the State Lottery Control Commission.

Section 10. The Village Board of the Village of Union Springs shall make an investigation of the qualifications of each applicant and the merits of each application with due expedition after the filing of the application, and if it shall determine that the applicant is duly qualified to be licensed under this ordinance pursuant to the provisions of Section 481 of the General Municipal Law, it shall issue a license to the applicant for the holding, operation and conduct of the specific kinds of games of chance applied for upon payment of a license fee or fees of $10.00 for each occasion upon which any games of chance are to be conducted under such license.

Section 11. On or before the 30th day of each month, the Treasurer of the Village of Union Springs shall transmit to the State Comptroller of the State of New York a sum equal to fifty percent of all license fees collected by such village pursuant to Section 481 of the General Municipal Law during the preceding calendar month.

Section 12. No license for the holding, operation and conduct of any game or games of chance shall be issued under this ordinance which shall be effective for a period of more than one year.

ROBERT D. JONES
ATTORNEY AT LAW
AUBURN, N.Y.

- 2 -

This ordinance shall become effective 30 days after it shall have been approved by a majority of the qualified electors of the Village of Union Springs voting on a proposition therefor to be submitted at a special election to be held in the Union Springs Village Hall, Union Springs, New York, on Monday, May 19, 1958, between the hours of 4 P.M. and 8 P.M. continuously.

STATE OF NEW YORK )
COUNTY OF CAYUGA ) SS:
VILLAGE OF UNION SPRINGS )

I, Ruth Fitzgerald, as Village Clerk of the Village of Union Springs, New York, do hereby certify:

That the above ordinance was approved by a majority of the qualified electors of the Village of Union Springs voting on a proposition therefor submitted at a special election held in the Union Springs Village Hall, Union Springs, New York, on Monday, May 19, 1958, between the hours of 4 P.M. and 8 P.M. continuously.

DATED: May 19, 1958

Ruth Fitzgerald
Union Springs Village Clerk

STATE OF NEW YORK
COUNTY OF CAYUGA SS:

Ruth Fitzgerald being duly sworn deposes and says that she is the Village Clerk of the Village of Union Springs in the County of Cayuga and State of New York.

That on the 26th day of May, 1958 in the Village of Union Springs aforesaid, deponent personally posted a printed copy of the above ordinance conspicuously in each of three public places in said village as follows: Village Market; Smith's Jewelery Store

and the Red & White Store.

Ruth L. Fitzgerald

Sworn to before me, this

26th day of May, 1958.

NOTARY PUBLIC

OBERT D. JONES
ATTORNEY AT LAW
AUBURN, N.Y.

Exhibit C

## VILLAGE OF UNION SPRINGS
## CAYUGA COUNTY, NEW YORK

## ORDER TO REMEDY VIOLATIONS

Location  271 Cayuga St. Union Springs New York 13160

Map No. 141.05-1-3   Section 141.05   Block 1   Lot 3

Date  July 9   19 2013

To  Cayuga Nation of New York
(owner or authorized agent of owner)

Po Box 786 Seneca Falls NY 13148
(address of owner or authorized agent of owner)

PLEASE TAKE NOTICE there exists a violation of:

New York State Uniform Fire Prevention and Building Code _____

New York State Building Construction Code _____

Zoning Ordinances   X

Other Applicable Laws, Ordinances or Regulations   X

at premises hereinafter described in that  Operating Bingo without a
(state character of violation)

license Issued By the Village of Union Springs

in violation of  Games of Chance ordinance dated May 19, 1958
(state section of paragraph of applicable law, ordinance or regulation)

YOU ARE THEREFORE DIRECTED AND ORDERED to comply with the law and to remedy the conditions above mentioned

forthwith no later than the  26 th  day of  July   19 2013

Failure to remedy the conditions aforesaid with notice *in writing* of compliance to the Village of Union Springs, Factory St., Union Springs, NY 13160, and to comply with the applicable provisions of law may constitute an offense punishable by fine or imprisonment or both. PURSUANT to section 268 of the Village Law of the State of New York, the Village of Union Springs also may seek injunctive relief in the New York Supreme Court.

_____
Village of Union Springs Official

**From the Desk of Howard Tanner**

**Code Enforcement Officer**

**Village of Union springs**

June 24,2013

To:  Manager/Owner

If you are receiving this letter it has been deemed that in accordance with local laws and the fire code of New York State, your building is in need of a fire inspection.   All buildings with an occupant load of 50 people or more ,or that have areas of public assembly are subject to annual fire inspections.  All buildings that are open to the general public are subject to  fire inspections every 3 years.

