# Exhibit B

# National Indian Gaming Commission

About Us · Regional Offices · Tribal Data · Laws & Regulations · Resources · FOIA · Contact Us

Chairwoman Bonnie Akaka-Smith
Pyramid Lake Paiute Tribe
PO Box 256
Nixon, NV 89424

Attorney General Brian Sandoval
State of Nevada
Office of the Attorney General
Gaming Division
3476 Executive Pointe Way, Suite 13
Carson City, NV 89706

Re: Gaming on fee land at Pyramid Lake Paiute Indian Reservation

Dear Chairwoman Akaka-Smith and Attorney General Sandoval:

The NIGC Office of General Counsel (OGC) has received requests from both of you for an opinion on whether gaming conducted on fee lands within the exterior boundaries of the Tribe's reservation is Indian gaming under the IGRA. It is our understanding that a family by the name of Crosby owns fee land[1] within the reservation and operates a small gambling operation, the Crosby Lodge, with approximately 15 slot machines. The Tribe licenses the gaming and collects fees both quarterly and annually. The Tribe and the State of Nevada have a Class III Gaming Compact set to expire on January 6, 2006. The Crosby Lodge is the only gaming activity on the Tribe's reservation.

We have evaluated the history of the Tribe's reservation and statutory language of IGRA, and we conclude that the land owned by the Crosby family is Indian lands and that the gaming is Indian gaming under IGRA.

Background

The existence of fee lands within the Tribe's Reservation is the result of the land's history. The Tribe first had official contact with non-Indian settlers in January of 1844. Historical journal entries and reports indicate non-Indian contact as early as 1827 in the Humboldt River Basin. The U.S. General Land Office (Utah Territory) set aside land for the benefit of the Tribe on December 8, 1859. This land was withdrawn from the public domain for the preservation of the livelihood of the Tribe. From 1861 through 1885, a number of non-Indian white settlers encroached and settled on these lands. Some of the best lands were inhabited by squatters who believed it was their right to settle on the Tribe's lands.

In 1868, the Central Pacific Railroad was completed, a portion of which ran through

the Tribe's reservation. The railroad company established a rail station at the Big Bend of the Truckee River and later founded the present-day town of Wadsworth. The railroad company acquired rights-of-way for its rail course across fee lands in the southern part of the Tribe's reservation.

Since the early 1860s the Indian Agent of the Utah Territory had tried unsuccessfully to evict the non-Indians who were trespassing on the land reserved for the Tribe. In 1874, President Ulysses Grant issued an Executive Order confirming the establishment of the Tribe's reservation. The Order confirms the date of the reservation's establishment as December 8, 1859.

In 1916, lawsuits were filed against the non-Indian settlers who were considered to be trespassing on the Tribe's reservation. The 68th U.S. Congress enacted, "A bill for the relief of settlers and town-site occupants of certain lands in the Pyramid Lake Indian Reservation, Nevada." The Act provided for the sale of any land that had been settled upon or occupied for at least twenty-one (21) years. Settlers would pay $1.25 per acre and in return be granted certain lands in fee simple status.

By 1935, many settlers had become delinquent on their land payments to the U.S. government. In a pair of related decisions, the Ninth Circuit Court of Appeals upheld the United States' efforts to eject these non-Indians from the reservation and awarded possession of the land back to the Tribe. See *U.S. v. Garaventa Land & Livestock, Co.*, 129 F.2d 216 (9th Cir. 1942); *U.S. v. Depoali*, 139 F.2d 225 (9th Cir. 1943). The Supreme Court denied certiorari in 1944. *Depoali v. U.S.*, 321 U.S. 796 (1944). In 1951, the non-Indian white residents began vacating the lands. By 1956, the lands were assigned to the Tribe's members. Today, less than one percent (1%) of the Tribe's reservation lands remains in fee status.

Applicable Law

IGRA explicitly defines "Indian lands" as follows:

> (A) all lands within the limits of any Indian reservation; and
> (B) any lands title to which is either held in trust by the United States for the benef tribe or individual subject to restriction by the United States against alienation power.

25 U.S.C. § 2703(4).

NIGC regulations further clarify the Indian lands definition, providing that:

> Indian lands means:
> (a) Land within the limits of an Indian reservation; or
> (b) Land over which an Indian tribe exercises governmental power and that is either --
> > (1) Held in trust by the United States for the benefit of any Indian tribι individual; or
> > (2) Held by an Indian tribe or individual subject to restriction by the United States against alienation.

25 C.F.R. § 502.12. Generally, lands that do not qualify as Indian lands under IGRA are subject to state gambling laws. See *National Indian Gaming Commission: Definitions Under the Indian Gaming Regulatory Act*, 57 Fed. Reg. 12382, 12388 (1992).

Further, IGRA gives tribes the exclusive right to regulate gaming on Indian lands, specifically providing that:

> Indian tribes have the exclusive right to regulate gaming activity on Indian lan prohibited by Federal law and is conducted within a State which does not, as such gaming activity.

