# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| CAYUGA NATION<br>AND JOHN DOES 1-20,<br><br>Plaintiffs,<br><br>v.<br><br>HOWARD TANNER, VILLAGE<br>OF UNION SPRINGS CODE ENFORCEMENT<br>OFFICER, IN HIS OFFICIAL CAPACITY;<br>EDWARD TRUFANT, VILLAGE OF UNION<br>SPRINGS MAYOR, IN HIS OFFICIAL<br>CAPACITY; CHAD HAYDEN, VILLAGE OF<br>UNION SPRINGS ATTORNEY, IN HIS<br>OFFICIAL CAPACITY; BOARD OF<br>TRUSTEES OF THE VILLAGE OF UNION<br>SPRINGS, NEW YORK; AND THE VILLAGE<br>OF UNION SPRINGS, NEW YORK,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No.: 5:14-cv-1317-DNH-ATB |

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
# DEFENDANTS' CROSS-MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................ 3

I.       RES JUDICATA DOES NOT BAR THIS ACTION. ........................................... 3

II.      THE COURT HAS SUBJECT MATTER JURISDICTION OVER THIS
         ACTION, AND JURISDICTION IS NOT DESTROYED BY THE
         VILLAGE'S ASSERTION OF A LEADERSHIP DISPUTE WITHIN
         THE CAYUGA NATION. ............................................................................ 9

         A.       The Court Has Subject Matter Jurisdiction, And The Individuals
                  Who Authorized This Suit May Sue To Protect The Nation's
                  IGRA Rights. ........................................................................... 10

         B.       Even If the Court Retains Questions About The Nation's Status, It
                  Cannot Dismiss the Nation As A Plaintiff. ...................................... 17

CONCLUSION ..................................................................................................... 20

# TABLE OF AUTHORITIES

**CASES**

*A.H. Bull Steamship Co. v. National Marine Engineers' Beneficial Ass'n AFL-CIO*, 250 F.2d 332 (2d Cir. 1957)..................................................................................................19

*Arizona v. Tohono O'odhom Nation*, No. CV-11-0296, 2011 WL 2357833 (D. Ariz. June 15, 2011) ........................................................................................................................18

*Barnes v. White*, 494 F. Supp. 194 (N.D.N.Y. 1980) ....................................................11

*Bowen v. Doyle*, 880 F. Supp. 99 (W.D.N.Y. 1995), *superseded by statute*, *Peters v. Noonan*, 871 F. Supp. 2d 218 (W.D.N.Y. 2012) ......................................................10, 16

*Camreta v. Greene*, 131 S. Ct. 2020 (2011) ............................................................12, 14

*Cayuga Indian Nation of New York v. Eastern Regional Director, BIA*, 58 IBIA 171 (2014)................................................................................................................12, 14, 15

*Cayuga Indian Nation of New York v. Gould*, 14 N.Y.3d 614 (2010)..........................16

*Cayuga Indian Nation of New York v. Seneca County*, 761 F.3d 218 (2d Cir. 2014) .................16

*Cayuga Indian Nation of New York v. Village of Union Springs*, 390 F. Supp. 2d 203 (N.D.N.Y. 2005) ........................................................................................................4, 5

*Cayuga Indian Nation of New York v. Village of Union Springs*, 317 F. Supp. 2d 128 (N.D.N.Y. 2004) ..........................................................................................................5

*Crowe v. Eastern Band of Cherokee Indians, Inc.*, 506 F.2d 1231 (4th Cir. 1974).....................11

*Computer Associates International, Inc. v. Altai, Inc.*, 126 F.3d 365 (2d Cir. 1997)....................5

*George v. Eastern Regional Director, BIA*, 49 IBIA 164 (2009) ..................................11

*Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51 (2d Cir. 1994) ..........................18

*Grand Traverse Band of Ottawa & Chippewa Indians v. United States Attorney for Western District of Michigan*, 46 F. Supp. 2d 689 (W.D. Mich. 1999)..................................18

*Harkins Amusement Enterprises, Inc. v. Harry Nace Co.*, 890 F.2d 181 (9th Cir. 1989) ..............5

*Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955).....................................7

*Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262 (S.D.N.Y. 2012) ........12, 14

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) .....................................6

*Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457 (2d Cir. 2013) ..............................8

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 175 F. Supp. 2d 593 (S.D.N.Y. 2001) ..........................................................................18

*Motah v. United States*, 402 F.2d 1 (10th Cir. 1968) ..................................................11

*New York v. Jewell*, No. 6:08–CV–0644, 2013 WL 7853439 (N.D.N.Y. Sept. 11, 2013), *declined to adopt as moot*, 2014 WL 841764 (N.D.N.Y. Mar. 4, 2014) ................................12

*New York v. Jewell*, No. 6:08–CV–0644, 2014 WL 841764 (N.D.N.Y. Mar. 4, 2014) ...............13

*Oneida Indian Nation of New York v. New York*, 194 F. Supp. 2d 104 (N.D.N.Y. 2002).......3, 6, 7

*Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644 (2003) .............19

*Pike v. Freeman*, 266 F.3d 78 (2d Cir. 2001) .........................................................3, 4, 7

*In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litigation*, 340 F.3d 749 (8th Cir. 2003).......................................................................................11

*Sac & Fox Tribe of the Mississippi in Iowa, Election Board v. Bureau of Indian Affairs*, 439 F.3d 832 (8th Cir. 2006) ..................................................................14

*SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450 (2d Cir. 1996)...............................4, 8

*Shenandoah v. United States Department of Interior*, 159 F.3d 708 (2d Cir. 1998) ......................................................................10, 11, 16, 17, 18, 19

*Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370 (2d Cir. 2003) ....................................5, 6

*Tarbell v. Department of Interior*, 307 F. Supp. 2d 409 (N.D.N.Y. 2004)............................10, 16

*TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493 (2d Cir. 2014) ..................................3, 5, 8, 9

*Thyroff v. Nationwide Mutual Insurance Co.*, No. 05-CV-6607T, 2006 WL 2827082 (W.D.N.Y. Sept. 29, 2006) .......................................................................9

*Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935 (D.C. Cir. 2012) ...........................11

*United States v. 43.47 Acres of Land, More or Less, Situated in County of Litchfield*, 896 F. Supp. 2d 151 (D. Conn. 2012), *aff'd*, No. 12-4544, __ F. App'x __, 2014 WL 7011937 (2d Cir. Dec. 15, 2014) ..............................................................18

*Visual Sciences, Inc. v. Integrated Communications Inc.*, 660 F.2d 56 (2d Cir. 1981)................19

*Wheelabrator Corp. v. Chafee*, 455 F.2d 1306 (D.C. Cir. 1971) ..................................19

*Williams v. Perry*, 229 F.3d 1136, 2000 WL 1506086 (2d Cir. 2000) (unpublished table decision) ........................................................................................................................6, 8

**STATUTES**

18 U.S.C. § 1166 ..............................................................................................................9

18 U.S.C. § 1166(d) ..........................................................................................................9

25 U.S.C. § 2710(b) ..........................................................................................................8

**OTHER AUTHORITIES**

25 C.F.R. § 2.6(a) ..........................................................................................................12

25 C.F.R. § 2.6(b) ..........................................................................................................12

25 C.F.R. § 556.5 ............................................................................................................14

25 C.F.R. § 556.6 ............................................................................................................14

25 C.F.R. § 558.2 ............................................................................................................14

25 C.F.R. § 558.2(c) ........................................................................................................14

25 C.F.R. § 559.1 *et seq.* ............................................................................................8, 14

http://www.nigc.gov/Reading_Room/Gaming_Ordinances.aspx ....................................14

**INTRODUCTION**

The Village's arguments for dismissal have nothing to do with the merits, but seek only to deny Plaintiffs a fair chance to protect the exercise of their federal rights.  First, the Village insists that the Cayuga Nation's 2003 lawsuit renders this one res judicata, even though the Nation *could not have raised* its present claims in 2003.  Second, in an argument with potentially devastating consequences for all Indian nations, the Village insists that the leadership dispute within the Nation deprives the Court of jurisdiction – even though controlling precedent holds that Plaintiffs may maintain this action and that dismissal would be inappropriate.  The Court should reject the Village's attempts to deprive Plaintiffs of their day in court.

As to res judicata, the Village principally maintains that Plaintiffs' claims are barred because they *should* have been brought in the 2003 action.  But the Village cannot establish that affirmative defense, because the Nation *could not* have raised its present claims in 2003.  The 2003 action arose out of orders that the Nation comply with certain building and construction laws in the course of renovating the building that later became Lakeside Entertainment.  It would have been nonsensical for the Nation to make claims in 2003 concerning gaming at Lakeside Entertainment, or the application of anti-gaming laws.  When the Nation commenced that action, the Village had not invoked its anti-bingo ordinance (or any anti-gaming law); IGRA preemption would not have been a defense to the building and construction laws that the Village *had* invoked; and the Nation was not conducting any gaming and had not even satisfied IGRA's legal preconditions for doing so.  The Nation's current claims arose only in 2013 and 2014, when the Village issued new threats with a new legal basis against Lakeside Entertainment.  The Court should not endorse the Village's attempts to avoid a ruling on the merits.

1

No more persuasive is the Village's argument that the leadership dispute within the Cayuga Nation requires dismissal for want of jurisdiction.  To begin with, the Village ignores that Plaintiffs include not just the Nation, but also individual Nation officials and employees who are at risk of criminal or civil penalties.  But even as to the Nation, it is plain that the suit can proceed.  Federal courts do not simply dismiss every suit by a tribe subject to a leadership dispute.  Rather, they defer to the judgment of the Department of Interior and the Bureau of Indian Affairs ("BIA") – and here, the last operative decision confirms that Mr. Halftown and Mr. Twoguns may advance the Nation's interests in federal court.  That operative decision is why Mr. Halftown and Mr. Twoguns (together with Mr. Wheeler) have in fact been able to exercise the Nation's IGRA rights under the oversight of the National Indian Gaming Commission ("NIGC").  The Village's position that they cannot protect those same rights in court is not just wrong, but portends grave consequences even beyond the Cayuga Nation: under the Village's approach, the courthouse doors slam shut to any Indian nation facing a leadership dispute.

Finally, even if the Court had some doubt about whether this suit can properly proceed in the name of the Cayuga Nation, that still is no reason to dismiss the case.  As the Court is aware, both sides in the Nation's leadership dispute have asked BIA to render a new leadership determination.  BIA has now promised such a determination by no later than February 20 – just over three weeks after this motion is scheduled to be heard.  Given that a new BIA decision is on the horizon, dismissal would be all the more inappropriate.  Instead, to the extent that the Court has any doubt about whether the Nation has properly brought this lawsuit, the Court may simply defer ruling on the Village's motion until BIA has reached a decision.

## ARGUMENT

### I.   RES JUDICATA DOES NOT BAR THIS ACTION.

The Village's lead argument for dismissal is that this action is barred by res judicata, solely on the basis of the action that the Nation filed against the Village in 2003.  The claims raised in this lawsuit, the Village maintains, should have been brought in that earlier proceeding and are therefore barred.  That argument fails, for the Nation *could not* have brought its current claims in the 2003 action. This action stems from different Village orders; raises an IGRA preemption claim that was not a defense to the construction-related orders the Village issued in 2003; and depends on gaming activity that completely postdates the filing of the 2003 action. Res judicata is irrelevant.

Res judicata's "main concern . . . is to bring litigation to an end after the parties have had a fair opportunity to litigate their claims."  *Oneida Indian Nation of N.Y. v. New York*, 194 F. Supp. 2d 104, 125 (N.D.N.Y. 2012) (Kahn, J.).  It is an affirmative defense that requires the Village to show that "the claims asserted in the subsequent action were, or could have been, raised in the prior action." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014) (quotation marks omitted).[1]  The "could have been" language, however, "is . . . a misnomer." *Pike v. Freeman*, 266 F.3d 78, 91 (2d Cir. 2001) (Sotomayor, J.).  The dispositive question is whether a later claim is so "related to the claims that were asserted in the first proceeding that it *should have been* asserted" there.  *Id.*; *see TechnoMarine*, 758 F.3d at 499 (considering "whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were

---

[1] Moreover, where (as here) a defendant raises res judicata through a motion to dismiss, the court must "accept[] all allegations in the complaint as true and draw[] all inferences in favor of the plaintiff." *TechnoMarine*, 758 F.3d at 498.

present in the first" (quotation marks omitted)).  Critically, if a claim could not have been asserted in the first action, then it "of course . . . is not barred in the second action."  *Pike*, 266 F.3d at 91.

