15-1667-cv (L)
*Cayuga Nation v. Tanner*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————

August Term, 2015

(Argued: January 28, 2016   Decided: June 2, 2016)

Docket No. 15-1667-cv; 15-1937-cv

————————

CAYUGA NATION, JOHN DOES, 1-20,

*Plaintiffs-Appellants,*

— v. —

HOWARD TANNER, Village of Union Springs Code Enforcement Officer, in his Official Capacity, EDWARD TRUFANT, Village of Union Springs Mayor, in his Official Capacity, CHAD HAYDEN, Village of Union Springs Attorney, in his Official Capacity, BOARD OF TRUSTEES OF THE VILLAGE OF UNION SPRINGS, NEW YORK, and VILLAGE OF UNION SPRINGS, NEW YORK,

*Defendants-Appellees.*

————————

B e f o r e :

CALABRESI, LYNCH, AND LOHIER, *Circuit Judges.*

————————

Plaintiffs-Appellants, the Cayuga Nation, a federally recognized Indian tribe, and individual officers, employees, and representatives of the Cayuga

CERTIFIED COPY ISSUED ON 06/02/2016

Nation, filed this action in the United States District Court for the Northern District of New York (David N. Hurd, *Judge*) against the Village of Union Springs, the Board of Trustees of the Village, and individual Village officials, seeking declaratory and injunctive relief.  Plaintiffs contend that the federal Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, preempts the defendants' efforts to enforce a local anti-gambling ordinance against a gaming facility located on land owned by Cayuga Nation.

The district court dismissed the complaint, holding that it lacked subject matter jurisdiction to hear the case because it could not determine, in light of an ongoing leadership dispute within Cayuga Nation, whether the lawsuit was authorized as a matter of tribal law.  Following a motion for reconsideration, the district court additionally held that the individual plaintiffs lacked Article III standing to sue in their own right.

On appeal, the plaintiffs argue that the district court had jurisdiction because the Bureau of Indian Affairs had recognized Clint Halftown, who initiated this suit, as the Cayuga Nation's "federal representative," thereby relieving the court of the need to resolve questions of tribal law, and because the individual plaintiffs had standing to challenge the anti-gaming ordinance.  We agree and therefore VACATE the district court's order dismissing the complaint and REMAND for further proceedings consistent with this opinion.

————————————

DAVID W. DEBRUIN (Joshua M. Segal and Matthew E. Price, *on the brief*), Jenner & Block LLP, Washington, D.C., *for Plaintiffs-Appellants*.

CORNELIUS D. MURRAY, O'Connell and Aronowitz, P.C., Albany, N.Y., *for Defendants-Appellees*.

————————————

GERARD E. LYNCH, *Circuit Judge*:

Plaintiffs-appellants – the Cayuga Nation ("the Nation"), a federally

recognized Indian tribe, and individual officers, employees, and representatives

of the Nation – filed an action in 2014 in the United States District Court for the

Northern District of New York (David N. Hurd, *Judge*) against the Village of

Union Springs, the Board of Trustees of the Village, and individual Village

officials (collectively "the Village"), seeking declaratory and injunctive relief.

Plaintiffs contend that the federal Indian Gaming Regulatory Act ("IGRA"), 25

U.S.C. §§ 2701-2721, preempts the application of a local anti-gambling ordinance

to a Nation-owned gaming facility, Lakeside Entertainment ("Lakeside"), located

on land owned by the tribe.

The Village moved to dismiss the complaint, arguing that the district court

lacked subject matter jurisdiction to determine whether the plaintiffs had

authority under tribal law to sue on behalf of the Nation, and that the suit was

barred by *res judicata*.  The district court dismissed the complaint for lack of

subject matter jurisdiction, and, following a motion for reconsideration, also

concluded that the individual plaintiffs lacked standing as they had not

sufficiently alleged an injury-in-fact.[1]  On appeal, the Nation argues that this

decision was in error because the Bureau of Indian Affairs ("BIA") had

previously recognized Clint Halftown, who initiated this suit, as the Nation's

---

[1] The district court did not reach the Village's *res judicata* argument.

3

federal representative, and federal courts may defer to that determination without resolving questions of tribal law.  The Nation further argues that the individual plaintiffs adequately alleged a credible threat of prosecution and need not make any further showing of imminent injury to bring a preenforcement challenge to a criminal statute.

