**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| CAYUGA NATION, CLINT HALFTOWN, TIMOTHY TWOGUNS, GARY WHEELER, DONALD JIMERSON, MICHAEL BARRINGER, RICHARD LYNCH, B.J. RADFORD, AND JOHN DOES 8-20, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 5:14-cv-1317-DNH-ATB |
| HOWARD TANNER, VILLAGE OF UNION SPRINGS CODE ENFORCEMENT OFFICER, IN HIS OFFICIAL CAPACITY; BUD SHATTUCK, VILLAGE OF UNION SPRINGS MAYOR, IN HIS OFFICIAL CAPACITY; CHAD HAYDEN, VILLAGE OF UNION SPRINGS ATTORNEY, IN HIS OFFICIAL CAPACITY; BOARD OF TRUSTEES OF THE VILLAGE OF UNION SPRINGS, NEW YORK; AND THE VILLAGE OF UNION SPRINGS, NEW YORK | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

---

**FIRST AMENDED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.     This is an action by the Cayuga Nation ("the Nation") and unnamed Nation officers, employees, and representatives against the Village of Union Springs and certain of its officials to prevent their interference with the Nation's federally protected rights.

2.     To promote tribal economic development, the Indian Gaming Regulatory Act ("IGRA") gives the Nation the right to conduct certain gaming activities on its reservation lands free of interference from state or local authorities, and sets up a comprehensive

scheme of federal and tribal regulation of those activities.  IGRA also prohibits state and local officials from bringing criminal enforcement actions under state or local gambling laws in "Indian country" – a statutorily defined term that includes the Nation's federally recognized reservation land – even with respect to Indian gambling activities that are not authorized by IGRA.  The Nation, for its part, has fully complied with the requirements of IGRA and the regulations of the National Indian Gaming Commission ("NIGC").   In spite of this, the Village of Union Springs has issued multiple "Orders to Remedy Violations" and has threatened legal action, including criminal proceedings, if the Nation does not come into compliance with a 1958 Village anti-gambling ordinance that IGRA plainly preempts.  To prevent these unlawful actions, the Nation seeks declaratory and injunctive relief, including a temporary restraining order and a preliminary injunction.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362.

4.     Venue is proper under 28 U.S.C. § 1391(b)(1) because all defendants reside in this district and in New York State.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district (namely, in the Village of Union Springs, where Lakeside Entertainment is located).

## FACTUAL BACKGROUND

The Parties

5.     Plaintiff Cayuga Nation ("Nation") is a federally recognized Indian tribe.  *See* 77 Fed. Reg. 47,868 (Aug. 10, 2012).  The federal government recognizes the Nation as the same entity with which it entered the Treaty of Canandaigua in 1794 (7 Stat. 44).

6.    Plaintiff Clint Halftown is the Nation's federal representative and a member of the Nation's governing body, the Cayuga Nation Council, recognized by the U.S. Department of the Interior.  *See Cayuga Nation v. Bernhardt*, No. CV 17-1923 (CKK), 2019 WL 1130445, at *1 (D.D.C. Mar. 12, 2019).  Mr. Halftown oversees the operation of the Nation's Lakeside Entertainment gaming facility at 271 Cayuga Street, Union Springs, New York.

7.    Plaintiff Timothy Twoguns is the Nation's alternate federal representative and a member of the Cayuga Nation Council.  Mr. Twoguns is also Chair of the Cayuga Nation Gaming Commission, and as such, participates with Plaintiff Halftown in overseeing the operation of the Nation's Lakeside Entertainment gaming facility.

8.    Plaintiff Gary Wheeler is a member of the Cayuga Nation Council.

9.    Plaintiff Donald Jimerson is a member of the Cayuga Nation Council.

10.    Plaintiff Michael Barringer is a member of the Cayuga Nation Council.

11.    Plaintiff Richard Lynch is the Chief Operating Officer of Lakeside Enterprises.

12.    Plaintiff B.J. Radford is the Chief Financial Officer of the Nation and of Lakeside Enterprises.

13.    Plaintiffs John Does 8 through 20 are unknown officers, employees, and/or representatives of the Nation who are at risk of criminal or civil penalties for conduct relating to the operation of the Lakeside Entertainment gaming facility at 271 Cayuga Street, Union Springs, New York.

