# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

---

CAYUGA NATION, CLINT HALFTOWN,
TIMOTHY TWOGUNS, GARY WHEELER,
DONALD JIMERSON, MICHAEL
BARRINGER, RICHARD LYNCH, B.J.
RADFORD, AND JOHN DOES 8-20,

        Plaintiffs,

        v.                              No. 5:14-cv-1317-DNH-ATB

HOWARD TANNER, VILLAGE OF
UNION SPRINGS CODE ENFORCEMENT
OFFICER, IN HIS OFFICIAL CAPACITY;
BUD SHATTUCK, VILLAGE OF UNION
SPRINGS MAYOR, IN HIS OFFICIAL
CAPACITY; CHAD HAYDEN, VILLAGE OF
UNION SPRINGS ATTORNEY, IN HIS
OFFICIAL CAPACITY; BOARD OF
TRUSTEES OF THE VILLAGE OF UNION
SPRINGS, NEW YORK; AND THE VILLAGE
OF UNION SPRINGS, NEW YORK,

        Defendants.

---

## ANSWER TO FIRST AMENDED COMPLAINT
## AND COUNTERCLAIM

Defendants Village of Union Springs, Howard Tanner, Village of Union

Springs Code Enforcement Officer, Bud Shattuck, Village of Union Springs Mayor, Chad

Hayden, Village of Union Springs Attorney, Board of Trustees of the Village of Union

1

Springs (collectively "Defendants"), for their answer to the First Amended Complaint dated
May 22, 2019, state as follows:

1.      The allegations in Paragraph 1 of the First Amended Complaint
("Complaint") are introductory statements describing the litigation and stating either
conclusions of law or legal argument or both and do not require a response.  To the extent a
response is required, Defendants deny the allegations in Paragraph 1 of the Complaint.

2.      The allegations in Paragraph 2 of the Complaint are introductory
statements describing the litigation and stating either conclusions of law or legal argument or
both and do not require a response.  To the extent a response is required, Defendants deny
the allegations in Paragraph 2 of the Complaint, except admit that Defendant Village of
Union Springs("Village") has informed Plaintiffs that the portion of the land described in
Paragraph 29 of the Complaint (the "Subject Property") is located within the borders of the
Village and is subject to all local laws, rules and regulations of the Village (and the County of
Cayuga and State of New York), and Defendants have informed Plaintiffs that the Subject
Property is subject to the Village's 1958 gaming ordinance attached as Exhibit B to the
Complaint.

## JURISDICTION AND VENUE

3.      The allegations in Paragraph 3 of the Complaint are conclusions of law
or legal argument or both and do not require a response.

4.      The allegations in Paragraph 4 of the Complaint are conclusions of law
or legal argument or both and do not require a response.  To the extent a response is
required, Defendants admit each defendant resides in this district and in New York State,

and that the dispute giving rise to the lawsuit concerns the Tribe's Lakeside Entertainment property on lands within the limits of the Village.

## FACTUAL BACKGROUND

<u>The Parties</u>

5.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5 of the Complaint, except admit that Plaintiff Cayuga Nation ("Nation") is on a list of "Indian Tribal Entities within the Contiguous 48 States Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs" published in the referenced section of the Federal Register.

6.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6 of the Complaint.

7.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 of the Complaint.

8.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8 of the Complaint.

9.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 of the Complaint.

10.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 of the Complaint.

11.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11 of the Complaint.

12.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 of the Complaint.

13.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 of the Complaint.

14.     Admit the allegations in Paragraph 14 of the Complaint.

15.     Admit the allegations in Paragraph 15 of the Complaint.

16.     Admit the allegations in Paragraph 16 of the Complaint.

17.     Admit the allegations in Paragraph 17 of the Complaint.

18.     Admit the allegations in Paragraph 18 of the Complaint.

19.     The allegations in Paragraph 19 of the Complaint are conclusions of law or legal argument or both and do not require a response.

The Indian Gaming Regulatory Act

20.     The allegations in Paragraph 20 of the Complaint are conclusions of law or legal argument or both and do not require a response.

21.     The allegations in Paragraph 21 of the Complaint are conclusions of law or legal argument or both and do not require a response.

22.     The allegations in Paragraph 22 of the Complaint are conclusions of law or legal argument or both and do not require a response.

23.     The allegations in Paragraph 23 of the Complaint are conclusions of law or legal argument or both and do not require a response.

24.     The allegations in Paragraph 24 of the Complaint are conclusions of law or legal argument or both and do not require a response.

25.     The allegations in Paragraph 25 of the Complaint are conclusions of law or legal argument or both and do not require a response.

26.     The allegations in Paragraph 26 of the Complaint are introductory statements describing the litigation and stating either conclusions of law or legal argument or both and do not require a response.

27.     The allegations in Paragraph 27 of the Complaint are introductory statements describing the litigation and stating either conclusions of law or legal argument or both and do not require a response.

The Nation's Operation of Lakeside Entertainment

28.     Deny the allegations in Paragraph 28 of the Complaint.

29.     Admit the allegations in Paragraph 29 of the Complaint and further state that the Cayugas' former historic reservation lies within the exclusive regulatory jurisdiction of New York State and its political subdivisions.