These types of inspections are intended to protect the general health and safety of the public.

Please call 730-7439 to make an appointment

Sincerely,

Howard Tanner

Code enforcement officer

Exhibit D

1099 NEW YORK AVENUE NW  SUITE 900  WASHINGTON, DC  20001-4412

J E N N E R & B L O C K LLP

December 19, 2013

David W. DeBruin
Tel  202 639-6015
Fax 202 637-6375
ddebruin@jenner.com

Robert Williams
Acting Executive Director
New York State Gaming Commission
P.O. Box 7500
Schenectady, New York 12301-7500

Dear Mr. Williams:

We represent the Cayuga Indian Nation of New York ("the Nation").  As you know, on July 3, 2013, the Nation resumed "Class II" gaming operations at its licensed facility in Union Springs, New York, pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"). On that same day, we sent you a letter that sets forth the legal basis for those operations.  We are writing to inform you that, as of this date, the Nation has installed Class II electronic bingo machines at its licensed facility.

As I have emphasized previously, the Nation seeks at all times to work cooperatively with federal, state, and local officials and to comply with federal law and all applicable state and local laws.  However, to the extent that there is any allegation that the Nation's gaming operations are not authorized under IGRA, you should be aware that the United States has exclusive jurisdiction to enforce state criminal gambling laws in "Indian country."  Under 18 U.S.C. §1166(d), "[t]he United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country," unless a tribal-state compact provides otherwise.  That exclusive jurisdictional grant is broad, covering "all State laws pertaining to the licensing, regulation, or prohibition of gambling."  *Id.* §1166(a).  In effect, Section 1166 preempts all state criminal enforcement authority over gambling in Indian country and vests that enforcement authority exclusively in the federal government. *See, e.g., United States v. Cook*, 922 F.2d 1026, 1033–34 (2d Cir. 1991) ("[T]he statutory mechanism providing for the enforcement of the IGRA establishes exclusive federal jurisdiction over criminal prosecutions for violations of state [gambling] laws."); *Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 543–44 (8th Cir. 1996); *United States v. E.C. Investments, Inc.*, 77 F.3d 327, 330–31 (9th Cir. 1996); *United Keetoowah Band of Cherokee Indians v. State of Okl. ex rel. Moss*, 927 F.2d 1170, 1177 (10th Cir. 1991).

"Indian country" is a term of art defined by statute to include federally recognized reservation land.  *See* 18 U.S.C. §1151(a); *DeCoteau v. District County Court for Tenth Judicial Dist.*, 420 U.S. 425, 427–28 (1975) ("[Whether] lands are 'Indian country' ... depends upon whether the lands retained reservation status ...").  The New York Court of Appeals recently confirmed that the Nation's reservation continues to exist as a matter of federal law.  In so holding, the court observed that "every federal court to

Robert Williams
December 19, 2013
Page 2

consider the question" has reached the same conclusion and that the United States has consistently supported that position.  *See Cayuga Nation v. Gould*, 930 N.E.2d 233, 247 (N.Y. 2010).  Indeed, the United States most recently reiterated that position in an amicus brief filed in September 2013 in the Second Circuit.  *See* Letter Brief of United States, *Cayuga Indian Nation of N.Y. v. Seneca County, N.Y.*, No. 12-3723 (2d Cir. Sept. 30, 2013), at 4 n.1.  Accordingly, the Nation's reservation land is "Indian country" as defined in 18 U.S.C. §1151(a), and the United States has exclusive jurisdiction to enforce state or local gambling laws on that land.  A criminal action brought by the State would violate clearly established federal law, and would subject law enforcement to potential civil liability for damages and attorney's fees under 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

If you have any questions or concerns about the Nation's gaming operations, I urge you to notify us at once.  Thank you for your consideration.