25 U.S.C. § 2701 (5). IGRA further clarifies the jurisdiction of Tribes as to the different class of gaming stating that:

(1) Class I gaming on Indian lands is within the exclusive jurisdiction of the In the provisions of this chapter.
(2) Any class II gaming on Indian lands shall continue to be within the jurisdic subject to the provisions of this chapter.

25 U.S.C. § 2710(a)(1)(2). The requirements for Class III gaming likewise state:

(1) Class III gaming activities shall be lawful on Indian lands only if such activ
  (A) authorized by an ordinance or resolution that
    (i) is adopted by the governing body of the Indian tribe having juri:
  (C) conducted in conformance with a Tribal-State compact entered int paragraph
    (3) that is in effect.

25 U.S.C. § 2710(d)(1)(A)(C).

Analysis

OGC recently revised its analytic approach to Indian lands within reservation boundaries. (See Indian lands opinion letter to Judith Kammins Albeitz, Esq. from Penny J. Coleman, Acting General Counsel, Dated June 30, 2005).[2] The analysis used through the past few years included a two-part determination whenever an Indian lands questions was raised – OGC looked first to determine whether the lands constituted Indian lands; OGC then looked to whether the tribe exercised jurisdiction over those lands. This two-part analysis was driven by the outcome in *Kansas v. United States*, 86 F. Supp. 2d 1094 (D. Kan. 2000), *aff'd* 249 F.3d 1213 (10th Cir. 2001)(*Miami III*). That Court held the NIGC's failure to focus on the threshold question of whether the tribe possessed jurisdiction over a tract of land rendered the ultimate conclusion arbitrary and capricious. *Id*. Despite this holding, the NIGC has concluded that, in some instances IGRA's preemptive effect negates the need for a complete jurisdictional analysis. IGRA specifically defines Indian lands as any "[l]ands within the

limits of an Indian Reservation." This finding is a prerequisite for a tribe to lawfully conduct gaming under IGRA. IGRA gives tribes the exclusive right to regulate gaming on Indian lands if the Indian lands in question are within "such tribe's jurisdiction." A tribe is presumed to have jurisdiction over its own reservation. Therefore, if the gaming is to occur within a tribe's reservation, under IGRA, we can presume that jurisdiction exists. (See Letter to Judith Kammins Albeitz, Esq. at page 6).

The particular question at issue here is whether the non-Indian owned fee land, which is within the exterior boundaries of the Pyramid Lake reservation, falls within the "limits" of the reservation and meets the definition of Indian lands under IGRA, 25 U.S.C. § 2703(4)(A), and NIGC's regulations, 25 C.F.R. §502.12(a). Case law supports the view that "all land within the limits of any Indian reservation" as used in the Indian country statute, 18 U.S.C. § 1151(a) means all lands – including fee lands – within the boundaries of a reservation. "Indian country" as defined at 18 U.S.C. § 1151 (a), means "*all land within the limits of any Indian reservation* under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." *Solem v. Bartlett*, 465 U.S. 463, 468 (1984) (Emphasis added); *see also City of Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554, 557 (8th Cir. 1993) ("[T]he general definition of Indian country in § 1151 …. includes all fee lands within reservations.") The IGRA definition of "Indian lands" in 25 U.S.C.

§ 2703(4)(A) is identical to the highlighted language in 18 U.S.C. § 1151(a). Because the pertinent language in both statutes is identical, these cases support the notion that "all land within the limits of any Indian reservation" as used in IGRA means lands within the boundaries of a reservation. We therefore conclude that the land at issue falls within the "limits" of the Tribe's reservation and meets the definition of Indian lands under IGRA and NIGC regulations.

This conclusion is consistent with our recent opinion regarding gaming on fee land at the White Earth Reservation in Minnesota (see Memorandum to NIGC Acting General Counsel Re: Tribal jurisdiction over gaming on fee land at White Earth Reservation, dated March 14, 2005) and with our Buena Vista opinion regarding gaming on fee land. In our White Earth opinion, we determined that the State of Minnesota lacked jurisdiction over gaming on the White Earth Reservation because the gaming took place within the exterior boundaries of the reservation; the gaming was therefore Indian gaming under IGRA, which pre-empts state jurisdiction. As the White Earth Band was undisputedly the only tribe exercising jurisdiction over the land at White Earth, that Tribe met IGRA's requirement that it be the tribe with jurisdiction over the Indian lands at issue. In our Buena Vista opinion, we similarly held that the fee land within the exterior boundaries of the Buena Vista Rancheria fell within the "limits" of the reservation and met the definition of Indian lands under the IGRA, 25 U.S.C. § 2703(4)(A), and NIGC's regulations, 25 C.F.R. §502.12(a).

We note that IGRA's jurisdiction is not limited to gaming conducted by tribal entities or members. Rather, IGRA's jurisdiction runs with the land and allows gaming, even by non-tribal entities, that is conducted on Indian lands. 25 U.S.C. § 2710(b)(4)(A) ("A tribal ordinance or resolution may provide for the licensing or regulation of class II gaming activities owned by any person or entity other than the Indian tribe and conducted on Indian lands, only if the tribal licensing requirements include the requirements described [below]…and are at least as restrictive as those established by State law…."). Gaming by non-tribal entities must meet certain requirements,

however, for example, that 60 percent of the proceeds go to the tribe. See 25 U.S.C. § 2710(b)(4)(B). These same requirements apply to class III gaming. See 25 U.S.C. §2710(d)(1)(A)(ii).