Here, the Village does not contend that the 2003 action adversely decided any issue relevant to Plaintiffs' claims – and with good reason, for it plainly did not.  Instead, the Village insists that those claims could have (meaning "should have") been raised in the 2003 action.  Village Br. 7.  The Village is incorrect.

Background on the 2003 action is critical.[2]  That action was spurred not by gaming, but by the Nation's attempt to renovate the property that later became Lakeside Entertainment. *Cayuga Indian Nation of N.Y. v. Village of Union Springs*, 390 F. Supp. 2d 203, 205 (N.D.N.Y. 2005) ("*Union Springs II*").  The Nation believed that Nation-owned properties within the Nation's historic reservation were entirely immune from all "local zoning or other land use laws, rules, or ordinances."  Compl. ¶ 26, *Cayuga Indian Nation of N.Y. v. Village of Union Springs*, 317 F. Supp. 2d 128 (N.D.N.Y. 2004) (No. 03-cv-1270) ("2003 Compl.") (attached as Ex. A to the Second Supp. Decl. of David W. DeBruin ("DeBruin 2d Supp. Decl.")).  The Nation therefore began building without obtaining construction permits from the Village.  The Village disagreed – and, in October 2003, it issued Stop Work Orders and Orders to Remedy.  *Id.* ¶ 28.  Those orders alleged violations such as "demolition without permit/asbestos survey," "need stamped plans by architect/engineer," and "no building permit."  *See* Affidavit of Clint Halftown,

---

[2] It is hornbook law that "[t]he scope of [earlier] litigation" for res judicata purposes "is framed by the complaint."  *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1464 (2d Cir. 1996) (quotation marks omitted).  Yet even though the Village has the burden of establishing res judicata, it has not provided the Court with a copy of the complaint from the 2003 action.  For the Court's convenience, a copy is attached as Exhibit A to the Second Supplemental Declaration of David W. DeBruin.

Ex. B., *Cayuga Indian Nation of N.Y. v. Village of Union Springs*, No. 03-cv-1270 (N.D.N.Y. Oct. 21, 2003), ECF No. 3 (attached as Ex. B to the DeBruin 2d Supp. Decl.).

The Nation, in turn, filed suit on October 19, 2003.  *See* 2003 Compl. at 9.  It sought declaratory and injunctive relief on the ground that the "Nation has sovereignty over the property," so that the Village "may not regulate it" at all.  *Id.* ¶ 5.  This Court agreed with the Nation's claim of categorical immunity and entered a permanent injunction.  *Cayuga Indian Nation of N.Y. v. Village of Union Springs*, 317 F. Supp. 2d 128, 151-52 (N.D.N.Y. 2004).  It reversed course after the Supreme Court's decision in *City of Sherrill*, however, and vacated the injunction.  *See Union Springs II*, 390 F. Supp. 2d at 206-07.

The 2003 action poses no res judicata bar for at least three reasons.  First, the present action rests entirely on new threats.  Res judicata is categorically inapplicable where "the facts that have accumulated after the first action are enough on their own to sustain the second action." *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 384 (2d Cir. 2003); *see TechnoMarine*, 758 F.3d at 502-03 (deeming res judicata inapplicable because plaintiffs' "present claim, to the extent based on the new acts of infringement" committed after the prior suit, "was not and could not have been litigated in the earlier proceeding"); *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 369 (2d Cir. 1997) ("Without a demonstration that the conduct complained of in the [second] action occurred prior to the initiation of the [first] action, *res judicata* is simply inapplicable.").  For example, even if a plaintiff does not succeed in its first attempt to enjoin a violation of the antitrust laws, res judicata does not bar a second action if the conduct continues. *See Storey*, 347 F.3d at 384 (discussing *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327-28 (1955); *Harkins Amusement Enters., Inc. v. Harry Nace Co.*, 890 F.2d 181, 183 (9th Cir. 1989) (Kennedy, J.)).  That is true even if the later acts "were part of [the] same pattern that

formed" the basis of the first suit.  *Williams v. Perry*, 229 F.3d 1136, 2000 WL 1506086, at *4

(2d Cir. 2000) (unpublished table decision) (citing *First Jersey*, 101 F.3d at 1464)).

Here, Plaintiffs' request for declaratory and injunctive relief in no way depends on the

2003 threats that gave rise to the prior action.  Instead, the Complaint rests entirely on Orders to

Remedy and related enforcement threats issued in 2013 and 2014 – threats that, as discussed

further below, not only post-date the prior action, but are about gaming rather than construction.

*See* Compl. ¶¶ 36, 43-44, 53, ECF No. 1.  These new threats stand on their own to create a "new

claim" for res judicata purposes.  *Storey*, 347 F.3d at 384 (internal quotation marks omitted).