We conclude that the district court had subject matter jurisdiction, as it was not required to resolve questions of tribal law to hear the lawsuit, and that the individual plaintiffs have standing to sue.  We therefore VACATE the district court's order dismissing the complaint and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

In 2003, the Nation adopted a Class II gaming ordinance pursuant to IGRA, which was then approved by the National Indian Gaming Commission ("NIGC"), and formed a Class II Gaming Commission ("the Commission").[2]

---

[2] Class I gaming consists of social games played for no significant financial stakes or traditional forms of Indian gaming.  25 U.S.C. § 2703(6).  Class II gaming includes "the game of chance commonly known as bingo," and certain card games.  *Id.* § 2703(7)(A)(i).  Class III is a residual category consisting of non-Class I or II games, including casino-style games and slot machines.  *Id.* § 2703(8). Different classes of gaming are subject to different regulation and oversight.

Thereafter, the Nation opened Lakeside on land it claimed was within the limits of its reservation.  The Village objected on the ground that the construction of Lakeside violated local land use and zoning laws.  The Nation sued, seeking a declaratory judgment stating that the property on which Lakeside is located is within Indian Country within the meaning of 18 U.S.C. § 1151(a), that the Nation has jurisdiction over that property, and that the Village's zoning and land use laws are preempted as applied to Lakeside.  That lawsuit was dismissed following the Supreme Court's decision in *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197 (2005), leading to the closure of Lakeside in 2005.[3]

In 2013, members of the Nation, led by Clint Halftown, decided to reopen Lakeside.[4]  Halftown reconstituted the Commission with himself as chairman, and two of his supporters – Tim Twoguns and Gary Wheeler – as members.  The Nation resumed contact with the NIGC through the Commission.

---

[3] *City of Sherrill* addressed the manner in which tribes could establish sovereignty over property that was acquired through open-market purchases.  544 U.S. at 198.  Though potentially relevant to the merits of the instant action, *City of Sherrill* has no bearing on the issues of subject matter jurisdiction or standing, which are the only issues addressed in this opinion.

[4] As will be discussed further below, Halftown and his supporters claim to act on behalf of the governing Council of the Nation; other members of the Nation dispute that claim.  By referring to the Halftown group here as "members of the Nation" rather than as "the Council," we intend neither to endorse nor disparage their claim to authority under tribal law, on which we take no position.

Lakeside reopened on July 3, 2013.  On that same day, defendant Howard

Tanner, the Code Enforcement Officer for the Village, visited the facility and

expressed concern about whether the Nation's conduct of Class II gaming

activities was permissible under local law and further stated that the Nation

would need a Certificate of Occupancy for the facility.  Five days later, the

Village's Board of Trustees determined at an executive meeting that it would

enforce a 1958 anti-gambling ordinance ("the Ordinance") against the Nation.

The Ordinance makes the "unauthorized conduct of a bingo game . . . punishable

as a misdemeanor."  J.A. 290.  The following day, the Nation was served with an

Order to Remedy Violations that cited the Nation for operating bingo without a

license in violation of the Ordinance, and for zoning violations.  The Order

warned that "[f]ailure to remedy the [violations] . . . and to comply with the

applicable provisions of law may constitute an offense punishable by fine or

imprisonment or both."  J.A. 25.  In response, Lakeside's manager submitted a

completed application for a Certificate of Occupancy.  Tanner requested

additional information from the Nation, which was provided in December 2013.

In the same month, defendant Chad Hayden, the Village Attorney, was

quoted in a newspaper article as saying that the Village would move to shut

6

down Lakeside.  Shortly thereafter, the Nation was served with two additional Orders to Remedy Violations citing the Ordinance and local zoning rules, as well as state regulations.

The Nation then informed the Village that it would seek a temporary restraining order, as well as preliminary and injunctive relief.  The Village and the Nation subsequently agreed to a "Standstill Agreement" which provided that the Village would take no action against Lakeside without notice and the Nation would not change the nature of the gaming offered there.  During this "Standstill" period, the Village maintained the illegality of the Lakeside operation and the viability of enforcement against Halftown.  Hayden informed the Nation by letter that "Mr. Halftown's group [was] in violation of the [Ordinance]" and that Tanner "has served violation notices on Mr. Halftown's group and will be proceeding in court to compel compliance."  J.A. 674.