14.    Defendant Bud Shattuck is the Mayor of the Village of Union Springs and is sued in his official capacity.

15.   Defendant Howard Tanner is the Code Enforcement Officer of the Village of Union Springs and is sued in his official capacity.

16.   Defendant Chad Hayden is the Village Attorney of the Village of Union Springs and is sued in his official capacity.

17.   Defendant Board of Trustees of the Village of Union Springs is the governing body of the Village of Union Springs.

18.   Defendant Village of Union Springs is a municipal corporation chartered under the laws of New York State.

19.   All of the Defendants' conduct described in this complaint has been undertaken, or will be undertaken, under color of state law.

The Indian Gaming Regulatory Act

20.   In furtherance of the federal policy of Indian economic self-sufficiency, Congress enacted IGRA in 1988 to explicitly allow, and to provide a comprehensive scheme for the regulation of, certain Indian gaming activities.  25 U.S.C. §§ 2701-02.

21.   The provisions of IGRA preempt any contrary state or local law.  Thus, if gaming is permitted by IGRA, a state or local law may not punish or restrict it.  *See, e.g.*, *Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 539-40 (9th Cir. 1994).

22.   IGRA divides Indian gaming into three categories.

23.   Class I gaming consists of traditional and social games played for no significant financial stakes.  25 U.S.C. § 2703(6).  Indian nations maintain exclusive control over Class I gaming.  *Id.* § 2710(a)(1).

24.   Class II gaming includes "the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith)" and similar games if played in the same location.  *Id.* § 2703(7)(A)(i).  Class II

gaming is regulated by Indian nations pursuant to tribal ordinances approved by the National Indian Gaming Commission ("NIGC"), an independent federal regulatory commission located within the Department of the Interior. *Id*. §§ 2704, 2710(a)(2), (b).

25.   Class III is a residual category, consisting of any games not included in Classes I and II.  Class III gaming includes casino-style games, slot machines, and lotteries, 25 U.S.C. § 2703(8), and must be conducted in conformance with a "Tribal-State compact entered into by the Indian tribe and the State."  25 U.S.C. § 2710(d)(1)(C).

26.   Only Class II gaming is at issue in this case.  IGRA permits Indian nations to engage in Class II gaming on "Indian lands within such tribe's jurisdiction" if the "gaming is located within a State that permits such gaming for any purpose by any person," and "the governing body of the Indian tribe adopts an ordinance or resolution" that is approved by the Chairman of the NIGC.  25 U.S.C. § 2710(b).

27.   In addition to preempting state and local laws prohibiting Class II gaming, IGRA also bars state and local officials from bringing criminal proceedings under state or local gambling laws in Indian country, even with respect to Indian gambling activities that are *not* authorized by IGRA.  Instead, IGRA vests the United States with "exclusive jurisdiction" over "criminal prosecutions" under "State gambling laws that are made applicable under this section to Indian country."  25 U.S.C. § 1166(d).  That section covers "all State laws pertaining to the licensing, regulation, or prohibition of gambling," *id*. § 1166(a), thus allowing the federal government (and only the federal government) to prosecute violations of state gambling laws, except that even the federal government may not prosecute violations of state gambling laws where IGRA authorizes Indian gaming, *id.* § 1166(c).

The Nation's Operation of Lakeside Entertainment

28.    Pursuant to IGRA's regulatory scheme, in 2004 the Nation opened a business known as Lakeside Entertainment, sometimes referred to as a "bingo hall."

29.    Lakeside Entertainment is located at 271 Cayuga Street, Union Springs, New York, within the boundaries of the Nation's historic reservation.