30.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 of the Complaint.

31.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 31 of the Complaint. The remainder of the allegations in Paragraph 31 are conclusions of law or legal argument or both and do not require a response.

32.     The allegations in Paragraph 32 of the Complaint are conclusions of law or legal argument or both and do not require a response.

33.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 of the Complaint.

34.     The allegations in Paragraph 34 of the Complaint are conclusions of law or legal argument or both and do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 34 of the Complaint.

35.     The allegations in Paragraph 35 of the Complaint are conclusions of law or legal argument or both and do not require a response.

36.     The allegations in Paragraph 36 of the Complaint are conclusions of law or legal argument or both and do not require a response. To the extent a response is required, admit the treaty of 1794 acknowledged Cayuga lands in the areas later established as Cayuga and Seneca Counties, and that the fee lands within the current legal and enforceable boundaries of the Village also happen to fall within the former historic reservation areas, and by way of further response state that Lakeside Entertainment sits on fee lands under the exclusive governmental authority of New York State and its political subdivisions, to wit, Cayuga County and the Village of Union Springs.

37.     The allegations in Paragraph 37 of the Complaint are conclusions of law or legal argument or both and do not require a response. To the extent a response is required, deny the allegations in Paragraph 37 of the Complaint.

38.     The allegations in Paragraph 38 of the Complaint are conclusions of law or legal argument or both and do not require a response. To the extent a response is required, deny the allegations in Paragraph 38 of the Complaint.

39.     The allegations in Paragraph 39 of the Complaint are conclusions of law or legal argument or both and do not require a response. To the extent a response is required, deny the allegations in Paragraph 39 of the Complaint.

40.     The allegations in Paragraph 40 of the Complaint are conclusions of law or legal argument or both and do not require a response. To the extent a response is required, deny the allegations in Paragraph 40 of the Complaint.

41.     The allegations in Paragraph 41 of the Complaint are conclusions of law or legal argument or both and do not require a response. To the extent a response is required, deny the allegations in Paragraph 41 of the Complaint.

42.     The allegations in Paragraph 42 of the Complaint are conclusions of law or legal argument or both and do not require a response. To the extent a response is required, deny the allegations in Paragraph 42 of the Complaint.

43.     Admit the allegations in Paragraph 43 of the Complaint that the Department of Justice filed an amicus brief in *Cayuga Indian Nation of N.Y. v. Seneca Cty.*, 761 F.3d 218 (2d Cir. 2014) but deny that that filing has any legal significance whatsoever in determining the matters before this Court inasmuch as it is not a policy statement of the federal government and in any event contravenes the holding of the Supreme Court of the United States in *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197 (2005).

44.     Deny the allegations in Paragraph 44 of the Complaint that the Nation has a current reservation or exercises governmental power over its purported reservation lands, including over the gaming site (Lakeside Entertainment) located on fee lands within the borders of the Village and subject to the Village's regulatory authority.  By way of further response, Defendants answer subparagraphs (a) through (j) as follows:

(a) Deny the allegations in subparagraph (a).

(b) Deny knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraph (b).

7

(c) Deny knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraph (c).

(d) Deny knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraph (d).

(e) Deny knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraph (e).

(f) Deny knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraph (f).

(g) Deny that Nation has a current reservation as to which the federal government provides "on-reservation" funding and deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in the remainder of subparagraph (g).

(h) Deny knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraph (h).

(i) Deny knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraph (i).

(j) Deny that Nation has a current reservation as to which the federal government provides a supervisory role and deny knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in subparagraph (j).

45.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 of the Complaint.

46.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 of the Complaint.

8

47.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 of the Complaint including subparagraphs (a) through (j).

48.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 of the Complaint.

49.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 of the Complaint.

50.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 of the Complaint and respectfully refer the Court to the referenced letter for the true and correct content thereof.

51.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 of the Complaint and respectfully refer the Court to the referenced letter for the true and correct content thereof.

52.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52 of the Complaint.

53.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53 of the Complaint.

The Village of Union Springs' Efforts to Prevent the Nation from Gaming

54.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54 of the Complaint.

55.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55 of the Complaint.

56.     Deny the allegations contained in Paragraph 56 of the Complaint except admit that the referenced letter (attached as Exhibit A to the Complaint) was sent to the named addresses and refer the Court to Exhibit A for the true and correct content thereof.

57.     Deny the allegations in Paragraph 57 and refer Court to letter (Exhibit A) for the true and correct content thereof.

58.     Deny the allegations in Paragraph 58 of the Complaint except admit Defendant Tanner visited the Lakeside Entertainment facility and advised Plaintiffs that the referenced facility is subject to local building and zoning codes and local gaming ordinance.

59.     Admit the allegations of Paragraph 59 of the Complaint that the Board of Trustees determined that it would enforce the 1958 gaming ordinance and respectfully refer the Court to the 1958 ordinance attached as Exhibit B to the Complaint for the true and correct content thereof.