Sincerely,

David W. DeBruin

cc:     Joseph A. D'Amico, Superintendent, New York State Police

1099 NEW YORK AVENUE NW  SUITE 900  WASHINGTON, DC  20001-4412                    J E N N E R & B L O C K LLP

December 19, 2013                                            David W. DeBruin
                                                             Tel  202 639-6015
                                                             Fax 202 637-6375
                                                             ddebruin@jenner.com

Cindy Altimus
Region Director
National Indian Gaming Commission
1441 L Street NW  Suite 9100
Washington, DC 20005

Dear Ms. Altimus:

        We represent the Cayuga Indian Nation of New York ("the Nation").  As you know, on July 3, 2013, the Nation resumed "Class II" gaming operations at its licensed facility in Union Springs, New York, pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"). On that same day, we sent you a letter that sets forth the legal basis for those operations.  We are writing to inform you that, as of this date, the Nation has installed Class II electronic bingo machines at its licensed facility.

        If you have any questions or concerns about the Nation's gaming operations, I urge you to notify us at once.  Thank you for your consideration.

                                                   Sincerely,

                                                   David W. DeBruin

cc:    Jonodev Osceola Chaudhuri, Acting Chairperson, National Indian Gaming Commission
       Michael Hoenig, Senior Counsel, National Indian Gaming Commission
       Hilary Tompkins, Solicitor, United States Department of the Interior
       Paula L. Hart, Director, Office of Indian Gaming, United States Department of the Interior

1099 NEW YORK AVENUE NW  SUITE 900  WASHINGTON, DC  20001-4412

J E N N E R & B L O C K LLP

December 19, 2013

David W. DeBruin
Tel  202 639-6015
Fax 202 637-6375
ddebruin@jenner.com

Chad Hayden
Village Attorney
Village of Union Springs
6569 State Route 90 North
Cayuga, NY 13034

Dear Mr. Hayden:

We represent the Cayuga Indian Nation of New York ("the Nation").  As you know, on July 3, 2013, the Nation resumed "Class II" gaming operations at its licensed facility in Union Springs, New York, pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"). On July 23, 2013, we sent you a letter that sets forth the legal basis for those operations, notwithstanding the Village's 1958 Games of Chance Ordinance.  In brief, under IGRA, the Nation is entitled to conduct bingo (and similar games) at its Union Springs facility, and state or local laws prohibiting or regulating those activities are preempted as a matter of federal law.  We are writing to inform you that, as of this date, the Nation has installed Class II electronic bingo machines at its licensed facility.

As I have emphasized previously, the Nation seeks at all times to work cooperatively with federal, state, and local officials and to comply with federal law and all applicable state and local laws.  However, to the extent that there is any allegation that the Nation's gaming operations violate the Village's Ordinance, you should be aware that the United States has exclusive jurisdiction to carry out criminal enforcement of state and local gambling laws in "Indian country."  Under 18 U.S.C. §1166(d), "[t]he United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country," unless a tribal-state compact provides otherwise.  That exclusive jurisdictional grant is broad, covering "all State laws pertaining to the licensing, regulation, or prohibition of gambling."  *Id.* §1166(a).  In effect, Section 1166 preempts all state and local criminal enforcement authority over gambling in Indian country and vests that enforcement authority exclusively in the federal government.  *See, e.g., United States v. Cook*, 922 F.2d 1026, 1033–34 (2d Cir. 1991) ("[T]he statutory mechanism providing for the enforcement of the IGRA establishes exclusive federal jurisdiction over criminal prosecutions for violations of state [gambling] laws."); *Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 543–44 (8th Cir. 1996); *United States v. E.C. Investments, Inc.*, 77 F.3d 327, 330–31 (9th Cir. 1996); *United Keetoowah Band of Cherokee Indians v. State of Okl. ex rel. Moss*, 927 F.2d 1170, 1177 (10th Cir. 1991).

"Indian country" is a term of art defined by statute to include federally recognized reservation land.  *See* 18 U.S.C. §1151(a); *DeCoteau v. District County Court for Tenth Judicial Dist.*, 420 U.S. 425,

Chad Hayden
December 19, 2013
Page 2

427–28 (1975) ("[Whether] lands are 'Indian country' ... depends upon whether the lands retained reservation status ...."). The New York Court of Appeals recently confirmed that the Nation's reservation continues to exist as a matter of federal law. In so holding, the court observed that "every federal court to consider the question" has reached the same conclusion and that the United States has consistently supported that position. *See Cayuga Nation v. Gould*, 930 N.E.2d 233, 247 (N.Y. 2010). Indeed, the United States most recently reiterated that position in an amicus brief filed in September 2013 in the Second Circuit. *See* Letter Brief of United States, *Cayuga Indian Nation of N.Y. v. Seneca County, N.Y.*, No. 12-3723 (2d Cir. Sept. 30, 2013), at 4 n.1. Accordingly, the Nation's reservation land is "Indian country" as defined in 18 U.S.C. §1151(a), and the United States has exclusive jurisdiction over the criminal enforcement of state or local gambling laws on that land.