Because IGRA's applicability is determined by the character of the land on which gaming is conducted rather than by who is conducting the gaming, we note that the situation at hand is not governed by the line of cases analyzing whether tribes have jurisdiction over non-members on non-Indian owned fee land within the reservation. The primary case in this line of cases is *Montana v. United States*, 450 U.S. 544 (1981). *Montana* and its progeny stand for the proposition that "...the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe. *Montana*, 450 U.S. at 565. *See also Brendale v. Confederate Tribe and Bands of the Yakima Indian Nation*, 492 U.S. 408 (1989); *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997) (reaffirming *Montana* analysis in questions of tribal adjudicatory authority).[3] Because Congress has made IGRA's application dependent upon whether the gaming is conducted on Indian lands, not upon whether the gaming is conducted by Indian or non-Indian people, we need not engage in a jurisdiction analysis under *Montana*.

We do, however, need to evaluate jurisdiction in the sense that we need to determine whether the Pyramid Lake Tribe is the tribe that exercises jurisdiction over the land at Pyramid Lake. IGRA states that a tribe may engage in Class II gaming "on Indian lands within such tribe's jurisdiction" if, among other things, the tribe has an ordinance approved by NIGC's Chairman. 25 U.S.C. §2710(b)(1). The requirements for conducting Class III gaming likewise state: "Class III gaming activities shall be lawful on Indian lands only if such activities are (A) authorized by an ordinance or resolution that (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands...." 25 U.S.C. §2710(d)(1).

The context of IGRA's prescriptions as to jurisdiction—that land be within "such tribe's jurisdiction" and ordinances adopted by "the Indian tribe having jurisdiction over such lands"—indicates that Congress intended that gaming on any specific parcel of Indian lands not be conducted by any Indian tribe, but only by the specific tribe or tribes with jurisdiction over that land. See, e.g., *Williams v. Clark* 742 F.2d 549 (9th Cir. 1984), *cert. denied sub nom. Elvrum v. Williams*, 471 U.S. 1015 (1985)(Both Quileute and Quinault tribes exercise jurisdiction over the Reservation, and either may be considered the "tribe in which lands are located" for purposes of Indian Reorganization Act § 4). Since the Pyramid Lake Tribe is undisputedly the only tribe exercising jurisdiction over the land at Pyramid Lake, the Tribe meets IGRA's requirements for jurisdiction over the Indian lands at issue.

The gaming at Pyramid is conducted within the limits of the reservation and is thus on Indian land.

Sincerely,

Penny J. Coleman
Acting General Counsel

cc:  Brian Gunn and Kevin Wadzinski
     Gardner Carton & Douglas

1301 K. Street, NW
Suite 900 East
Washington, DC 20005-3317

---

[1] The legal description of the land is as follows: FRAC N1/2 of SE ¼ of NE ¼ of Section 15, Township 24N, Range 21E. The address is 30605 Sutcliffe Drive, Reno, Nevada, 89510.

[2] This Indian lands opinion addressed the question whether fee land within the exterior boundaries of the Buena Vista Rancheria qualifies as reservation land and therefore as Indian land upon which the Rancheria may game. We concluded that it does.

[3] The *Montana* court acknowledged that "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands" *(Montana* at 565), it established two important exceptions to its general rule that jurisdiction does not extend to nonmembers. The first exception is for nonmembers who have certain agreements with a tribe; the second is for activities by nonmembers that threaten a tribe's well-being:

A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers *who enter consensual relationships with the tribe or members,* through commercial dealing, contracts, leases, or other arrangements [cites omitted]. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation *when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe* [emphases added].

450 U.S. at 565-566; *cited with approval Atkinson Trading Co. v. Shirley,* 532 U.S. 645, 651 (2001).

Were a *Montana* analysis necessary, we would find that the Tribe has jurisdiction. The gaming conducted on fee land within the Pyramid Lake reservation meets this exception by virtue of the agreement between the Tribe and the Cosby family for gaming fees and slot machine taxes the tribe collects from the gaming operated by the Crosby family. (These fees and taxes represents the specific kind of consensual economic agreement between non-members and a Tribe that the *Montana* Court upheld: a "tribe may regulate, through *taxation,* licensing, or other means, the activities of nonmembers…through *commercial dealing,* contracts, leases, or other arrangements."

450 U.S. at 565.

About Us | Regional Offices | Tribal Data | Laws & Regulations | Resources | FOIA | Contact Us | Search | Text Only | Employee Login

1441 L. Street NW Suite 9100, Washington DC 20005 Tel.: (202) 632-7003  Fax: (202) 632-7066
E-mail with Questions, Comments, or Suggestions   Privacy Statement