Second, the Village's new threats have an entirely new basis and thus give rise to a

defense that was previously unavailable.  *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280,

286-87 (2d Cir. 2002) ("It is . . . well settled . . . that a prior judgment 'cannot be given the effect

of extinguishing claims which did not even then exist and which could not possibly have been

sued upon in the previous case.'" (quoting *Lawlor*, 349 U.S. at 328)); *Oneida Indian Nation*, 194

F. Supp. 2d at 125 (res judicata applies "to any claim or defense *previously available*" (emphasis

added)).  *All* of the Village's recent orders and threats ultimately rest on Lakeside

Entertainment's alleged violation of the Village's 1958 anti-bingo ordinance and associated anti-

gaming laws.  *See* Decl. of B.J. Radford ¶¶ 12, 14 19, 20, 25 & Exs. B, H, J ("Radford Decl."),

ECF No. 5-7.[3]  IGRA's preemption of those anti-gaming laws is the primary basis for Plaintiffs'

_____

[3] Although the Village's 2013 Orders alleged that the Nation had failed to obtain "a new certificate of occupancy for any change in building use," this purported violation is also based on the Village's anti-gaming laws.  Radford Decl. ¶ 20 & Ex. H.  The Nation has duly applied for a certificate of occupancy, and has complied with all nonpreempted zoning and land use ordinances.  *Id.* ¶¶ 13-18 (detailing extensive efforts by Nation to comply with building code and related requirements).  The Village's continuing refusal to issue a certificate of occupancy reflects nothing other than its categorical prohibition of gaming, as Plaintiffs have explained – and as the Village has never disputed.  *See* Mem. of L. in Support of Order to Show Cause at 18-19, ECF No. 5-1.

present request for declaratory and injunctive relief.  *See* Opening Br. 10-21.  But critically, IGRA preemption was not a defense to the enforcement steps the Village took in 2003, nor did the Village invoke anti-gaming laws.  That is because the Village's claims of authority had nothing to do with the Nation's plans to use the facility for gaming; instead, the Village simply claimed authority to require the Nation to comply with its building and construction laws.  The Nation, in turn, had to rely on an assertion of blanket immunity from local regulation.  When the Village claimed that local laws required a "demolition permit" or "asbestos survey" for the Nation's renovation work, for example, it would have been a non sequitur to assert (as Plaintiffs do here) that IGRA "preempts . . . local laws that prohibit the Nation . . . from . . . gaming," Compl. ¶ 57.  Plaintiffs' current claims thus could not have been raised in the 2003 action, and Plaintiffs did not have the "fair opportunity to litigate their claims" that res judicata demands.  *Oneida Indian Nation*, 194 F. Supp. 2d at 125.  This fact "suffices to show that the claim is not barred" here.  *Pike*, 266 F.3d at 91.[4]

---

[4] The Village repeatedly suggests that, because the broad injunctive relief that the Nation sought in 2003 would *also* have precluded the Village's current threats against Lakeside Entertainment, res judicata must bar this suit.  Village Br. 7-8.  But the Village cites no case for the proposition that a previously unavailable claim is barred merely on the ground that the requested relief overlaps with *relief* previously sought on a different claim. To the contrary, the Supreme Court in *Lawlor* squarely rejected the argument that res judicata bars a suit simply because a prior action sought "injunctive relief which, if granted, would have prevented the illegal acts now complained of."  *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955).

In all events, the Village grossly mischaracterizes the scope of the relief sought in the 2003 action, as well as the scope of the relief sought in this action.  It is simply false that the 2003 action sought a "declaration that the Gaming Ordinance and 'all other state and local laws prohibiting gambling are preempted by federal law as applied to the Nation's Class II gaming activities at Lakeside Entertainment.'"  Village Br. 7 (asserting that "*[a]s with the prior action*," the Plaintiffs complaint here seeks such relief (emphasis added)).  Rather, as explained above, the 2003 action sought broad, categorical immunity with respect to gaming.  Nor is it true that this action "seeks an injunction to prevent the Defendants from interfering with the Nation's use and ownership of the Property, and from commencing any actions to apply or enforce the Village's laws and ordinances against the Nation."  Village Br. 8.  To the contrary, the complaint

Third, even if the 2003 threats *had* been based on the Village's anti-gaming laws, res judicata still would be inapplicable because the facts essential to the Nation's preemption claim did not yet exist.  *See Williams*, 2000 WL 1506086 at *4 (res judicata inapplicable when "an essential fact giving rise to the claim" had "not transpired at the time [plaintiff] filed" the first suit).  IGRA preempts state regulation of "the governance of gaming activities," *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 469-70 (2d Cir. 2013).  But the Nation had not yet entered that field when it filed the prior action (on October 20, 2003).[5]  The Nation had no NIGC-approved tribal gaming ordinance – a precondition for an Indian nation to conduct Class II gaming under IGRA.  25 U.S.C. § 2710(b); *see* Decl. of Clint Halftown ("Halftown Decl.") ¶ 4 & Ex. B, ECF No. 5-8.  Lacking a tribal gaming ordinance, the Nation also had not issued (and could not have issued) a facility license for the property that would become Lakeside Entertainment – another IGRA prerequisite.  25 C.F.R. § 559.1 *et seq.*; *see* Halftown Decl., Ex. B. at 13.  And the still-under-construction facility did not open until 2004.  Halftown Decl. ¶ 5.  Had the Nation raised IGRA preemption in October 2003, it would have been asking the Court to pass on the legality of gaming that had not been authorized by the Nation or NIGC, at a facility

in this case seeks a far narrower injunction – one limited to actions "in furtherance of Class II gaming activities" at Lakeside Entertainment.  Compl. at 18, ECF No. 1.

[5] The Nation did, to be sure, begin to conduct gaming at Lakeside Entertainment while the 2003 action was pending.  But the Second Circuit has made crystal-clear that events transpiring after the filing of a complaint do not expand the litigation's scope for purposes of res judicata.  Rather, "[t]he scope of litigation" for res judicata purposes "is framed by the complaint at the time it is filed."  *First Jersey*, 101 F.3d at 1464 (quotation marks omitted).  And although plaintiffs may "bring events occurring after the filing of the complaint into the scope of the litigation by filing a supplemental complaint with leave of the court," there "is no requirement that plaintiffs do so."  *Id.* (quotation marks omitted).  The Nation never did so, and any claim premised on the Nation's gaming activities therefore remained well outside the scope of the 2003 action.  *See also TechnoMarine SA*, 758 F.3d at 501 (explaining that a "plaintiff is not required to" bring post-complaint conduct into the proceeding by filing "a supplemental pleading" and "his election not to do so is not penalized by application of res judicata to bar a later suit on that subsequent conduct" (internal quotation marks omitted)).

that was not yet even physically *capable* of hosting gaming.  Indeed, any claim of IGRA preemption would have been obviously unripe, and would have amounted to an impermissible attempt to secure an advisory opinion.  Because the "facts essential to" this action "were [not] present in the first," in short, res judicata cannot apply.   *TechnoMarine*, 758 F.3d at 499 (quotation marks omitted); *see, e.g.*, *Thyroff v. Nationwide Mut. Ins. Co.*, No. 05-CV-6607T, 2006 WL 2827082, at *3 (W.D.N.Y. Sept. 29, 2006) (claims not barred by res judicata where they "were not ripe until the previous proceeding concluded").[6]

## II.   THE COURT HAS SUBJECT MATTER JURISDICTION OVER THIS ACTION, AND JURISDICTION IS NOT DESTROYED BY THE VILLAGE'S ASSERTION OF A LEADERSHIP DISPUTE WITHIN THE CAYUGA NATION.