Ten months after the parties entered into the Standstill Agreement, the Village advised the Nation that it intended to bring an enforcement action under the Ordinance.  Pursuant to the authorization of Halftown, Twoguns, and Wheeler, the Nation filed the instant action and motion for a preliminary injunction the following day.

7

The Village moved to dismiss the complaint, arguing that the district court lacked subject matter jurisdiction and that the suit was barred by *res judicata*.  The district court granted that motion on the ground that it lacked subject matter jurisdiction because determining whether the lawsuit was properly authorized by the Nation would require resolution of questions of tribal law.

The district court's concern arises from  a long-standing leadership dispute within the Nation.  The Nation is governed by a Council.  In 2003, pursuant to a letter signed by all of the members of the Council, the BIA recognized Halftown as the Nation's representative for government-to-government purposes. Beginning shortly thereafter, and continuing to the present, there have been attempts to oust Halftown from his position as federal representative.

As of 2006, the Council consisted of six members divided into two groups. The first, which supports Halftown as the federal representative ("the Halftown group"), includes Halftown, Twoguns, and Wheeler.  The second, called the "Unity Council," which believes that Halftown was removed from the Council and his position as federal representative under tribal law, includes the three remaining Council members.  In 2009, the Interior Board of Indian Appeals ("IBIA") affirmed a BIA decision rejecting a demand that it withdraw its

8

recognition of Halftown on the grounds that he had been removed from his position as a matter of tribal law and had misused federal and tribal funds. *George*, 49 IBIA 164 (2009).

In 2011, following a request by the Unity Council that the BIA recognize new federal representatives, the Eastern Regional Director of the BIA issued a decision regarding the composition of the Council.  Based on representations that Halftown had been removed from his position as Councilmember and federal representative, the Regional Director recognized a new Council.  The Halftown group appealed that decision to the IBIA.  In January 2014, the IBIA reversed the Regional Director's determination because it impermissibly intruded into internal tribal affairs.  The IBIA took no position in the ongoing leadership dispute and clarified that the BIA may make a recognition decision *only* when such recognition is necessary for a federal purpose.

In February 2015, the Eastern Regional Director of the BIA issued a decision recognizing the 2006 Council, with Halftown as federal representative, for the purposes of administering Indian Self-Determination and Education Assistance ("ISDA") contracts.  The BIA stated that, under the circumstances,

> it will on an interim basis recognize the Nation 2006
> Council as the last undisputed leadership of the Nation,
> with Clint Halftown as the Nation's representative for
> purposes of administering existing ISDA contracts.  As
> explained below, this *interim* recognition decision is
> intended to provide the Nation with additional time to
> resolve this dispute without BIA interference.

J.A. 741 (emphasis in original).  In explaining its decision, the BIA stated that it

had the option of either making a recognition decision based on its

understanding of the Nation's law, or extending interim recognition to the

Nation's last undisputed leadership.  The BIA chose to recognize on an interim

basis the last undisputed tribal leadership – the 2006 Council, with Halftown as

federal representative – because rendering a new recognition decision would

impermissibly intervene in the ongoing leadership dispute.  The BIA also noted

that circumstances had changed since the issuance of the vacated 2011 decision

removing Halftown from his position as federal representative, and that serious

questions of legitimacy precluded recognition of either the Halftown group or the

Unity Council.

   In determining that it could not establish whether this lawsuit was

properly authorized by the Nation, the district court observed that the Nation's

law generally required consensus and that three members of the Council

supported the lawsuit and three members opposed it.  The district court further found that the 2015 BIA decision was insufficient to establish that Halftown was authorized to initiate the lawsuit as "[t]here is nothing in the language of the BIA decision that provides Halftown with the unilateral authority to initiate lawsuits."  S.A. 9.  On reconsideration, the district court determined that the individual plaintiffs – three of whom were named in the complaint as John Does, but who were identified in a proposed amended complaint prior to the district court's decision as Halftown, Twoguns, and Wheeler – lacked standing as individuals because there had been no specific threat to enforce the ordinance against any person rather than the Nation generally.  This appeal followed.

## DISCUSSION

We review the district court's dismissal of the complaint under Fed. R. Civ. P. 12(b)(1) de novo, accepting as true the allegations in the complaint and drawing all reasonable inferences in favor of the plaintiff.  *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012).  We consider first whether the district court lacked jurisdiction to hear the Nation's claim before considering the standing of the individual plaintiffs.