30.    The Nation temporarily closed Lakeside Entertainment in October 2005. The Nation reopened Lakeside Entertainment in the same location on July 3, 2013.

31.    The gaming taking place at Lakeside Entertainment consists of bingo, conducted with the technological aid of machines.  IGRA classifies this form of gaming as Class II.   25 U.S.C. § 2703(7)(A)(i).

32.    The gaming activities taking place at Lakeside Entertainment are ones that New York State permits for at least some classes of persons.  *See* N.Y. Const. Art. I, § 9(2) ("any city, town or village within the state may . . . authorize, subject to state legislative supervision and control, the conduct of . . . games of chance commonly known as . . . bingo or lotto [by] . . . bona fide religious, charitable or non-profit organizations of veterans, volunteer firefighter and similar non-profit organizations…").

33.    The Nation also is in compliance with the statutory requirement that it adopt, and receive NIGC approval of, a Class II gaming ordinance.  On November 12, 2003, the Nation's Council adopted a Class II gaming ordinance, and on November 18, 2003, NIGC approved the ordinance.  On May 3, 2018, the Nation adopted a revised Class II gaming ordinance, updated to reflect federal regulatory changes and best business practices that have developed since 2003.  On July 31, 2018, NIGC approved the revised ordinance.  The revised ordinance remains in effect, as does NIGC's approval.

34.   Lakeside Entertainment satisfies IGRA's requirement that the Nation's Class II gaming occur on "Indian lands within such tribe's jurisdiction."  25 U.S.C. § 2710(b).

35.   With respect to the "Indian lands" requirement, IGRA defines this term to include "all lands within the limits of any Indian reservation." 25 U.S.C. § 2703(4)(A); *see* 25 C.F.R. § 502.12.

36.   The Cayuga Nation's federal reservation recognized by the Treaty of Canandaigua includes land in Cayuga and Seneca counties, including the land on which Lakeside Entertainment sits.

37.   Congress has never disestablished the Cayuga Nation's federal reservation.

38.   The Cayuga Nation's federal reservation therefore continues to exist.

39.   Lakeside Entertainment thus operates on "Indian lands."

40.   The lands in question also satisfy the requirement that the lands be "within such tribe's [i.e., the Nation's] jurisdiction," 25 U.S.C. § 2710(b).

41.   NIGC has repeatedly made clear that the phrase "with such tribe's jurisdiction" requires only that an Indian nation's gaming occur within the boundaries of its *own* territory, rather than the territory of another Indian nation.

42.   Moreover, the Cayuga Nation possesses inherent authority over its reservation by virtue of its sovereign existence as a people.

43.   The United States has recognized that on its reservation the Nation retains the right to "exercise sovereign powers consistent with [local governments'] concurrent authority."  Brief of the United States as Amicus Curiae at 4 n.1, *Cayuga Indian Nation of N.Y. v. Seneca Cty.*, 761 F.3d 218 (2d Cir. 2014) (No. 12-3723).

44.    While nothing in IGRA requires the Nation to show that it in fact exercises authority over its reservation lands, the Nation does so in numerous ways, including but not limited to the following:

    a.    The Nation maintains a police department that patrols the reservation, enforces a penal code, and provides emergency services.

    b.    The Nation employs a Conservation Officer responsible for monitoring and enforcing Nation ordinances pertaining to hunting, fishing, and related activities.

    c.    The Nation has promulgated ordinances related to building, zoning, land use, and health and safety, enforced by a Nation Compliance officer.

    d.    The Nation operates a court and contracts with a private prison to incarcerate those found guilty of violating the Nation's laws.

    e.    The Nation participates in child welfare matters concerning reservation children.

    f.    The Nation has built and manages housing funded by the United States Department of Housing and Urban Development and by Nation funds.

    g.    The Nation is regularly awarded federal funding via government-to-government programs for the provision of on-reservation services, such as a grant pursuant to the Indian Roads Program and grants under the Indian-Self Determination Act.

    h.    The Nation provides scholarships to Nation citizens.

    i.    The Nation organizes an annual community event that strengthens citizen ties within and to the Nation's reservation.

j.   The federal government plays a supervisory rule over affairs on the Cayuga reservation, including but not limited to providing federal funding for Nation-run reservation services, training Nation police officers, and inspecting underground storage tanks.