60.     Admit the allegations of Paragraph 60 of the Complaint that the Nation was served with an order to remedy violations, and respectfully refer the Court to the referenced order (Exhibit C to the Complaint) for the true and correct content thereof.

61.     Admit the allegations in Paragraph 61 of the Complaint that the referenced letter was sent by the Nation and respectfully refer the Court to the letter for the true and content thereof.

62.     Admit the allegations in Paragraph 62 of the Complaint that Nation sent the referenced letter but deny Plaintiffs' characterization of the contents of the letter and respectfully refer the Court to the letter for the true and correct content thereof.

63.     Deny the allegations in Paragraph 63 of the Complaint.

64.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first and second sentences of Paragraph 64, and admit the allegations contained in the third sentence of said paragraph.

65.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 65 of the Complaint.

66.    Deny allegation in Paragraph 66 of the Complaint except admit existence of letters attached as Exhibit D to the Complaint and respectfully refer the Court to the letters for the true and correct content thereof.

67.    Admit the allegations in Paragraph 67 and respectfully refer the Court to the referenced newspaper article attached as Exhibit E to the Complaint for the true and correct content thereof.

68.    Admit the allegations in Paragraph 68 that Defendant Village issued two orders to remedy violations dated December 20, 2013 and respectfully refer the Court to the referenced orders attached as Exhibit F to the Complaint for the true and correct content thereof.

69.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 69 of the Complaint and respectfully refer the Court to the orders to remedy violations attached as Exhibit F of the Complaint for the true and correct content thereof.

70.    Deny the allegations contained in the first clause of Paragraph 70 and admit the Village was informed the Nation would seek provisional relief.

71.   Admit so much of the allegations of Paragraph 71 that Defendants and Cayuga Nation entered into a standstill agreement and respectfully refer the Court to the referenced agreement for the true and correct content thereof.

72.   Deny the allegation contained in Paragraph 72 of the Complaint.

73.   Admit the allegations in Paragraph 73 that Defendant Tanner inspected the Lakeside Entertainment facility on specified date but deny Plaintiffs" characterization of Defendant Tanner's findings following his inspection.

74.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 74 of the Complaint.

75.   Deny the allegations in Paragraph 75 of the Complaint that Defendant Tanner did not issue a certificate of occupancy and respectfully refer the Court to the letter attached as Exhibit G to the Complaint for the true and correct content thereof.

76.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first clause of Paragraph 76 of the Complaint, and deny the remainder of the allegations in Paragraph 76.

77.   Admit the allegations in Paragraph 77 as to the expiration date of the standstill agreement and deny knowledge or information sufficient to form a belief as to the truth of the allegations in the remainder of Paragraph 77.

78.   Deny the allegations in Paragraph 78 of the Complaint except admit that the orders to show cause were sent.

79.   Admit the allegations in Paragraph 79 of the Complaint but deny Plaintiffs' characterization of the actions taken by the Village.

## COUNT ONE
## (IGRA PREEMPTION)[1]

80.    In response to the allegations in Paragraph 80 of the Complaint, repeat, reallege, and reincorporate by reference the responses to allegations in Paragraphs 1 through 79 of the Complaint as if fully set forth herein.

81.    Deny the allegations in Paragraph 81 of the Complaint.

82.    Deny the allegations in Paragraph 82 of the Complaint.

83.    Deny the allegations in Paragraph 83 of the Complaint.

84.    Deny the allegations in Paragraph 84 of the Complaint.

85.    Deny the allegations in Paragraph 85 of the Complaint.

## COUNT TWO
## (ILLEGAL PROSECUTION PREEMPTED UNDER IGRA)

86.    In response to the allegations in Paragraph 86 of the Complaint, repeat, reallege, and reincorporate by reference the responses to allegations in Paragraphs 1 through 85 of the Complaint as if fully set forth herein.

87.    Deny the allegations in Paragraph 87 of the Complaint.

88.    Deny the allegations in Paragraph 88 of the Complaint.

89.    Deny the allegations in Paragraph 89 of the Complaint.

90.    Deny the allegations in Paragraph 90 of the Complaint.

91.    Deny the allegations in Paragraph 91 of the Complaint.

---

[1] Plaintiffs' Amended Complaint includes a footnote to Count One that consists of legal argument and authorities to which no response is required.

## COUNT THREE
## (SOVEREIGN IMMUNITY FROM SUIT)

92.   In response to the allegations in Paragraph 92 of the Complaint, repeat, reallege, and reincorporate by reference the responses to allegations in Paragraphs 1 through 91 of the Complaint as if fully set forth herein.

93.   Deny the allegations in Paragraph 93 of the Complaint.

94.   Deny the allegations in Paragraph 94 of the Complaint.

95.   Deny the allegations in Paragraph 95 of the Complaint.

96.   Deny the allegations in Paragraph 96 of the Complaint.

97.   Any allegations not expressly admitted heretofore are hereby denied.

98.   Defendants deny that Plaintiffs are entitled to any of the relief requested under the Complaint's Prayer for Relief.