The Nation seeks at all times to comply with all applicable federal, state, and local laws and to work cooperatively with federal, state, and local officials. Yet the Nation cannot lawfully be cited for violating a local ordinance whose application to the Nation is preempted by clearly established federal law. Any effort to enforce the Ordinance against the Nation's gaming activities would subject the Village and its Trustees to potential civil liability for damages and attorney's fees under 42 U.S.C. § 1983 and 42 U.S.C. § 1988; *see Pembaur v. Cincinnati*, 475 U.S. 469 (1986); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). We would welcome the opportunity to address any questions or concerns you may have about the Nation's gaming operations. Thank you for your consideration.

Sincerely,

David W. DeBruin

cc:     Howard Tanner, Village of Union Springs Code Enforcement Officer

1099 NEW YORK AVENUE NW  SUITE 900  WASHINGTON, DC  20001-4412            J E N N E R & B L O C K LLP

December 19, 2013

David W. DeBruin
Tel  202 639-6015
Fax 202 637-6375
ddebruin@jenner.com

Jon E. Budelmann
Cayuga County District Attorney
95 Genessee Street, First Floor
Auburn, New York 13021

Dear Mr. Budelmann:

 We represent the Cayuga Indian Nation of New York ("the Nation").  As you know, on July 3, 2013, the Nation resumed "Class II" gaming operations at its licensed facility in Union Springs, New York, pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"). On that same date, we sent you a letter that sets forth the legal basis for those operations.  We are writing to inform you that, as of this date, the Nation has installed Class II electronic gaming machines at its licensed facility.

 As I have emphasized previously, the Nation seeks at all times to work cooperatively with federal, state, and local officials and to comply with federal law and all applicable state and local laws.  However, to the extent that there is any allegation that the Nation's gaming operations are not authorized under IGRA, you should be aware that the United States has exclusive jurisdiction to enforce state and local gambling laws in "Indian country."  Under 18 U.S.C. §1166(d), "[t]he United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country," unless a tribal-state compact provides otherwise.  That exclusive jurisdictional grant is broad, covering "all State laws pertaining to the licensing, regulation, or prohibition of gambling." *Id.* §1166(a).  In effect, Section 1166 preempts all state enforcement authority over gambling in Indian country and vests that enforcement authority exclusively in the federal government. *See, e.g.,* *United States v. Cook*, 922 F.2d 1026, 1033–34 (2d Cir. 1991) ("[T]he statutory mechanism providing for the enforcement of the IGRA establishes exclusive federal jurisdiction over criminal prosecutions for violations of state [gambling] laws."); *Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 543–44 (8th Cir. 1996); *United States v. E.C. Investments, Inc.*, 77 F.3d 327, 330–31 (9th Cir. 1996); *United Keetoowah Band of Cherokee Indians v. State of Okl. ex rel. Moss*, 927 F.2d 1170, 1177 (10th Cir. 1991).

 "Indian country" is a term of art defined by statute to include federally recognized reservation land. *See* 18 U.S.C. §1151(a); *DeCoteau v. District County Court for Tenth Judicial Dist.*, 420 U.S. 425, 427–28 (1975) ("[Whether] lands are 'Indian country' … depends upon whether the lands retained reservation status …."). The New York Court of Appeals recently confirmed that the Nation's reservation continues to exist as a matter of federal law.  In so holding, the court observed that "every federal court to consider the question" has reached the same conclusion and that the United States has consistently supported that position. *See Cayuga Nation v. Gould*, 930 N.E.2d 233, 247 (N.Y. 2010).  Indeed, the

Jon E. Budelmann
December 19, 2013
Page 2

United States most recently reiterated that position in an amicus brief filed in September 2013 in the Second Circuit.  *See* Letter Brief of United States, *Cayuga Indian Nation of N.Y. v. Seneca County, N.Y.*, No. 12-3723 (2d Cir. Sept. 30, 2013), at 4 n.1.  Accordingly, the Nation's reservation land is "Indian country" as defined in 18 U.S.C. §1151(a), and the United States has exclusive jurisdiction to enforce state or local gambling laws on that land.  A criminal action brought by your office would violate clearly established federal law, and would subject law enforcement to potential civil liability for damages and attorney's fees under 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

We would welcome the opportunity to address any questions or concerns you may have about the Nation's gaming operations.  Thank you for your consideration.