Equally meritless is the Village's argument that the complaint must be "dismissed for lack of subject matter jurisdiction" because "[s]ince 2004, the Nation has been involved in a governance dispute."  Village Br. 9-10.  That argument about the Nation, of course, could never justify dismissal of the entire action, because the individual Plaintiffs subject to the Village's threats could still maintain the suit.  As to the Nation, moreover, what matters is that the Department of Interior's most recent controlling decision recognizes the individuals who authorized this action as entitled to sue on the Nation's behalf.  That controlling decision is why, notwithstanding the Nation's decade-long leadership dispute, these same individuals have been able to exercise federal gaming rights on the Nation's behalf.  And it is also why these same individuals may sue to prevent the Village's attempt to violate those rights.  It is not the law – nor could it be – that the Village may rely on an internal leadership dispute to entirely deny an

---

[6] For the same reasons, res judicata does not bar Plaintiffs' claim that 18 U.S.C. § 1166 provides for "exclusive [federal] jurisdiction over criminal prosecutions of violations of State gambling laws" that are not preempted.  18 U.S.C. § 1166(d); *see* Mem. of L. in Support of Order to Show Cause at 19-21, ECF No. 5-1.  The Village in 2003 was not threatening to enforce any "gambling laws," so this section was not a defense.  Nor was the Nation engaged in any activity that might violate such laws.  *See supra* pp. 7-9.

Indian nation the right to sue in federal court.  Finally, even if the Court retained some questions about the proper filing of this suit, those questions would not justify either dismissal of the suit or denial of a preliminary injunction, given that BIA has promised a leadership determination by February 20.

### A. The Court Has Subject Matter Jurisdiction, And The Individuals Who Authorized This Suit May Sue To Protect The Nation's IGRA Rights.

The leadership dispute within the Cayuga Nation does not require dismissal of this action. As an initial matter, the Village's contentions regarding the leadership dispute could *never* require that the complaint be dismissed in its entirety.  Village Br. 10.  That is because the Nation is not the only plaintiff in this lawsuit.  Rather, Plaintiffs include individuals who are involved in the operation of Lakeside Entertainment, and who are thus threatened with criminal and civil penalties as a result of the Village's actions.  This suit therefore will go forward regardless of the Village's arguments about the Nation's capacity to sue.

In any event, the Nation is properly a plaintiff, and permitting it to continue as such does not require the Court to impermissibly "resolve internal governance disputes."  Village Br. 10. Leadership disputes within Indian nations are common, even within New York State.  *See, e.g.*, *Shenandoah v. Dep't of Interior*, 159 F.3d 708, 710-11 (2d Cir. 1998) (Oneida Indian Nation); *Tarbell v. Dep't of Interior*, 307 F. Supp. 2d 409, 411 (N.D.N.Y. 2004) (Saint Regis Mohawk Tribe); *Bowen v. Doyle*, 880 F. Supp. 99, 105-06 (W.D.N.Y. 1995) (Seneca Nation), *superseded on other grounds by statute*, *Peters v. Noonan*, 871 F. Supp. 2d 218 (W.D.N.Y. 2012).  But the existence of such a dispute, or the presence of a dissident group within an Indian nation, does not mean – as the Village maintains – that the Indian nation cannot sue in federal court.  Nor does it mean that the federal court cannot hear the suit without resolving nonjusticiable issues of tribal law.  Rather, in such an instance, a federal court "defer[s] to the judgment of the Executive

10

Branch as to who represents a tribe." *Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935, 938 (D.C. Cir. 2012). In particular, the court follows the decisions of the Department of Interior and the BIA – the executive agency with "special expertise and extensive experience in dealing with Indian affairs," including questions of leadership that federal courts may not themselves resolve. *Shenandoah*, 159 F.3d at 713 (internal quotation marks omitted).[7]

Here, the Department of the Interior's controlling decision recognizes the individuals who authorized this suit – Mr. Halftown, Mr. Twoguns, and Mr. Wheeler – as entitled to act on the Nation's behalf. BIA first recognized Mr. Halftown and Mr. Twoguns as the Nation's federal representative and alternate representative, respectively, in 2003. *George v. E. Reg'l Dir., BIA*, 49 IBIA 164, 166 (2009). Shortly thereafter, a dissident group (which later evolved into the "Unity Council") asked the federal government to withdraw its recognition of Mr. Halftown on the ground that he supposedly had been removed from the Council and as federal representative. But BIA rejected those claims in 2005 and 2006. The Interior Board of Indian Appeals ("IBIA"), in turn, affirmed BIA's rulings in 2009. *Id.* at 192-93. As a result, the federal government's recognition of the Nation's leadership remained unchanged.