11

I.      The Nation

The parties characterize their dispute as concerning whether Halftown had "standing" to initiate this lawsuit on behalf of the Nation.  We note at the outset, however, that this issue is not a question of "standing" in the Article III sense, as there is no doubt that the *Nation*, which is the principal named plaintiff in this action, has standing to bring the claim asserted in the complaint.  Rather, the dispute between the parties concerns whether Halftown is authorized by tribal law to initiate this lawsuit on behalf of the Nation.  Though not a question of constitutional standing, that issue nonetheless implicates the subject matter jurisdiction of this Court.

Several principles of law guide our analysis.  First, and most significantly, federal courts lack authority to resolve internal disputes about tribal law.  *See Shenandoah v. U.S. Dep't of Interior*, 159 F.3d 708, 712 (2d Cir. 1998); *Runs After v. United States*, 766 F.2d 347, 352 (8th Cir. 1985).  It is "a bedrock principle of federal Indian law that every tribe is capable of managing its own affairs and governing itself." *Cal. Valley Miwok Tribe v. United States,* 515 F.3d 1262, 1263 (D.C. Cir. 2008) (internal quotation marks omitted).  Second, the BIA has the authority to make recognition decisions regarding tribal leadership, but "only when the situation

[has] deteriorated to the point that recognition of some government was essential for *Federal* purposes." *Wadena*, 30 IBIA 130, 145 (1996) (emphasis added). Thus, the BIA "has both the authority and responsibility to interpret tribal law when necessary to carry out the government-to-government relationship with the tribe." *United Keetoowah Band of Cherokee Indians*, 22 IBIA 75, 80 (1992). Internal dysfunction or paralysis within tribal governance standing alone, however, does not permit the BIA to decide who constitutes the legitimate leadership of a tribe. *Cf. Goodface v. Grassrope*, 708 F.2d 335, 338-39 (8th Cir. 1983); *Alturas Indian Rancheria*, 54 IBIA 138, 143-44 (2011).

The foregoing principles compel the conclusion that we lack jurisdiction to resolve the question of whether this lawsuit was properly authorized as a matter of *tribal law*. But we do not need to address that question in order to establish the jurisdiction of the court. To conclude that the case may go forward only if those who filed it were authorized to do so under tribal law either would require the court to answer disputed questions of tribal law – the very thing that federal courts are forbidden to do – or else would prevent the tribe from suing at all, thus rendering the tribe helpless to defend its rights in court. The Village's position would mean that whenever any faction within a tribe asserted a claim to

leadership under tribal law that is inconsistent with the claim of authority made by those who filed the lawsuit, the resulting internal division would raise a question of tribal law that the district court would need to resolve to hear the suit, but that the court lacked jurisdiction to answer.  That result would be convenient for litigants engaged in disputes with the tribe, but disastrous for the tribe's rights.  We therefore hold that where the authority of the individual initiating litigation on behalf of a tribe has been called into dispute, the only question we must address is whether there is a sufficient basis in the record to conclude, without resolving disputes about tribal law, that the individual may bring a lawsuit on behalf of the tribe.

As both parties acknowledge, deference to the Executive Branch is appropriate in addressing this question.  The BIA has special expertise in dealing with Indian affairs, and we have previously indicated that the BIA's decision to recognize a tribal government can determine a plaintiff's claims.  *See, e.g.*, *Shenandoah*, 159 F.3d at 712-13 (noting that the "BIA's determination that [an individual] does not represent the Nation may well moot plaintiffs' claims"); *see also Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935, 938-39 (D.C. Cir. 2012) (dismissing lawsuit brought by one group on behalf of the tribe after the

14

Executive Branch recognized a different group as the tribe's governing body).

Furthermore, as the Supreme Court has acknowledged in the analogous context

of foreign relations, recognition of foreign nations "is a topic on which [the

United States] must speak with one voice," and that voice must emanate from the

Executive.  *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2086 (2015)

(internal quotation marks and alteration omitted).  Based on those principles, we

hold that a recognition decision from the BIA is sufficient for us to find that the

recognized individual has the authority to initiate a lawsuit on behalf of a tribe.