45.   In 2013, in the hope of furthering the Nation's economic development, the Nation's Council authorized the reopening of Lakeside Entertainment.

46.   In compliance with NIGC regulations, the Nation renewed the facility license for Lakeside Enterprises, and on May 8, 2013, the Nation provided NIGC with notice of that renewal.  At the same time, the Nation submitted the required environmental, public health, and safety attestation for that facility.  *See* 25 C.F.R. §§ 559.3, 559.4.

47.   The Nation has similarly complied with IGRA and NIGC regulations regarding the licensing of "primary management officials" and "key employees."  *See* 25 U.S.C. § 2710 (b)(2)(F).   These individuals include Plaintiffs Halftown, Twoguns, Wheeler, Lynch, and Radford in addition to some of John Does 8-20.

a.   On May 21, 2013, the Nation submitted to the NIGC background check materials, including fingerprints, for personnel whom the NIGC's regulations require to be licensed.  *See* 25 C.F.R. §§ 556.4, 522.2(h).

b.   NIGC, in turn, assisted in processing those fingerprints and provided the resulting Criminal History Record Information (CHRI) to the Nation.

c.   On review of the CHRI, the Nation: (i) determined that the individuals were eligible to be licensed; and (ii) informed NIGC of its actions, as required by the agency's regulations.  *See* 25 C.F.R. Parts 556, 558.

d.   As part of this process, NIGC approved the Nation's request for access to

its secure, restricted Tribal Access Portal (https://tap.nigc.gov).

e.   On July 17, 2013, NIGC stated that it had no objection to the issuance of gaming licenses to the personnel whose information the Nation submitted on May 21.

f.   On July 23, 2013, the Nation submitted to NIGC information for four additional employees who require licenses.

g.   Following the same procedures outlined above, the NIGC processed this information and returned the CHRI to the Nation, which determined that each of those four individuals were eligible for a gaming license, and so notified the NIGC.

h.   On August 29, 2013, NIGC responded that it had no objection to the licensing of three of the individuals.

i.   After discussions with the Nation, on September 6, 2013, NIGC informed the Nation that it had no objection to the licensing of the fourth individual.

j.   Since 2013, the Nation and NIGC have followed similar procedures with respect to the licensing of numerous other individuals.  In total from 2013 until now, the Nation has licensed over 50 individuals pursuant to this process.

48.   The NIGC actively regulates the Lakeside Entertainment facility.

49.   On April 18, 2018, the NIGC conducted a site visit at Lakeside Entertainment.

50.   In a May 16, 2018 letter to Mr. Halftown, the NIGC confirmed that it was "regulat[ing] the gaming facility of the Nation" at Lakeside Entertainment.

51.   In a July 31, 2018 letter, the NIGC approved an amendment to the Nation's

Class II gaming ordinance as consistent with IGRA and NIGC regulations.

52.   The Nation pays quarterly fees to NIGC based upon its Assessable Gaming Revenue, and it regularly provides its Minimum Internal Control Standards Agreed Upon Procedures audits reports and its audited financial statements to NIGC pursuant to IGRA and applicable NIGC regulations.

53.   NIGC lists the Nation on its "Gaming Tribe Report," which was last updated September 25, 2018, https://www.nigc.gov/images/uploads/state.pdf.

<u>The Village of Union Springs' Efforts to Prevent the Nation from Gaming</u>

54.   The Nation resumed gaming operations at Lakeside Entertainment on July 3, 2013.  Upon reopening, the Nation initially offered only paper bingo and pull-tabs at the facility.