## AS AND FOR A FIRST DEFENSE

1.      Plaintiff's claims are barred by the federal common law doctrine of res judicata and collateral estoppel.

## AS AND FOR A SECOND DEFENSE

2.      The area in which the Subject Property is located is not now, and never was, a reservation under the jurisdiction of the United States government and therefore is not now, and never has been, Indian country as that term is defined in 18 U.S.C. § 1151.

## AS AND FOR A THIRD DEFENSE

3.      To the extent the area in which the Subject Property is located was ever part of a reservation under the jurisdiction of the United States government, that reservation was disestablished long ago.

4.      In 1838 the New York Indians, including the Cayugas, entered into the Treaty of Buffalo Creek with the United States government.

5.      The Treaty of Buffalo Creek of 1838 was ratified by the Senate and proclaimed by the President.

6.      Under the Treaty of Buffalo Creek of 1838, the United States agreed to set aside a tract of land in what is now Kansas as a new homeland for the New York Indians to which the New York tribes were to remove.

7.      In exchange for the creation of this new homeland, the New York Indians, including the Cayugas, agreed to remove to Kansas.

8.      The Cayugas agreed to the Treaty of Buffalo Creek of 1838 and accepted the land in Kansas and thereby abandoned, released and relinquished any jurisdiction over any land in New York.

9.      The Treaty of Buffalo Creek of 1838, in combination with federal removal policy and federal involvement in removing New York Indians leading up to the Treaty of Buffalo Creek of 1838, and the subsequent treatment of the area as non-Indian for 200 years, disestablished any Cayuga Indian reservation that then existed in New York.

## AS AND FOR A FOURTH DEFENSE

10.      Plaintiffs' claims are barred by *City of Sherrill v. Oneida Nation of N.Y.,* 544 U.S. 197 (2005) and its specific prohibition against tribes exercising sovereignty "in whole or in part" with respect to lands acquired in fee from non-Indians that fall within the tribe's historic reservation. Such attempts at "rekindling embers of sovereignty that long ago grew cold" are barred under principles of laches, acquiescence and impossibility, given the passage of centuries since the alleged wrongs occurred.

WHEREFORE, Defendants respectfully request that this Court dismiss Plaintiffs' First Amended Complaint and deny the relief requested therein, and grant such other or further relief as to the Court shall seem just and equitable.

## COUNTERCLAIM

Counterclaim-Plaintiff Village of Union Springs for its counterclaims against Counterclaim-Defendants Cayuga Nation, Clint Halftown, Timothy Twoguns, Gary Wheeler, Donald Jimerson, Michael Barringer, Richard Lynch, B.J. Radford, and John Does 8-20, alleges as follows based on information and belief:

### Nature of the Action

1.      This is an action for a declaratory judgment pursuant to 28 U.S.C. § 2201.

2.      The relief sought is a declaration stating that the Lakeside Entertainment parcel and other Cayuga-owned parcels within the Village of Union Springs are not located on an Indian reservation or otherwise "Indian lands" for purposes of the Indian Gaming and Regulatory Act 25 U.S.C. § § 2701, et seq. and implementing regulations of the National Indian Gaming Commission, and do not constitute Indian country for purposes of 18 U.S.C. § 1151 and 25 U.SC. § 1166.

### Jurisdiction and Venue

3.      This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. §§ 1331 and 2201.

4.      Venue is proper based on 28 U.S.C. § 1391(b).

### Parties

5.      The Village of Union Springs is a municipality created under New York law and is located in Cayuga County within the State of New York.

6.      Counterclaim-Defendant Cayuga Indian Nation of New York (the "Nation") is included on a list of "Indian Entities Recognized and Eligible to Receive Services from the United State Bureau of Indian Affairs." The Nation's principal office is located within Seneca County in Seneca Falls, New York.

7.      Counterclaim-Defendant the Cayuga Nation claims to be an Indian tribe with a historic reservation of 64,015 acres that extends across portions of Seneca and Cayuga Counties, and purports to operate a gaming facility located at 271 Cayuga Street within the borders of the Village, which was organized under New Yok law and is located within the limits of the Tribe's historic reservation.

8.      Counterclaim-Defendant Clint Halftown is reported to be the Nation's federal representative and is a member of the Nation's governing body, the Cayuga Nation Council ("Council").  Plaintiff Halftown is reported to oversee the operation of the Nation's Lakeside Entertainment gaming facility located at 271 Cayuga Street, Union Springs New York ("Lakeside").

9.      Counterclaim-Defendant Timothy Twoguns is reported to be the Nation's alternate federal representative and is a member of the Council.  Plaintiff Twoguns, in conjunction with Counterclaim-Defendant Halftown, is reported to oversee the operation of the Lakeside facility.

10.      Counterclaim-Defendant Gary Wheeler is reported to be a member of the Council.

11.      Counterclaim-Defendant Donald Jimerson is reported to be a member of the Council.

12.     Counterclaim-Defendant Michael Barringer is reported to be a member of the Council.

13.     Counterclaim-Defendant Richard Lynch is reported to be the Chief Operating Officer of Lakeside Enterprises.

14.     Counterclaim-Defendant B.J. Radford is reported to be the Chief Financial Officer of the Nation and Lakeside Enterprises.  (Collectively Clint Halftown, Timothy Twoguns, Gary Wheeler, Donald Jimerson, Michael Barringer, Richard Lynch, and B.J. Radford are referred to hereinafter as "Tribal Leaders," and together with the Tribe, are hereinafter referred to as "Counterclaim-Defendants.")