Sincerely,

David W. DeBruin

cc:   Hon. David S. Gould, Cayuga County Sheriff
      Hon. Richard S. Hartunian, United States Attorney, Northern District of New York
      Mr. Grant Jaquith, First Assistant, United States Attorney's Office, Northern District of New York
      Hon. William J. Hochul, Jr., United States Attorney, Western District of New York

# Exhibit E

Nexus 7 from $229
www.google.com/nexus
The 7" tablet from Google. Free shipping for limited time. Buy now.



24°

TRIBAL AFFAIRS

# Union Springs attorney: Village aims to shut down Cayugas' gaming hall, seize machines

DECEMBER 20, 2013 3:06 PM • ROBERT HARDING | ROBERT.HARDING@LEE.NET

One day after the Cayuga Indian Nation **reopened its gaming facility in Union Springs**, an attorney for the village said they will take action despite claims from the tribe that they are complying with local laws.

Attorney Chad Hayden said the village hasn't conducted a codes inspection of the facility, but the Cayugas opened LakeSide Entertainment without a certificate of occupancy or a certificate of zoning compliance.

Hayden said if the Cayugas fail to comply with local and state laws, they will move to shut down the gaming hall and seize more than 80 electronic bingo machines.

"Initially, we'll send them a notice of violation," Hayden said. "That will give them a reasonable time to comply and then we'll proceed to court."

When asked Thursday if the Cayugas were abiding by all of the necessary laws and ordinances to reopen LakeSide Entertainment, a spokesman for the tribe said the facility "is in full compliance with all applicable local zoning laws."

But Hayden said the Cayugas, among other things, have failed to abide by the village's bingo ordinance. The bingo ordinance requires any entity running bingo games to obtain a license from the village.

The Cayugas first opened LakeSide Entertainment in 2004 after several legal challenges and stop-work orders.

One year later, a judge lifted an injunction that allowed the tribe to open the gaming hall without local regulation. As a result of the judge's action, the tribe decided to close LakeSide.

LakeSide remained closed until July of this year, when the Cayugas temporarily reopened the facility. The tribe closed the facility again before reopening it Thursday.

**UPDATE**: A spokesman for the Cayuga Nation said the tribe's architect filed for a certificate of occupancy and submitted zoning compliance paperwork with the village. He added that the village is free to inspect the facility, which they are anticipating.

Exhibit F

**VILLAGE OF UNION SPRINGS**
**CAYUGA COUNTY, NEW YORK**

# ORDER TO REMEDY VIOLATIONS

Location _271 Cayuga St    Union Springs    New York 13160_

Map No. _141.05 - 1- 3_    Section _141.05_    Block _1_    Lot _3_

Date _December 20_    19 _2013_

To _Cayuga Nation of NY_
(owner or authorized agent of owner)

_Po Box 786 Seneca Falls NY 13148_
(address of owner or authorized agent of owner)

PLEASE TAKE NOTICE there exists a violation of:

New York State Uniform Fire Prevention and Building Code _____

New York State Building Construction Code _____

Zoning Ordinances _____

Other Applicable Laws, Ordinances or Regulations _____

at premises hereinafter described in that _no change shall be made in the nature_
(state character of violation)

_of the occupancy of an Existing Building unless a Certificate of_
_occupancy authorizing the change has been made_

in violation of _Title 19 NYCRR Section 1202.3_
(state section of paragraph of applicable law, ordinance or regulation)

YOU ARE THEREFORE DIRECTED AND ORDERED to comply with the law and to remedy the conditions above mentioned

forewith no later than the _28 th_ day of _December_    19 _2013_

Failure to remedy the conditions aforesaid with notice *in writing* of compliance to the Village of Union Springs, Factory St., Union Springs, NY 13160, and to comply with the applicable provisions of law may constitute an offense punishable by fine or imprisonment or both. PURSUANT to section 268 of the Village Law of the State of New York, the Village of Union Springs also may seek injunctive relief in the New York Supreme Court.