The 2011 decision of then-BIA Regional Director Franklin Keel did not alter that state of affairs. In August 2011, the "Unity Council" prevailed upon Director Keel to reverse course and

---

[7] None of the cases cited by the Village (Village Br. 10) is to the contrary. Not one is about authorization to sue on behalf of a tribe. In three cases cited by the Village, a tribal government dispute was the very subject matter of the action. *See In re Sac & Fox Tribe of Miss. in Iowa/Meskwaki Casino Litig.*, 340 F. 3d 749, 763-64 (8th Cir. 2003) (trespass claim by one leadership faction against another); *Motah v. United States*, 402 F.2d 1, 2 (10th Cir. 1968) (challenge to results of tribal election); *Barnes v. White*, 494 F. Supp. 194, 200 (N.D.N.Y. 1980) (allegations that existing leadership refused to step down after being voted out of office). And in the fourth, the court merely stated that "a federal court has no jurisdiction over an intratribal controversy" – even as it *asserted* jurisdiction over the plaintiff's action under the Indian Civil Rights Act. *See Crowe v. E. Band of Cherokee Indians, Inc.*, 506 F.2d 1231, 1233 (4th Cir. 1974). Those cases cast no doubt on the Nation's ability to seek this Court's protection of its federal rights against a *third party* like the Village.

withdraw recognition from Mr. Halftown and Mr. Twoguns.   But Mr. Halftown and Mr. Twoguns appealed, vigorously maintaining that Director Keel's decision was wrong on the merits.   And as a result of the appeal, Director Keel's decision never became effective; indeed, the IBIA expressly declined to place the decision into immediate effect.   *See Cayuga Indian Nation of N.Y. v. E. Reg'l Dir.*, *BIA*, 58 IBIA 171, 172 (2014); *see also* 25 C.F.R. § 2.6(a)-(b). Thus, during the pendency of the appeal, Mr. Halftown and Mr. Twoguns plainly remained the Nation's federally recognized leadership.   Magistrate Judge Peebles recognized as much in September 2013 when he recommended granting the Nation's motion to intervene in the litigation surrounding the Oneida Nation's trust application – notwithstanding the State's argument that intervention had not been properly authorized.   *See New York v. Jewell*, No. 6:08–CV–0644, 2013 WL 7853439, at *3 n.4 (N.D.N.Y. Sept. 11, 2013), *declined to adopt as moot*, 2014 WL 841764 (N.D.N.Y. Mar. 4, 2014).

Nor did the IBIA's 2014 decision deprive Mr. Halftown and Mr. Twoguns of the right to sue on the Nation's behalf.   In January 2014, the IBIA vacated Director Keel's 2001 ruling.   It did so on the ground that no action pending before the BIA in 2011 (when Director Keel had ruled) required BIA to make a new leadership determination at that point.   *See Cayuga Indian Nation*, 58 IBIA at 186.   The IBIA's vacatur of the 2011 decision left matters as if that decision had never been issued.   *See, e.g.*, *Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 266 (S.D.N.Y. 2012) (explaining that when an order is vacated, it is "as if the order never existed" (quotation marks omitted)); *Camreta v. Greene*, 131 S. Ct. 2020, 2035 (2011) (similar).   As a result of the vacatur, in other words, the operative decision – to which both other federal agencies and courts defer – remained BIA's 2009 ruling reaffirming Mr. Halftown's status as federal representative.   The impact of BIA's January 2014 vacatur of Director Keel's

decision was clear even to the "Unity Council," the body with the most reason to deny its import: as a result of that decision, the "Unity Council" announced in a press release, "the United States continues to recognize Clint Halftown as the Nation's 'federal representative.'" "Unity Council" Press Release (Jan. 21, 2014) (attached as Ex. C to the DeBruin 2d Supp. Decl.).  The impact of the decision also was clear to Judge Kahn.  Addressing the Nation's motion to intervene to lodge objections to a settlement, Judge Kahn denied intervention because those objections had already been addressed – rather than ruling that, on account of the leadership dispute, the intervention motion had not been properly authorized in the first place.  *New York v. Jewell*, No. 6:08–CV–0644, 2014 WL 841764, at *4 n.8 (N.D.N.Y. Mar. 4, 2014) (reasoning that although New York "argue[s] that a dispute within the [Cayuga Nation] has cast doubt on the current leadership's (the 'Halftown Group') standing to assert claims under IGRA," the "IBIA recently decided in favor of the Halftown Group and vacated the BIA decision of August 2011").

It is precisely because the Department of Interior's operative decision recognizes Mr. Halftown, Mr. Twoguns, and Mr. Wheeler – the three members of the Nation's Class II Gaming Commission – that these individuals have been able to exercise federal gaming rights on the Nation's behalf, right up to the present day.  Supp. Decl. of Clint Halftown in Opp. to "Unity Council" Mot. to Intervene ("Halftown Supp. Decl.") ¶¶ 10, 22-34, ECF No. 33-1.  Ever since Lakeside Entertainment reopened in July 2013, it has operated under the direction and control of these individuals.  *Id.* ¶¶ 22-26.  And it is these individuals (and others acting at their direction) who have interacted with NIGC, the federal body charged with regulating Class II gaming on Indian lands.  *Id.* ¶¶ 23-26, 31. It was Mr. Halftown, for instance, who notified NIGC that the Nation had renewed the facility license for Lakeside Entertainment.  *Id.* ¶ 23.  When the Nation follows NIGC's procedures for licensing primary management officials and key employees, it is

13

Mr. Twoguns who provides NIGC with the information required by statute and regulation; NIGC, in turn, informs Mr. Twoguns whether it objects to the licensing of a particular applicant, or whether it requires more information. *Id.* ¶¶ 25, 31.[8]   NIGC plays this role, moreover, even though it has authority to order *closure* of a gaming facility if it is not being operated by the proper leadership of an Indian nation. *See Sac & Fox Tribe of the Miss. in Iowa Election Bd. v. BIA*, 439 F.3d 832, 834 (8th Cir. 2006).   And NIGC's approval of the Nation's tribal gaming ordinance remains in force, notwithstanding the Unity Council's claim to have revoked that ordinance. *See* NIGC, Gaming Ordinances, http://www.nigc.gov/Reading_Room/Gaming_Ordinances.aspx (attached as Ex. D to the DeBruin 2d Supp. Decl.); Mem. of L. in Support of "Unity Council's" Mot. to Intervene at 12, ECF No. 28-1.   It is plain, in short, that Mr. Halftown, Mr. Twoguns, and Mr. Wheeler currently exercise the Nation's federal gaming rights under federal oversight.   And it is absurd to suggest that those same individuals cannot seek the protection of a federal court when those rights are threatened.