The Village does not dispute that an unambiguous decision from the BIA

acknowledging Halftown as the federal representative, with the authority to

initiate lawsuits, would be sufficient to establish his authority to bring the instant

lawsuit on behalf of the Nation.  The Village argues, however, that the February

2015 BIA decision – which recognized Halftown as the Nation's federal

representative "on an interim basis . . . for purposes of administering existing

ISDA contracts,"  J.A. 741, and did not address the authority of the federal

representative with respect to the initiation of litigation – does not have the same

effect.  We conclude that it is does.

15

The BIA decision, though couched in limiting language, is the only evidence in the record before us of who is recognized by the Executive Branch as the Nation's governing body.  That decision recognizes the 2006 Council, with Halftown as the federal representative, as the government of the Nation.  There is no evidence that the Executive Branch has recognized the Unity Council, or any other group, as the Nation's governing body and, in fact, the 2015 BIA decision explicitly disclaims recognition of any other group.

Moreover, there is nothing in the BIA's *reasoning* in the 2015 decision that confines itself to the ISDA contracts at issue, or that suggests that the BIA would recognize different tribal leadership in connection with other functions relevant to the Nation's dealings with the federal government, including its courts.  In deciding to recognize Halftown as the federal representative, the BIA explained that changes to intra-tribe dynamics "render it inappropriate for the BIA to take steps that could intrude in the Nation's ongoing governmental dispute."  J.A. 745. But, because it was necessary for a federal purpose for the United States government to recognize a tribal government to administer ongoing contracts, the BIA recognized, on an interim basis, the last undisputed leadership of the Nation – the 2006 Council, with Halftown as federal representative – as the body

16

with whom it would deal.  The reasoning that led the BIA to recognize the 2006

Council would apply with equal force to any situation in which there was a need

to recognize one person or group as authorized to act on behalf of the tribe.  The

authority of the Nation to bring a lawsuit in federal court is one such situation.[5]

Any finding that the 2015 BIA decision is not sufficient to permit Halftown

to initiate litigation on behalf of the Nation would have serious practical

implications for the ability of a tribe to initiate or defend litigation in federal

court.  The BIA, of course, regularly recognizes a tribe's undisputed leadership

without limitations through its course of dealing with the tribe.  When there is a

conflict over tribal leadership, however, the BIA is precluded from issuing a

recognition decision *except* where a federal purpose requires recognition.  For that

reason, such decisions will typically carry some kind of limiting language.  *See,*

*e.g.*, *Acting Governor Leslie Wandrie-Harjo*, 53 IBIA 121, 123 (2011) (discussing BIA

decision recognizing an official "for purposes of the ISDA contract modifications

---

[5] In a situation in which the BIA has no indication of which tribal leadership it
might recognize, the Eighth Circuit has sent the question back to the BIA,
"ordering the BIA to recognize one governing body."  *Goodface*, 708 F.2d at 339.
Where, as here, however, the BIA has issued an interim decision and there is no
reason to believe that the BIA would render a different recognition decision if
confronted with the precise issue at hand, such remand is unnecessary.

and related drawdown requests"); *Timbisha*, 678 F.3d at 937 (citing BIA decision that recognized one faction "for the limited purpose of conducting government-to-government relations necessary for holding a special election"). To require tribes to cite a BIA decision recognizing a tribal government for all purposes, or for the specific purpose of initiating litigation in order to establish the authority of particular individuals to initiate litigation on behalf of the tribe could in many situations prevent tribes from vindicating their rights in federal court.  Like the BIA, which must determine whom to recognize as a counterparty to administer ongoing contracts on behalf of the Nation, the courts must recognize someone to act on behalf of the Nation to institute, defend, or conduct litigation.  Lacking jurisdiction to resolve the question of governmental authority under tribal law, and lacking the authority under federal law (not to mention the resources and expertise of the BIA) to question the decision of the Executive about whom the federal government should recognize as speaking for the Nation, the only practical and legal option is for the courts to consider the available evidence of the present position of the Executive and then defer to that position.

The Village contends that deference to the BIA's decision is inappropriate because "[t]he scope of the powers of the federal representative is a question of Nation law" that we lack jurisdiction to consider.  J.A. 741 n.1.  It is thus possible that Halftown, even if he is accepted as the federal representative, lacks the authority to initiate this lawsuit as a matter of tribal law.  We cannot conclude, however, that the possibility that Halftown's actions run contrary to tribal law requires dismissal of this lawsuit.  Such a conclusion would again lead to an untenable result: tribes could be thrown out of federal court by the mere suggestion that the individual or group of individuals initiating litigation on behalf of the tribe had overstepped their tribal authority.  Moreover, as the BIA has previously suggested, the proper remedy for the misuse of tribal authority is recourse to tribal law or, where applicable, federal laws governing the conduct of the tribal officer.  *George*, 49 IBIA at 165-66.  It is not for the courts either to decide whether Halftown has exceeded his authority under tribal law, or effectively to deny his authority by the very act of refusing to decide.