55.   Prior to its reopening of Lakeside Entertainment, the Nation took steps to comply with all local zoning requirements.  In particular, in 2010, the Nation received a detailed architect's report stating that its use of Lakeside Entertainment for Class II gaming would comply with state and local zoning, land use, and building laws and codes, including the Village of Union Springs Zoning Ordinance.

56.   Consistent with the Nation's desire to act openly and in compliance with all applicable laws and regulations, the Nation's counsel informed various State and local officials by letter that it was reopening Lakeside Entertainment.  A true and correct copy of that letter is attached to this complaint as Exhibit A.

57.   Nation counsel's letter noted, among other things, that the Nation had received a formal legal opinion from the law firm of Dorsey & Whitney, LLP, confirming the legality of the Nation's reopening of Lakeside Entertainment.  The letter offered to

make the Dorsey & Whitney legal opinion available upon request, and twice urged law enforcement to contact Nation counsel should they have any concerns about the Nation's activities.

58.    On July 3, 2013, Defendant Howard Tanner, the Code Enforcement Officer for the Village of Union Springs, visited the Lakeside Entertainment facility and expressed concern about whether the Nation's conduct of Class II gaming activities was permissible under local law.  At that time, Mr. Tanner also stated that the Nation would need a Certificate of Occupancy for the facility.  Nation counsel provided Mr. Tanner with copies of the letter described in paragraph 33 above and with the Dorsey & Whitney opinion letter.

59.    On July 8, 2013, the Village of Union Springs Board of Trustees met in executive session.  At that meeting, the Board determined that it would enforce a 1958 Village anti-gambling ordinance against the Nation.  A true and correct copy of that ordinance is attached to this complaint as Exhibit B.

60.    On July 9, 2013, the Nation was served with an Order to Remedy Violations, which cited the Nation for "operating Bingo without a license Issued [sic] by the Village of Union Springs" in violation of "Games of chance ordinance dated May 19, 1958," as well as unspecified portions of the Union Springs Zoning Ordinance.  On information and belief, the Order to Remedy Violations was signed by Defendant Tanner.  The Order stated: "YOU ARE THEREFORE DIRECTED AND ORDERED to comply with the law and to remedy the conditions above mentioned forewith [sic] no later than the 26th day of July 2013."  The Order continued: "Failure to remedy the conditions aforesaid with notice in writing of compliance to the Village of Union Springs, Factory St., Union Springs, NY 13160, and to comply with the applicable provisions of law may constitute an offense

punishable by fine or imprisonment or both.  PURSUANT to section 268 of the Village Law of the State of New York, the Village of Union Springs also may seek injunctive relief in the New York Supreme Court."    A true and correct copy of the Order to Remedy Violations is attached to this complaint as Exhibit C.

61.    On July 23, 2013, Nation counsel wrote to Defendant Village Attorney Chad Hayden to address the Order to Remedy Violations.  Counsel explained that the Nation's gaming activities were lawful under IGRA, which preempts any state or local regulation of Indian gaming.

62.    On August 8, 2013, Betty Jane Radford, the Manager of Lakeside Entertainment, wrote to Mr. Tanner, enclosing a completed application for a Certificate of Occupancy.  Ms. Radford explained that because Lakeside Entertainment is located on the Nation's federally recognized reservation, the Nation did not believe that it was subject to the laws of other governments.  Ms. Radford further explained that the structure in question complies with the Cayuga Nation's own health and safety ordinance, which incorporates the requirements of the International Building Code, which in turn are at least as stringent as the state and local codes that govern in Union Springs.  Ms. Radford also noted, with respect to the State and local building code, that "a professional architect retained by the Nation recently determined that the Lakeside Entertainment facility is code-compliant in all respects."    Ms. Radford concluded that "the Nation always stands ready to work cooperatively with County and town officials on a government-to-government basis"; for that reason, and "without waiving any of the Nation's rights," Ms. Radford enclosed a completed application for a Certificate of Occupancy.