15.     Each of the Tribal Leaders have acted in the Northern District to arrange for, direct and/or oversee the construction and operation of the Lakeside Entertainment gaming facility located in the Village of Union Springs, New York and the County of Cayuga, and have met and conferred with Defendants in the Northern District in connection with the use of the Subject Property (which property is described in Paragraph 29 of the Complaint) and the application of local laws and regulations to such property.

16.     The Tribal Leaders have operated the Lakeside Entertainment gaming facility without complying with the applicable zoning and land use ordinances and in direct violation of the Village's 1958 gaming ordinance.

17.     In taking these actions, the Tribal Leaders have acted outside of the scope of any authority that the Tribe could lawfully bestow upon them.

**Present Controversy**

18.    The Nation filed its First Amended Complaint asserting that certain lands it owns in fee simple, located within the territorial jurisdiction of the Village, the County of Cayuga, and New York State, are reservation lands over which the Nation exercises governmental authority and thus qualify as "Indian lands" under the Indian Gaming and Regulatory Act ("IGRA"), 25 U.S.C. § 2701 et seq.  The Nation claims the Village is without governmental authority to require the Nation to comply with a long-standing Village gaming ordinance because of the land's reservation status under IGRA.

19.    The Nation's complaint raises the issue of whether or not the subject lands are located on a reservation notwithstanding their status as fee lands that are (a) subject to the plenary governmental authority of New York State and its political subdivisions and (b) under *Sherrill* are lands over which the Cayuga Nation lacks sovereign control.

**History of Cayuga Lands in New York**

20.    In the mid-1700s, the Cayugas, a tribe of the Six Nations, occupied territory in the vicinity of Cayuga Lake in what would become New York State in 1776.

21.    During the War for Independence, the Cayugas fought on the side of the British.

22.    After the war, a large segment of the Tribe emigrated to Canada, another group moved to western New York to live with the Senecas, and a third group removed to Ohio.

23.    On February 25, 1789, the State of New York entered into a treaty with the Cayugas still residing in New York whereby the Cayuga ceded all of their lands to the State

of New York, as stated in the treaty's first paragraph: "First, the Cayuga cede and grant all their lands to the people of the State of New York forever."

24.     The first paragraph's cession of all Indian lands to New York State had the effect of extinguishing Indian title to those lands, leaving New York holding the lands in fee simple.

25.     The State of New York then retroceded to the Cayugas a specific set-aside of fee lands consisting of one hundred square mile tract surrounding Cayuga Lake for the Cayugas' "use and occupancy."

26.     New York State retained for itself the exclusive right to purchase back the fee lands that it had set aside for the Cayugas' "use and occupancy," upon the conclusion of the tribe's occupancy of that land.  This buy-back provision was consistent with the fact that New York State held the right of preemption, i.e., the right to claim the underlying fee title upon the end of Indian occupancy.

27.     The right of preemption had devolved to New York from the British Crown at the conclusion of the War of Independence.

28.     The 100-square mile set-aside under New York law became known as the "Cayuga Reservation" and is sometimes referred to as the "Original" Reservation.

29.     The February 25, 1789 Treaty was lawfully negotiated by New York State. New York State exercised treaty-making powers that it possessed under the Articles of Confederation and lawfully exercised those powers to extinguish whatever interests the Cayugas had in the land.

30.     The February 25, 1789 Treaty preceded the first Indian Trade and Intercourse Act by nearly a year, and was completed even before the federal government started functioning.

31.     By Treaty of November 11, 1794 ("Treaty of Canandaigua"), between the United States and the Six Nations, the United States acknowledged that the Cayugas (and Oneidas and Onondagas) held certain reserved lands under state treaty, and the Federal Government promised "that the United States will never claim the same, nor disturb them. . . in the free use and enjoyment thereof."

32.     The Treaty of Canandaigua did not change the boundaries of the state-created "Cayuga Reservation," or the title in which the land was held, and did not impair or disturb New York's right of preemption.

33.     The Treaty of Canandaigua did not convey to the Cayugas (Oneidas or Onondagas) any interest in land.

34.     The Treaty of Canandaigua did not convey any legal rights on the Cayugas (or Oneida or Onondagas).

35.     The main objectives of the Treaty of Canandaigua had nothing to do with the Cayugas (or Oneida or Onondagas) in central New York.  Instead, the United States sought to:  (1) reconfirm peace between the United States and the Senecas, in particular over that part of Pennsylvania known as the Erie Triangle and located immediately west of New York State; (2) correct an inadvertent geographical error along the western boundary of New York; and (3) relinquish any rights the United States that may have acquired through that error.