Village of Union Springs Official

# VILLAGE OF UNION SPRINGS
## CAYUGA COUNTY, NEW YORK

# ORDER TO REMEDY VIOLATIONS

Location _271 Cayuga St. Union Springs New York 13160_

Map No. _141.05-1-3_   Section _141.05_   Block _1_   Lot _3_

Date _December 20_   19 _2013_

To _Cayuga Nation of NY_
(owner or authorized agent of owner)

_PO Box 786 Seneca Falls NY 13148_
(address of owner or authorized agent of owner)

PLEASE TAKE NOTICE there exists a violation of:

New York State Uniform Fire Prevention and Building Code _____

New York State Building Construction Code _____

Zoning Ordinances _X_

Other Applicable Laws, Ordinances or Regulations _X_

at premises hereinafter described in that _Operating Games of Chance Is not_
(state character of violation)

_permitted In the Village of Union Springs_

in violation of _Games of Chance ordinance Dated May 19, 1958_
(state section of paragraph of applicable law, ordinance or regulation)

YOU ARE THEREFORE DIRECTED AND ORDERED to comply with the law and to remedy the conditions above mentioned

forewith no later than the _28th_ day of _December_ 19 _2013_

Failure to remedy the conditions aforesaid with notice *in writing* of compliance to the Village of Union Springs, Factory St., Union Springs, NY 13160, and to comply with the applicable provisions of law may constitute an offense punishable by fine or imprisonment or both. PURSUANT to section 268 of the Village Law of the State of New York, the Village of Union Springs also may seek injunctive relief in the New York Supreme Court.

_____
Village of Union Springs Official

or upon the issuance of a certificate of occupancy (other than a temporary certificate of occupancy) or upon the issuance of a certificate of completion, whichever occurs first. A demolition permit issued pursuant to this Part for the purpose of removing or demolishing any building or structure shall expire six months from the date of issuance or upon the issuance of a certificate of completion of the permitted work, whichever occurs first. A building permit may, upon written request, be renewed for successive one year periods. A demolition permit may, upon written request, be renewed for successive six month periods. Renewals of permits may be granted only if:

  (1)  the permit has not been revoked or suspended at the time the application for renewal is made;

  (2)  the relevant information in the application is up to date; and

  (3)  any applicable renewal fee is paid.

§1202.3  Certificates of Occupancy and Completion.

  (a) Upon completion of all projects for which a building or demolition permit has been issued, the property owner shall obtain a certificate of occupancy or completion. No building erected subject to the Uniform Code and this Part shall be used or occupied, except to the extent provided in this section, until a certificate of occupancy has been issued. No building similarly enlarged, extended, or altered, or upon which work has been performed which required the issuance of a building or demolition permit shall be occupied or used for more than 30 days after the completion of the alteration or work unless a certificate of occupancy or certificate of completion has been issued.

  (b) No change shall be made in the nature of the occupancy of an existing building unless a certificate of occupancy authorizing the change has been issued. The owner or occupant of such building must demonstrate that such change will conform with all applicable provisions of the Uniform Code before a certificate of occupancy will be issued.

  (c) A temporary certificate of occupancy may be issued if the building or structure or a designated portion of a building or structure is sufficiently complete so that it may be safely put to the use for which it is intended. A temporary certificate of occupancy shall expire six months from the date of issuance or at an earlier date if specified thereon. A temporary certificate of occupancy may, at the discretion of the Department of State, be renewed an indefinite number of times.

  (d) No certificate of occupancy or completion shall be issued unless:

    (1) an inspection is conducted which indicates substantial completion of any work for which a permit has been issued;

    (2) no uncorrected deficiency or material violation of the Uniform Code is

Exhibit G

# Village of Union Springs
## P.O. Box 99
## Union Springs, New York  13160
INCORPORATED 1848
(315) 889-7341 • Fax (315) 889-7342

March 24, 2014

B.J. Radford
Manager, Lakeside Entertainment
Lakeside Enterprises of the Cayuga Nation
P.O. Box 786
Seneca Falls, New York 13148

Dear Mrs. Radford,

You are still in violation of the zoning law of the Village of Union Springs and the 1958 games of chance ordinance which prohibits bingo in the Village. Until this matter is resolved I cannot grant a certificate of occupancy.

In order to come into compliance with the zoning law, you will have to obtain a use variance from the zoning board of appeals. In order to come into compliance with the bingo ordinance, you will have to obtain a permit from the Village of Union Springs board.

You have ten (10) days from today's date to commence those applications.

Sincerely,

Howard Tanner
Village of Union Springs
Code Enforcement Officer