Nonetheless, the Village suggests that the IBIA's 2014 decision destroyed the ability of Mr. Halftown and Mr. Twoguns to act on the Nation's behalf.   That is incorrect.   Once again, the IBIA's January 2014 decision *vacated* Director Keel's 2011 determination. *Cayuga Indian Nation*, 58 IBIA at 172, 186.   That decision accordingly left the earlier recognition of Mr. Halftown and Mr. Twoguns as the operative federal determination. *See, e.g.*, *Liberty Media Corp.*, 861 F. Supp. 2d at 266; *Camreta*, 131 S. Ct. at 2035.   And the single snippet from the

---

[8] Under NIGC regulations, it is an Indian nation itself – rather than NIGC – that issues gaming licenses to primary management officials and key employees.   25 C.F.R. § 558.2(c). NIGC, however, is intimately involved in this process: with NIGC's assistance, an Indian nation conducts investigations of license applicants, makes eligibility determinations, and notifies NIGC of the results; NIGC then informs the Indian nation whether it objects. *Id.* §§ 556.5, 556.6, 558.2.   It is likewise the Indian nation – rather than NIGC – that issues licenses for gaming facilities, after providing NIGC with notice of a license's issuance. *See id.* § 559.1 *et seq.*

14

2014 decision on which the Village relies, *see* Village Br. 10, does not destroy that operative determination.  Indeed, the Village does not even present the Court with the full sentence from which it quotes: "*If there is no separate need for Federal action during the Nation's tribal government dispute,* BIA is not required to recognize anyone as the Nation's representative or any composition of the Council, nor would it be appropriate to do so."  *Cayuga Indian Nation*, 58 IBIA at 181 n.7 (emphasis added to language omitted  by Village).  Read in context, the language quoted by the Village merely explains that, in the absence of a "separate need for Federal action during the Nation's tribal government dispute," the BIA need not make a *new* decision regarding the Nation's federal representative.  *Id.*  This statement – relating to a possible fresh leadership determination, in a decision whose sole effect was to vacate Director Keel's 2011 decision – did not purport to *withdraw* federal recognition from Mr. Halftown and Mr. Twoguns.  That is why, as noted above, NIGC has continued to interact with Mr. Halftown and Mr. Twoguns, both before and after that decision.

The May 15, 2014 letter from Director Keel, upon which the "Unity Council" relied in its proposed motion to dismiss, likewise does not change the fact that the operative determination of the Department of Interior recognizes Mr. Halftown and Mr. Twoguns.  *See* Mem. of L. in Support of Mot to Dismiss by Proposed Intervenor "Unity Council" at 6-7, ECF No. 28-1.  The May 15 letter was explicit about its purpose: "only to solicit . . . views" on (1) whether certain outstanding requests to renew or modify contracts created a need for federal action that necessitated a recognition decision; and (2) whom the BIA should recognize as the Nation's leadership.  *See* Halftown Supp. Decl., Ex. C, at 3.  Precisely because the letter's purpose was solely to solicit further submissions, it explained that the letter was not "taking any position on the leadership dispute within the Cayuga Nation."  *Id.*  at 4.  Not only that, but the letter stated

that it did "not adversely affect any interested party" – and, therefore, that it provided no party with appeal rights within the Department. *Id.* Particularly in light of its statement that it did "not adversely affect any interested party," the May 15 letter cannot reasonably be read to have actually stripped Mr. Halftown and Mr. Twoguns of federal recognition, or to have eliminated the Department's prior operative decision recognizing Mr. Halftown and Mr. Twoguns. To the contrary, the May 15 letter "maintain[ed] the status quo with respect to the Nation's drawdown authority" on particular accounts held on the Nation's behalf – meaning that it kept "drawdown authority with the current individual" and so preserved Mr. Halftown's authority to access those funds. *Id.* at 3. Thus, the May 15 letter did no more than leave matters where it found them.

The consequences of the Village's position, moreover, should raise grave concern. If the Village is correct, then *nobody* can assert the Cayuga Nation's rights in federal court. And it is not just the Cayuga Nation that would be harmed; rather, leadership disputes within Indian nations are all too common. *See, e.g.*, *Shenandoah*, 159 F.3d at 710-11; *Tarbell*, 307 F. Supp. 2d at 411; *Bowen*, 880 F. Supp. at 105-06. A ruling for the Village here would mean that any person or government has free rein to move against any Indian nation whose leadership is disputed, for any effort to seek judicial redress will be jurisdictionally barred.[9] That sort of outcome is absurd on its face, and certainly cannot be squared with the United States' trust

---

[9] Notably, the leadership dispute within the Cayuga Nation has been ongoing since 2004. The Village's position would have required dismissal of the successful action that Mr. Halftown, Mr. Twoguns, and Mr. Wheeler authorized to preserve the Nation's rights after unannounced raids by county sheriffs on the Nation's two convenience stores. *See Cayuga Indian Nation of N.Y. v. Gould*, 14 N.Y.3d 614 (2010). It also would have required dismissal of the successful action that they authorized to protect against foreclosure of Nation-owned real property. *See Cayuga Indian Nation of N.Y. v. Seneca Cnty.*, 761 F.3d 218 (2d Cir. 2014). And it might well have required dismissal of the action filed by the Nation against the Village in 2003, for that action did not terminate until 2005.

obligations to Indian nations.  Instead of adopting the Village's position, the Court should simply follow BIA's last operative decision and deny the motion to dismiss.[10]

### B.    Even If the Court Retains Questions About The Nation's Status, It Cannot Dismiss the Nation As A Plaintiff.

Even if the Court retained some questions about the proper authorization of this action – and it should not, for the reasons given – it still cannot dismiss the Nation as a plaintiff, in view of the leadership determination now pending before BIA.  The Second Circuit's *Shenandoah* decision is instructive.  There, the plaintiffs were individuals who claimed that the Oneida Nation had removed its existing BIA-recognized representative and installed them instead.  BIA, however, had never recognized the plaintiffs; instead, it was in the process of considering the question.  *Shenandoah*, 159 F.3d at 711, 715.  The district court dismissed the action on the ground that these plaintiffs did "not represent the Nation."  *Id.*  The Second Circuit explained that dismissal was error, even though the plaintiffs had never been recognized by BIA.  To begin, the district court's action was "inconsistent with the presumptive validity courts are to bestow a plaintiff's allegations at the pleading stage."  *Id.*  And on the merits, the Second Circuit observed that there was a dispute over the "purported removal" of the Nation's existing BIA-recognized leadership.  *Id.*  This question "ha[d] not been determined by" BIA but, instead, was currently pending before it.  *Id.*  Dismissal therefore was "premature[]."  *Id.*