The BIA's decision in this case, though an interim decision issued for a specific purpose, is the only evidence in the record before us of who is recognized by the Executive Branch as the governing body of the Nation – the 2006 Council,

with Halftown as the federal representative.  We hold that we are entitled to defer to the BIA's recognition of an individual as authorized to act on behalf of the Nation, notwithstanding the limited issue that occasioned that recognition. We thus may, and do, conclude that Halftown may initiate litigation on behalf of the Nation in the instant matter, without resolving any questions of tribal law.

## II.    Individual Plaintiffs

The district court ruled that the individual plaintiffs – twenty John Doe members of the Nation, three of whom have been identified as Halftown, Twoguns, and Wheeler – lack standing to bring a lawsuit in their own right.  The plaintiffs argue that the district court's ruling was erroneous, contending that the individual plaintiffs have standing because there was a credible threat that the Ordinance would be enforced against them.  At least with respect to Halftown, Twoguns, and Wheeler, we agree.[6]

---

[6] Our determination that the three identified individual plaintiffs have standing resolves any jurisdictional questions.  We leave it to the district court to address, if and when the record develops, whether the seventeen unidentified John Doe plaintiffs – who are alleged to be "unknown officers, employees, and/or representatives of the Nation who are at risk of criminal or civil penalties for conduct relating to the operation of [Lakeside]," J.A. 810, and who are included in the notice of appeal – similarly face a credible threat of enforcement.

"Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).  Preenforcement challenges to criminal statutes – such as the Ordinance – are cognizable under Article III. When a plaintiff  "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (internal quotation marks omitted).  "Put differently, the Court held that a plaintiff has standing to make a preenforcement challenge 'when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative.'"  *Hedges v. Obama*, 724 F.3d 170, 196 (2d Cir. 2013), quoting *Babbitt*, 442 U.S. at 302.  "The identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact necessarily depends on the particular circumstances at issue," and will not be found where "plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is

likely, or even that a prosecution is remotely possible." *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (internal quotation marks omitted).  The  standard established in *Babbitt* "sets a low threshold and is quite forgiving to plaintiffs seeking such preenforcement review," as courts are generally "willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Hedges*, 724 F.3d at 197 (internal quotation marks omitted).

Under that framework, the identified individual plaintiffs here have adequately alleged that they face a credible threat of prosecution.  Those plaintiffs have alleged that they intend to conduct bingo games, which is clearly prohibited by the Ordinance, and the Village has announced its intention to enforce the Ordinance against the Nation and "Mr. Halftown's group." J.A. 674.[7] Halftown, Twoguns, and Wheeler are directly involved in the institution and ongoing management of gaming at Lakeside in their roles on the Commission, and are obvious targets of any criminal enforcement of the Ordinance.  Moreover,

---

[7] During the Standstill period, Hayden sent the Nation a letter stating that "*Mr. Halftown's group* is in violation of the [Ordinance]" and that Tanner "has served violation notices on *Mr. Halftown's group* and will be proceeding in court to compel compliance." J.A. 674 (emphasis added).

the Village has warned the Nation that "[f]ailure . . . to comply with the applicable provisions of law may constitute an offense punishable by fine or imprisonment or both."  J.A. 25.  Since "imprisonment" is a remedy available only against individuals, and since Halftown, Twoguns, and Wheeler are the members of the Nation most directly involved in opening and operating Lakeside, the individual plaintiffs have plausibly alleged that they have been directly threatened with prosecution.  Where, as here, there is reason to believe that the plaintiffs will be targets of criminal prosecution, and there has been no disavowal of an intention to prosecute those individuals,[8] the plaintiffs have adequately alleged a credible threat of prosecution.  *See Knife Rights*, 802 F.3d at 386-87.[9]

---

[8] Far from disavowing any intention to prosecute individuals, the Village maintains, even in its appellate brief, that "[a]lthough the Village cannot seek relief against the Nation, tribal officials . . . can be prosecuted for criminal and civil violations of the Village's laws and ordinances," and thus the Village "would not be barred from bringing suit against tribal officials and other individuals who are responsible for the illegal activity on the Nation's property." Appellee Br. 51.