63.    Defendant Tanner did not grant the Certificate of Occupancy.   Instead, Defendant Tanner requested additional information, including costly construction documents and site plans.

64.    Even though the Nation already believed itself to be in full compliance with all applicable local regulations, the Nation worked diligently to comply with Defendant Tanner's requests.   In particular, the Nation retained an architect to complete *another* full code compliance review.   On December 19, 2013, the Nation provided the results of that review to Defendant Tanner.

65.    Also on December 19, 2013, the Nation added 86 electronic bingo machines to Lakeside Entertainment.   These machines constitute Class II gaming under IGRA, and thus do not alter the legal status of the gaming taking place at the facility.

66.    Once again, consistent with the Nation's desire to act openly and to work with local authorities, on December 19, 2013, the Nation's counsel informed various State and local officials (including Defendant Tanner) about the addition of the electronic gaming machines.   The Nation further highlighted that the plain text of IGRA, as well as clearly established case law from the Second Circuit applying IGRA, bars state and local officials from bringing criminal proceedings for violations of state and local gambling laws in Indian country.    True and correct copies of those letters are attached to this complaint as Exhibit D.

67.    In a newspaper article published on December 20, 2013, Village Attorney Hayden was reported as saying that Village would move to shut down the gaming hall and seize the electronic bingo machines.   "Initially, we'll send them a notice of violation," the article quoted Hayden as saying.   "That will give them a reasonable time to comply and

then we'll proceed to court."  A copy of that article is attached to this complaint as Exhibit E.

68.    On December 23, 2013, the Nation was served with two further Orders to Remedy Violations, which were dated December 20, 2013.   One order stated that "operating games of chance is not permitted in the Village of Union Springs," again citing the "Games of chance ordinance dated May 19, 1958," as well as unspecified portions of the Union Springs Zoning Ordinance.  The second order claimed a violation of Section 1202.3 of Title 19 of the New York Code of Rules and Regulations, which provides that "[n]o change shall be made in the nature of an existing building unless a certificate of occupancy authorizing the change has been issued.  The owner or occupant of such building must demonstrate that such change will conform with all applicable provisions of the Uniform Code before a certificate of occupancy will be issued."  Both orders required the Nation to comply "no later than the 28th day of December, 2013," and both orders again stated that failure to remedy "may constitute an offense punishable by fine or imprisonment or both," and that the Village "also may seek injunctive relief in the New York Supreme Court."   On information and belief, the Orders to Remedy Violations were signed by Defendant Tanner.   True and correct copies of the Orders to Remedy Violations are attached to this complaint as Exhibit F.

69.    Because the Nation had duly applied for a certificate of occupancy and provided Defendant Tanner with documentation that Lakeside Entertainment complied with all applicable code requirements, the Nation sent Defendant Tanner a letter inquiring whether he asserted any justification other than 1958 "Games of Chance" Ordinance for his refusal to issue a certificate of occupancy.  Defendant Tanner did not respond.  On

information and belief, the sole reason that Defendant Tanner has refused to issue a certificate of occupancy is the Nation's non-compliance with the 1958 "Games of Chance" Ordinance.

70.   To forestall the imminent violation of its federally protected rights that the Village's actions threatened, the Nation on December 27, 2013, informed Village officials that it would seek a temporary restraining order, as well as preliminary and permanent injunctive relief.

71.   Subsequently, on December 30, 2014, the Village and the Nation entered a Standstill Agreement, which provided that the Village would take no action against Lakeside Entertainment without providing 48 hours notice, and that the Nation would not change the nature of the gaming offered at the facility.  The agreement was effective until April 30, 2014, and was subsequently extended for one month.

72.   Since then, the Nation has continued to operate Lakeside Entertainment in compliance with the Standstill Agreement and all applicable laws.

73.   On February 21, 2014, Defendant Tanner again inspected the facility, identifying three minor building-code issues he wished to see addressed, including confirmation of Lakeside Entertainment's most recent fire alarm test.