36.     U.S. Commissioner Thomas Pickering, who negotiated the Treaty of
Canandaigua on behalf of the United States, sent the signed Treaty to Secretary of War
Knox and declared in his transmittal letter that the objects of the Treaty had been obtained
with respect to the Erie Triangle, while stating that, "Yet not a foot of land has been given
up which by the cession then made the U. States had a right to hold: all that I have
relinquished falling within the preemption right of Massachusetts, and lying within the State
of New York."

37.     In a subsequent letter to Secretary of War Knox, Commissioner Pickering
acknowledged that the United States had neither title to, nor jurisdiction over those lands
since "the whole lay within the jurisdiction of New York."  Commissioner Pickering further
acknowledged the illusory nature of the Treaty with respect to the United States' promise
not to disturb the lands of the Oneidas, Onondagas and Cayugas when "in fact the subject
of the relinquishment was a shadow."

38.     Because the United States had no right to lands within the jurisdiction of New
York State, which were 200 miles away from the primary objects of the Treaty of
Canandaigua, the Treaty could not have created (and did not create) a federal Indian
reservation for the Cayugas, Oneida or Onondagas on land over which New York State not
only had jurisdiction but also held the right of preemption.

39.     The Federal Government had no right to disturb the occupancy use and
enjoyment of the lands set aside under state law for the benefit of Oneidas, Onondagas, and
Cayugas.

40.    The Treaty does not mention any intention to divest New York State of its property rights.

41.    New York's right of preemption was not impaired by any later treaty.

42.    New York's right of preemption was not impaired by the adoption of the Constitution in 1789.

43.    The federal Indian Trade and Intercourse Act, first enacted in 1790, did not change the fact that New York State possessed the right of preemption.

44.    The federal public domain did not exist in New York and in the other Original 13 States which predated the Constitution.

45.     At no time did the federal government have any claim to or interest in the land subject to the Cayuga Nation's right of occupancy.  That interest resided solely in New York State in the form of the right of preemption.

46.    The federal government stationed federal Indian agents and subagents in New York starting from 1792 to 1880.  The federal agents and subagents resided with or near the various tribes in New York and were intimately aware of the happenings and activities of the tribes under their supervision, including relations with the neighboring non-Indians.

47.    Until 1824, these agents reported directly to the Secretary of War, and after that, to the Commissioner of Indian Affairs, who was also in the War Department.

48.    The federal agents and subagents were required to submit detailed reports concerning the number of Indians under their supervision and the amount of land which they occupied.

23

49.     Israel Chapin was appointed United States Indian Agent for the Six Nations in or about 1792.  He died in March 1795 and was replaced by his son, Israel Chapin, Jr.

50.     Both Chapin Sr. and Chapin Jr. also served contemporaneously as State agents for the purpose of treating with the Oneidas, the Onondagas, and the Cayugas for the purchase of some of their lands for New York State. As early as March 11, 1793, the New York State Legislature enacted a law which appointed Israel Chapin Sr. to serve as a State agent.  Israel Chapin Jr. assumed that role upon his father's death.

51.     The New York State legislature on March 27, 1794 appointed commissioners for the New York Indians. The commissioners were granted full power to make agreements or arrangements with the Six Nations respecting conveyance of their lands. Any such conveyed lands were to be held in fee simple and provided for the use of the people of New York State.

52.     In subsequent legislation, the New York Legislature appointed people to negotiate with the Oneida, the Onondaga and the Cayuga tribes relative to their lands.  The agents were authorized to allot lands to the Indians in severalty if they desired.

53.     The New York State Legislature on April 9, 1795, appointed the Governor and several men to act as agents for the people of New York to make arrangements with the Oneida, Onondaga and Cayuga tribes relative to their lands.  The agents were authorized to allot lands to the Indians in severalty if they desired.

54.     New York State proceeded to negotiate a series of treaties by which the Oneidas, Onondagas and Cayugas ceded much or all of their lands.

55.     A federal employee named Jasper Parrish, later appointed a subagent to the Federal Indian Agent, assisted New York State Indian Commissioners inviting Cayugas and Onondagas to a treaty.

56.     The State of New York and the Cayugas in New York entered into a treaty on July 27, 1795, by which the Cayuga Nation ceded all of the Original Reservation save 3,200 acres contained in a tract of land two miles square and another tract one mile square for its own use and occupation (as well as an additional one mile square tract for use of a sachem named Fish Carrier).

57.     Federal Indian Agent Israel Chapin, Jr. served as both a Federal and State Indian agent at the time that New York State and the Cayuga Nation negotiated the July 27, 1795 Treaty.

58.     Both Jasper Parrish and Israel Chapin Jr. attended the 1795 treaty ceremony at Cayuga Lake.  Israel Chapin Jr. attended as an official representative of the United States. Chapin's signature appears on the 1795 conveyance as the first among ten witnesses.

59.     Following the execution of the July 27, 1795 Treaty, Agent Chapin reported to the Secretary of War that the State of New York had purchased lands from the Cayugas.

60.     The Secretary sent a letter to Agent Chapin in which he expressed his displeasure at learning that representatives of the federal government had assisted with New York's treaty-making with the Cayugas and Onondagas, but the Secretary took no actions to challenge the July 27, 1795 treaty.