---

[10] The Village's own conduct makes clear that its position is simply gamesmanship designed to deprive the Nation of access to federal court.  The Village has uniformly issued its Orders to Remedy to the "Cayuga Nation," and its officials have interacted with Mr. Halftown, Mr. Twoguns, and Mr. Wheeler (or their representatives) in addressing these Orders.  *See* Decl. of B.J. Radford ¶¶ 15-18, 22-25, Exs. B, H, ECF No. 5-6; Supp. Decl. of David W. DeBruin ("DeBruin Supp. Decl.") ¶¶ 2-7, ECF No. 41-2.  Thus, when not seeking litigation advantage, the Village has recognized that the gaming at Lakeside Entertainment is an activity of the Cayuga Nation, conducted by the same individuals who authorized this suit.

This case is far easier than *Shenandoah*.  Here, the individuals who authorized this suit on the Nation's behalf include the representatives recognized by the Department of Interior's operative decision and the individuals who exercise the relevant federal rights on the Nation's behalf.  That is why, as explained above, this action should simply proceed.  But at the very least, it follows *a fortiori* from *Shenandoah* that the Court cannot dismiss the Nation as a plaintiff unless the Department of Interior affirmatively determines that these individuals no longer represent the Nation.

The doctrine of "primary jurisdiction" suggests a similar result.  This doctrine applies when a claim "is originally cognizable in the courts," but its enforcement "requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body." *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58-59 (2d Cir. 1994).  When the doctrine applies, courts commonly stay the judicial proceeding pending a ruling from the administrative body in question.  *See, e.g.*, *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 616 (S.D.N.Y. 2001).  Courts have applied the doctrine for matters within the competency of both BIA and NIGC.  *Golden Hill*, 39 F.3d at 59-60 (BIA); *United States v. 43.47 Acres of Land, More or Less, Situated in County of Litchfield*, 896 F. Supp. 2d 151, 158 (D. Conn. 2012) (BIA), *aff'd*, No. 12-4544, — F. App'x —, 2014 WL 7011937 (2d Cir. Dec. 15, 2014); *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Att'y for W. Dist. of Mich.*, 46 F. Supp. 2d 689, 707 (W.D. Mich. 1999) (NIGC); *Arizona v. Tohono O'odham Nation*, No. CV-11-0296, 2011 WL 2357833, at *8 (D. Ariz. June 15, 2011) (NIGC).

Here, to the extent that the Court has doubts about the Nation's authorization to sue, a ruling from BIA is likely to assist the Court in resolving those doubts.  And the prospect of

administrative action from BIA is not merely hypothetical.  Rather, Mr. Halftown, Mr. Twoguns, and Mr. Wheeler already have pressed for a prompt decision from BIA.  *See* Second Supp. Decl. of Clint Halftown ¶ 6, ECF No. 41-1.  BIA, in response, has promised a decision by February 20. *See* DeBruin Supp. Decl. ¶ 9 & Ex. C.  Thus, even as the Village argues for dismissal on the basis of the leadership dispute, a decision is forthcoming from the federal agency with expertise in the matter.  Under these circumstances, the Court should, at a minimum, await BIA's decision.

In the interim, moreover, the Court may grant the requested preliminary injunction (or, alternatively, maintain the existing temporary restraining order).  Doing so is permissible as long as it would not undermine the agency's decisionmaking process.  *See Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 674 (2003) (Breyer, J., concurring in part and in the judgment) (observing that "courts have sometimes accompanied a stay with an injunction designed to preserve the status quo"); *Wheelabrator Corp. v. Chafee*, 455 F.2d 1306, 1316 (D.C. Cir. 1971). And here, BIA's decisionmaking process would not be undermined in any way.  The Department of Interior and the BIA have exclusive authority to make recognition decisions for federal purposes.  *Shenandoah*, 159 F.3d at 712.  There is no conceivable manner in which continuation of this action (or injunctive relief) could impede the exercise of that authority.[11]

---

[11] More generally, the Village's arguments regarding the leadership dispute provide no basis for denying a preliminary injunction.  For one thing, the Plaintiffs here include individuals whom the Village's argument does not touch.  A preliminary injunction in their favor will, as a practical matter, prevent the actions threatened by the Village.

For another thing, even as to the Nation itself, the Village's arguments cannot justify the denial of preliminary relief.  Even if the Court were to have doubts about its jurisdiction, a "federal court may issue a preliminary injunction pending its determination of a substantial question of federal jurisdiction."  *A.H. Bull S.S. Co. v. Nat'l Marine Eng'rs' Beneficial Ass'n AFL-CIO*, 250 F.2d 332, 337 (2d Cir. 1957).  Moreover, a court may issue preliminary relief during the pendency of the *entire suit* so long as there is a "reasonable probability" of jurisdiction.  *Visual Scis., Inc. v. Integrated Commc'ns Inc.*, 660 F.2d 56, 59 (2d Cir. 1981).  In light of the Department of Interior's operative decision, that standard is easily satisfied here.

## CONCLUSION

For the foregoing reasons, the Village's motion to dismiss should be denied.

Respectfully submitted,

January 14, 2015

/s/  John G. Powers

John G. Powers (Bar No. 508934)
Hancock Estabrook LLP
1500 AXA Tower I
100 Madison Street
Syracuse, New York 13202
(315) 565-4500

David W. DeBruin (*pro hac vice*)
Joshua M. Segal (*pro hac vice*)
Matthew E. Price (*pro hac vice*)
Jenner & Block LLP
1099 New York Ave., N.W.
Washington, DC  20001