[9] In finding that the individual plaintiffs lacked standing, the district court relied primarily on a district court case, *Jones v. Schneiderman*, which declined to apply the "credible threat of prosecution" standard to a Fifth Amendment preenforcement challenge on the ground that it applied only to First Amendment preenforcement challenges.  101 F. Supp. 3d 283, 289 n.4 (S.D.N.Y. 2015).  Thus,

The Village additionally argues that the plaintiffs lack standing because the

relief requested is not likely to redress their alleged injuries, as there is no private

right of action under IGRA.  That argument confuses the *merits* of the plaintiffs'

claim with the standing inquiry.  The injury alleged by the plaintiffs – threat of

criminal prosecution – could be redressed by a favorable decision finding that the

Ordinance is preempted as applied to gaming at Lakeside.  It may well be the

case that individual members of the Nation do not have a cause of action under

IGRA; however, whether a private cause of action exists goes to the merits of the

--------

the court required the plaintiff to show that the threat of prosecution "must target
the plaintiff's planned conduct with some degree of specificity" in order to meet
the higher "certainly impending" or "substantial risk" standards for alleging
imminent injury.  *Id.* at 289-91.  However, in *Knife Rights*, which was decided by
this Court after *Jones*, we applied the "credible threat of prosecution" standard to
a Fifth Amendment challenge to a criminal statute and held that an individual
plaintiff could establish standing even where there was no express threat of
prosecution specifically directed at the plaintiff.  *Knife Rights*, 802 F.3d at 384 n.4,
386-87.

Thus, even outside the First Amendment context, the plaintiffs need not
allege that the threat of prosecution is directed specifically at them as individuals.
But even if we were to impose such a requirement, the allegations in the
complaint are sufficient to meet that higher standard.  The Village has not
declared its intention of enforcing the Ordinance generally, but rather its
intention of enforcing it against *the Nation*.  As noted in the text above, Halftown,
Twoguns, and Wheeler, who are the sole members of the commission responsible
for authorizing and managing gaming at Lakeside, are the inevitable targets of
any criminal enforcement of the Ordinance.

claim and is properly addressed via a Fed. R. Civ. P. 12(b)(6) motion rather than as a component of the standing inquiry. *See, e.g.*, *Republic of Iraq v. ABB AG*, 768 F.3d 145, 171 (2d Cir. 2014) (affirming district court's dismissal of a complaint under Rule 12(b)(6) because the Foreign Corrupt Practices Act does not provide a private right of action); *Lopez v. Jet Blue Airways*, 662 F.3d 593, 597-98 (2d Cir. 2011) (affirming district court's dismissal of a complaint under Rule 12(b)(6) because the Air Carrier Access Act does not provide a private right of action).

The Village further argues that the plaintiffs have failed to show redressability because the Nation may decide to cease its gaming activities. That argument also fails. Although the Nation's decision to stop its gaming activities could moot the plaintiffs' claims, a favorable decision may redress the injury alleged in the complaint by preventing the Village from enforcing the Ordinance against the plaintiffs, which is all that is required to establish Article III standing. We do not believe that the standing of the individual plaintiffs – who will suffer an injury distinct from any felt by the Nation should the Ordinance be enforced against them – should turn on the hypothetical possibility that the Nation will voluntarily cease its current activities.

Accordingly, we conclude that the identified individual plaintiffs have standing in their own right to raise whatever claims they have against enforcement of the Ordinance.[10]

## CONCLUSION

For the foregoing reasons, the judgment of the district court dismissing the complaint is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

_____

[10] Having concluded that the district court erred in dismissing this action for lack of jurisdiction to address issues of tribal law and for lack of standing on the part of the individual plaintiffs, we decline to address in the first instance the merits of the Village's motion for dismissal on *res judicata* grounds or the plaintiffs' motion for a preliminary injunction, which were not addressed by the district court.  *See Thompson v. Cty. of Franklin*, 15 F.3d 245, 253-54 (2d Cir. 1994).  We note that the district court did enter a stay pending appeal but did not consider whether the plaintiffs were likely to succeed in the underlying action, only whether they were likely to succeed on appeal.