74.   The Nation resolved the issues identified by Defendant Tanner in his February 21 visit.  When Defendant Tanner returned on March 7, he said that he would issue a Certificate of Occupancy the following week.

75.   Defendant Tanner did not issue the Certificate of Occupancy.  Instead, on March 24, Defendant Tanner sent a letter reiterating his contention that Lakeside Entertainment violated the Zoning Law and the 1958 Ordinance, "which prohibits bingo in

the Village."    He further stated that "[u]ntil this matter is resolved I cannot grant a certificate of occupancy."    The letter gave the Nation 10 days to commence permit applications to the zoning board of appeals and the Village Board, and it identified no basis for requiring such applications other than the Village's plainly preempted ordinances.  A true and correct copy of Defendant Tanner's letter is attached to this complaint as Exhibit G.

76.    As of the date of the filing of this complaint, the Nation has continued to conduct its Class II gaming activities at Lakeside Entertainment, and the Village of Union Springs has refused to issue a Certificate of Occupancy for the facility.

77.    Although the Standstill Agreement was extended until May 30, 2014, it expired as of that date.  On October 27, 2014, outside counsel for the Village advised counsel for the Nation that the Village intended to proceed with enforcement action against the Lakeside Entertainment facility.

78.    On May 20, 2015, Village officials served Orders to Show Cause directed at the Lakeside Entertainment facility.  Those Orders required the closure of the facility by June 20, 2015, and threatened civil and criminal penalties for noncompliance.

79.    Neither Defendant Tanner nor any other Union Springs official has withdrawn the Village's threats to seek criminal penalties in connection with the Lakeside Entertainment facility.

**COUNT ONE**
**(IGRA PREEMPTION)[1]**

80.    Paragraphs 1 through 79 are realleged as if set forth in full herein.

_____

[1] For each count in this Complaint, all plaintiffs seek relief directly under the Supremacy Clause of the United States Constitution and the Declaratory Judgment Act, 28 U.S.C.

81.   The Nation's Class II gaming activities at Lakeside Enterprises are legal under IGRA.  In particular, the gaming takes place on Indian lands within the Nation's jurisdiction; it is the type of gaming permitted in at least some circumstances by New York State; and it is conducted pursuant to the Nation's Class II gaming ordinance, which has been approved by the Chairman of the NIGC.

82.   Accordingly, IGRA preempts the application of State and local laws that prohibit the Nation, its officers, its employees, or its other representatives from conducting Class II gaming at Lakeside Entertainment, including but not limited to the 1958 Village of Union Springs Anti-Gambling Ordinance; and including but not limited to the zoning and land use law of the Village of Union Springs insofar as it incorporates the 1958 Anti-Gambling Ordinance.

83.   The civil proceedings threatened by the Village of Union Springs to enjoin gaming activities authorized by federal law, and the prosecution of the Nation and its employees for gaming activities authorized by federal law, would cause irreparable injury to Plaintiffs.

84.   Plaintiffs are therefore entitled to declaratory relief declaring the lawful right of the Nation, its officers, and its employees to conduct Class II gaming at Lakeside Enterprises.

85.   Plaintiffs are also entitled to preliminary and permanent injunctive relief preventing Defendants from taking any steps to apply state and local gambling laws (including but not limited to the 1958 Games of Chance Ordinance) with respect to the

---

§§ 2201-2202 and *Ex Parte Young*, 209 U.S. 123 (1908), while the individual plaintiffs also seek relief under 42 U.S.C. § 1983.

Nation's Class II gaming activities at Lakeside Enterprises and ordering that the 1958 Games of Chance Ordinance cannot serve as a lawful basis for denying the Nation a certificate of occupancy.