61.     The Federal Government briefly attempted to interfere with New York's treaty-making with the Oneida a few weeks later in 1795, but that "was the last time that the

25

Federal Government would make even a pretense of interfering with New York's attempts to negotiate treaties for land cessions with any of the New York Indians . . . ."  ICC 43 Ind Cl. Comm 373, 385 (1978).

62.     Payments to the Cayuga Nation under the 1795 treaty (and the 1789 treaty) were to be paid at Canandaigua, Ontario County, New York, to the United States Agent for Indian Affairs.

63.     The Federal government had actual knowledge of the 1795 treaty with the Cayugas.

64.     The lands ceded under the 1795 Treaty were surveyed and sold by New York State with the actual or constructive knowledge of the Federal Government.

65.     Early in the 1800's, the federal government adopted an explicit policy of removing Eastern Indians to the Indian territory west of the Mississippi.

66.     Prior to adoption of the explicit federal removal policy, the federal government facilitated and encouraged removal of New York Indians by New York State including by attending state treaty-making ceremonies.

67.     On February 15, 1803, Parrish was appointed to the position of Indian sub-agent to the Six Nations.

68.     On February 26, 1807, Parrish travelled with Cayuga representatives to a negotiation session in Albany, New York.

69.     The Cayuga Nation entered into a treaty with New York State on May 30, 1807, in which the Tribe ceded the 3,200 acres that had been set aside under the 1795 Treaty.

70.     Jasper Parrish attended the signing of the 1807 treaty as the United States Superintendent of Indian Affairs.  Parrish signed and witnessed the final 1807 agreement between the Cayugas and the State of New York.  Additionally, Parrish transmitted the consideration paid by New York State for the acquisition of the Cayuga land under the 1807 treaty.

71.     The Federal government made no pretense of objecting to the 1807 Treaty, which furthered the national goal of removing Indians from Eastern states.

72.     The Treaty of Buffalo Creek in 1838 expressed the national government's removal policy, and called for the New York Indians to remove to the western lands upon making satisfactory arrangements for the sale of their lands to New York State.

73.     Article 10 of the Buffalo Creek Treaty states that the Cayuga Indian tribe "agree[s] to remove from the State of New York to their new homes within five years and to continue to reside there."  No terms for cession of land are provided for the Cayuga because they had no lands to convey.  They agreed to remove from the Seneca Reservation on which they lived.

74.     Because New York State held the right of preemption, the Treaty of Buffalo Creek could not dictate the terms of the sale for any tribe with lands to convey, and because almost all of the Indian lands in New York had already been conveyed to the State of New York by prior state treaties and purchased in fee simple by non-Indians, Congress could not employ the usual treaty language about cession to the federal government and return of the ceded land to the public domain; nor could Congress identify the sum certain to be paid for

the land because the New York Indians had to negotiate the selling price with New York State.

75.     The federal government's documented support for removal of New York Indians in the 1790s and early 1800s, including helping to gather Cayugas to engage in treaty-making with New York in 1795, attending signing ceremonies, and signing and witnessing treaties, together with the Federal Government's acquiescence to the resulting state treaties with the Cayugas (and practically every other New York State treaty with the Six Nations), renders the Treaty of Buffalo Creek a capstone on what had proved to be an effective state/federal partnership to disestablish, or at least substantially diminish, Indian land holdings in New York, including lands contained within the limits of the 1794 Treaty.

76.     All levels of the federal government in 1838--from the President of the United States, to the members of Congress, to the Secretary of Indian Affairs--and all levels of state government including the Governor of the State of New York, New York Legislature, and the New York Indian commissioners--not to mention the federal/state Indian agents living among the remnants of the Six Nations remaining in New York---understood that the New York Indians had largely removed to the Indian territories (or Canada) as desired by both the central government and New York State, and that the central government had long supported New York State's acquisition of Indian land holdings; and knew that Indian landholdings had already been eliminated in the case of the Cayugas and substantially reduced in the case of the Oneidas and Onondagas.

77.     Both New York State and the Federal Government intended to remove Oneida, Onondaga and Cayuga Indians from central New York and provide their conveyed

lands to non-Indians for settlement and development. That was the intent of state and federal actors in 1838 without regard to what language was used in the Treaty of Buffalo Creek in 1838, which Congress did not employ because it lacked the authority to use the normal treaty language of cession and could not identify a sum certain because it was paid by New York State.

78.     The historical record establishes as matter of undisputed fact that the State of New York and the Federal Government intended the reservations of the Oneidas, Onondagas and Cayugas to be diminished to the extent Indian lands were sold in fee simple to non-Indians, and disestablished if all tribal lands were conveyed to the State and resold to settlers in fee simple.

79.     The historical record establishes as matter of undisputed fact that the actions of the State of New York, encouraged and supported by the Federal Government, disestablished the reservation of the Cayugas by acquiring all of the tribe's lands in New York and then selling them to non-Indians in fee simple.

80.     The Treaty of Buffalo Creek was the culmination of a decades-long federal and state partnership that intentionally removed New York Indians and separated them from their lands.