## COUNT TWO
## (ILLEGAL PROSECUTION PREEMPTED UNDER IGRA)

86. Paragraphs 1 through 85 are realleged as if set forth in full herein.

87. Defendant Tanner's threatened criminal proceedings with respect to Lakeside Entertainment are illegal under IGRA regardless of whether the Nation's activities are authorized by IGRA. Under 18 U.S.C. § 1166(d), the United States has "exclusive jurisdiction" to prosecute violations of state laws pertaining to the licensing, regulation, or prohibition of gambling, if those violations occur in Indian country.

88. These threatened prosecutions would allege violations of state gambling laws that pertain to the licensing, regulation, or prohibition of gambling, and would seek to punish conduct that occurred at Lakeside Entertainment, which sits within the Nation's federally recognized reservation, and thus is within "Indian country" as that term is defined by federal statute, *see* 18 U.S.C. § 1151(a).

89. As a result, any prosecution by state or local officials of the Nation, its officers, its employees, or its other representatives for gaming activities at Lakeside Entertainment is prohibited by the express terms of IGRA and by clearly established federal case law applying IGRA. *See United States v. Cook*, 922 F.2d 1026, 1033–34 (2d Cir. 1991).

90. A criminal proceeding against Plaintiffs that is expressly prohibited by federal law would cause Plaintiffs irreparable injury.

91.   Plaintiffs are therefore entitled to declaratory and preliminary and permanent injunctive relief to protect the Nation and its officers, its employees, and its other representatives from illegal prosecution.

## COUNT THREE
## (SOVEREIGN IMMUNITY FROM SUIT)

92.   Paragraphs 1 through 91 are realleged as if set forth in full herein.

93.   The Nation is a federally recognized Indian tribe and therefore possesses sovereign immunity from suit.

94.   Any court proceedings to punish or restrict gaming at Lakeside Entertainment (including but not limited to proceedings to enforce the Orders to Remedy Violations) would violate the Nation's sovereign immunity.

95.   For that reason, such proceedings would exceed the jurisdiction of state courts.

96.   Plaintiffs therefore are entitled to declaratory and injunctive relief barring defendants from commencing or pursuing such proceedings.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court issue an order:

(A)   Declaring that the Village of Union Springs' 1958 Games of Chance Ordinance and all other state and local laws prohibiting gambling are preempted by federal law as applied to the Nation's Class II gaming activities at Lakeside Entertainment; declaring that the 1958 Games of Chance Ordinance cannot lawfully serve as a basis for denying the Nation a certificate of occupancy; declaring that federal law prohibits Defendants from taking any steps to restrict, interfere with, punish, prosecute, or otherwise penalize actions taken by the Nation, its officers, its employees, or its other representatives

in furtherance of Class II gaming activities at Lakeside Enterprises; and declaring that the Nation enjoys immunity to any suit to enforce the Ordinance.

(B)    Enjoining Defendants from taking any steps to restrict, interfere with, punish, prosecute, or otherwise penalize actions taken by the Nation, its officers, its employees, or its other representatives in furtherance of Class II gaming activities at Lakeside Enterprises, including but not limited to the enforcement of  the 1958 Union Springs Games of Chance Ordinance or other local and state laws concerning gambling, whether independently through a civil or criminal action, or through civil or criminal enforcement of the Village of Union Spring's zoning law; or through a civil or criminal action to enforce the Order to Remedy Violations dated July 9, 2013 or the Orders to Remedy Violations dated December 20, 2013.

(C)    Awarding attorney's fees to Halftown, Twoguns, Wheeler, Jimerson, Barringer, Lynch, Radford, and the John Doe Plaintiffs pursuant to 42 U.S.C. § 1988;

(D)    Awarding costs to Plaintiffs; and

(E)    Granting such other relief as this Court deems just and proper.

Respectfully submitted,

/s/ David W. DeBruin
David W. DeBruin (*pro hac vice*)
Zachary C. Schauf (*pro hac vice* application to be filed)
Jenner & Block LLP
1099 New York Ave., N.W.
Washington, DC  20001
*Attorneys for the Cayuga Nation*

DATED: May 22, 2019