81.     Many Cayugas had removed from New York by the time of the Treaty of Buffalo Creek.

82.     No one alive in 1838 believed a 64,000-acre Cayuga Reservation still existed. The tribe was widely reported to have no reservation. The tribe itself said it was "without a reservation."

83.     From the time the Tribe conveyed its lands to New York State, the lands were held in fee simple as were any other lands located within the territorial sovereignty of New York State and its political subdivisions.

84.     For two centuries, the lands conveyed by the Cayugas to New York State were not treated as Indian Country--not by the non-Indian settlers who purchased the land from New York State, not by the Executive, Legislative and Judicial branches of New York State, and not by the Federal Government.

85.     "'Generations have passed during which non-Indians have owned and developed the area that once composed the Tribe's historic reservation.'" *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 277 (2d Cir. 2005) (quoting *Sherrill*, 544 U.S. at 202).

86.     For nearly two hundred years the lands were held in fee simple by non-Indians without question as to the land's fee simple absolute title.

87.     For nearly two hundred years the non-Indian landowners reasonably believed the "Cayuga Reservation" did not exist other than in a historical sense—a "former" reservation—without legal significance.

88.     The non-Indian legal status and character of the Cayugas' former reservation area remained undisturbed for generations.

89.     The Treaty of Buffalo Creek did not mention the "Cayuga Reservation" or any Cayuga lands because none existed in 1838.

90.     The historical record shows that in 1838 the governmental actors at both the federal and state level believed the federal removal policy had been successfully implemented in New York and that Indian occupancy by the few remaining tribal remnants in New York

would end soon upon the lands being allotted in severalty to individual Indians who chose

not to remove, with any tribal ownership ending upon the death of the then-current

generation of Indians.

91.     Congress effectively ratified the prior land acquisitions by New York State in

the Treaty of Buffalo Creek, by expressly authorizing the State to keep acquiring Indian

lands and removing Indians, in furtherance of the Federal Government's long-standing

removal policy and in keeping the Federal Government's active support of state treaty-

making with the Six Nations.

92.     The historical record disproves any intent by Congress to retain reservation

status for the Cayugas (or Oneidas) much less two intact reservations undiminished in size

(64,000 acres for the Cayugas and 300,000 acres for the Oneidas).

93.     Given the unique history of the New York Indians and joint federal/state

efforts to successfully remove New York Indians from New York State two hundred years

ago, and the almost complete elimination of Indian landholdings in the state as the result of

those joint efforts, the "Cayuga Reservation" should be declared disestablished.

94.     The policies and practical considerations that underlie the decision in *City of

Sherrill v. Oneida Nation of N.Y.,* 544 U.S. 197 (2005)—specifically the concepts of laches,

impossibility and acquiescence rooted in unchallenged non-Indian ownership and

governance since the Founding Era—should inform the disestablishment analysis.

95.     The lands in question, as in *Sherrill*, are 99% owned by non-Indians, the

population is 99% non-Indian, the lands have long ago lost any Indian character.  Over the

generations since the Tribe was last in possession of any tribal lands, non-Indians have owned, governed, regulated and developed the land in every way possible.

96.    Two centuries of undisputed non-Indian ownership, occupancy and governance, resting on the mutual understanding of the state, federal government and Cayuga tribe, should not be set aside based on the legal premise that Congress did not take sufficiently clear action to disestablish the Cayuga Reservation, which ignores the historic record and actual treatment of the former reservation area for 200 years.

**WHEREFORE**, Defendants respectfully request that the Court:

a.    declare that the Tribe has no jurisdiction over or right to exercise tribal governmental power on the Subject Property or any other land in the 1789 Treaty Area under the authority of *Sherrill v. Oneida Nation of N.Y.*, 544 U.S. 197 (2005);

b.    declare that the Village gaming ordinance and all other Village laws and regulations apply to the Subject Property and the Tribe's conduct thereon;

c.    enjoin the Tribal Leaders from carrying out or causing to be carried out the operation of the Lakeside Entertainment gaming facility without obtaining all permits and approvals required by local building codes and zoning ordinances and as required by the Village gaming ordinance;

d.    declare that the Subject Property does not constitute "Indian lands" as that term is used in IGRA;

e.    declare that the Subject Property does not constitute "Indian Country" for purposes of IGRA;

f.      declare that the Subject Property does not constitute an Indian reservation under the jurisdiction of the United States government, is not held in trust by the United States on behalf of the Tribe and is not land subject to restriction against alienation over which the Tribe exercises governmental power; and

g.      declare that the Subject Property is not a reservation within the meaning of IGRA.

Dated: May 28, 2019

**LAW OFFICE OF DAVID TENNANT PLLC**

By: s/ David H. Tennant, Esq.

3349 Monroe Avenue, Suite 345
Rochester, New York 14618
(585) 708-9338
E-mail: david.tennant@appellatezealot.com
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I, David H. Tennant, hereby certify that this document was filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent via first class mail to those indicated as non-registered participants, if any, on May 28, 2019.

s/ David H. Tennant