UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CAYUGA NATION, DONALD
JIMERSON, MICHAEL
BARRINGER, GARY WHEELER,
RICHARD LYNCH, CLINT
HALFTOWN, TIMOTHY
TWOGUNS, B.J. RADFORD, and
JOHN DOES 8-20,

                Plaintiffs,

    -v-                             5:14-CV-1317

HOWARD TANNER, Village of
Union Springs Code Enforcement
Officer, in his Official Capacity,
CHAD HAYDEN, Village of Union
Springs Attorney, in his Official
Capacity, BOARD OF TRUSTEES
OF THE VILLAGE OF UNION
SPRINGS, NEW YORK, VILLAGE
OF UNION SPRINGS, NEW YORK,
and BUD SHATTUCK, Village of
Union Springs Mayor, in his Official
Capacity,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                OF COUNSEL:

JENNER, BLOCK LAW FIRM       DAVID DEBRUIN, ESQ.
Attorneys for Plaintiffs            MATTHEW E. PRICE, ESQ.
1099 New York Avenue, Suite 900  ZACHARY C. SCHAUF, ESQ.
Washington, DC  20001

JENNER, BLOCK LAW FIRM       JEREMY M. CREELAN, ESQ.
Attorneys for Plaintiffs
919 Third Avenue
New York, NY 10022

HANCOCK ESTABROOK, LLP                   JOHN G. POWERS, ESQ.
Attorneys for Plaintiffs
1800 AXA Tower I
100 Madison Street
Syracuse, NY  13221

OFFICE OF CHAD R. HAYDEN                  CHAD R. HAYDEN, ESQ.
Attorneys for Defendants
1634 Lehigh Station Road
Henrietta, NY 14467

LAW OFFICE OF DAVID TENNANT PLLC          DAVID H. TENNANT, ESQ.
Attorneys for Defendants
3349 Monroe Avenue, Suite 345
Rochester, NY 14618

DAVID N. HURD
United States District Judge

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     A. Relevant History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
         1. Nonintercourse Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
         2. Treaty of Canandaigua . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
         3. Indian Reorganization Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     B. First Round of Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
         1. The Cayugas Begin Economic Development . . . . . . . . . . . . . . . . . . . . 9
         2. The Nation Files Suit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
         3. Lakeside Entertainment Opens for Business . . . . . . . . . . . . . . . . . . . 12
         4. The Supreme Court Decides *Sherrill*. . . . . . . . . . . . . . . . . . . . . . . . . . 13
         5. Lakeside Entertainment Closes its Doors . . . . . . . . . . . . . . . . . . . . . . 14

     C. Second Round of Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
         1. The Cayugas Get Back into Gaming. . . . . . . . . . . . . . . . . . . . . . . . . . . 15
         2. Union Springs Renews Enforcement Efforts . . . . . . . . . . . . . . . . . . . . 16
         3. This Lawsuit is Filed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
         4. The Nation is Forced to Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
         5. A Return to the Status Quo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     D. Ending the Stalemate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III. LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
     A. Preclusive Effect of Prior Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
         1. Collateral Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
         2. Res Judicata . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     B. IGRA Preemption. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
         1. Civil Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
           a. Indian lands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
           b. Within such tribe's jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . 38
         2. Criminal Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

     C. Tribal Sovereign Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**MEMORANDUM–DECISION and ORDER**

## I. INTRODUCTION

This case arises out of a dispute between the tribal leadership of plaintiff Cayuga Nation (the "Nation" or the "Cayugas") and the elected officials of defendant Village of Union Springs (the "Village" or "Union Springs") over whether the municipality may regulate the Tribe's gambling activities at 271 Cayuga Street, a parcel of historic reservation land the Cayugas repurchased from the open market in 2003.

The parties have cross-moved for summary judgment on stipulated facts, and each side has supplemented the record with additional material in support of their respective contentions. The motions have been fully briefed and will be considered on the basis of the submissions without oral argument.

## II. BACKGROUND

Although the Nation filed this legal challenge in 2014, the origins of this controversy can be traced back to promises made by the newly formed federal government well over two hundred years ago. Two in particular—one secured by law; the other pledged in treaty—helped set the stage for a massive shift in federal Indian policy that arrived in the early twentieth century. A quick review of all three historical developments is essential to untangling the contemporary posture of this case.

### A. Relevant History

Before beginning, however, the reader should understand that a comprehensive account of North American tribal relations with European colonists encroaching on aboriginal lands would be significantly more convoluted than the brief, incomplete narrative presented in this opinion. *See, e.g.*, *Seneca Nation of Indians v. New York* ("*Seneca I*"), 206 F. Supp. 2d

448, 455-98 (W.D.N.Y. 2002) (chronicling these shifting relations in a suit by the Senecas to recover ownership of certain islands in the Niagara River).

Indeed, the Nation correctly points out that the details of this complex history are mostly absent from the limited fact record developed by the parties in this case. *See* Pls.' Response to Defs.' Local Rule Statement ("Pls.' Response to Defs.' Facts"), Dkt. No. 137-1 at pp. 2-4[1] (objecting to the Village's repeated citation to other tribal litigation as purportedly undisputed fact sufficient to support its bid for summary judgment).

Thus, to the extent that some of the following background is drawn from litigation that is unrelated to the ongoing land-use dispute between the Cayugas and Union Springs, it is included here as necessary context only; it will not be considered part of the fact record for purposes of resolving the cross-motions for summary judgment.

## 1. Nonintercourse Act

On July 22, 1790, exercising its authority under the Indian Commerce Clause of the Constitution, U.S. Const. art. I, § 8, Congress enacted the Indian Trade and Intercourse Act. *Seneca I*, 206 F. Supp. 2d at 482. More commonly known as the Nonintercourse Act, "[t]he law codified a hodgepodge of federal powers, some intended to protect the federal treaty power, others related to trade." Gregory Ablavsky, *Beyond the Indian Commerce Clause*, 124 YALE L.J. 1012, 1044 (2015).

Reenacted several times between 1793 and 1802, and later modified in 1834, the Nonintercourse Act remains on the books today. 25 U.S.C. § 177; *Seneca I*, 206 F. Supp. 2d at 482 (describing the Act's passage and revision history). In both its original formulation and

---

[1] Pagination corresponds to CM/ECF.

in subsequent iterations, the Nonintercourse Act barred "sales of tribal land without the consent of the United States." *Oneida Indian Nation of N.Y. v. County of Oneida*, 617 F.3d 114, 116 (2d Cir. 2010).

## 2. **Treaty of Canandaigua**

Faced with the prospect of renewed hostilities from tribal resistance to its ongoing westward expansion, in 1794 the United States sought to broker what it hoped would finally be a lasting peace with the Iroquois Confederacy, a group of six member nations that included the Cayugas. *Seneca Nation of Indians v. New York* ("*Seneca II*"), 382 F.3d 245, 256-57 (2d Cir. 2004); *Seneca I*, 206 F. Supp. 2d at 486-87.

On November 11, 1794, after nearly a month of tense negotiations, an envoy from the United States and representatives for the six Iroquois member nations executed the Treaty of Canandaigua. *Seneca II*, 382 F.3d at 256-57; *Seneca I*, 206 F. Supp. 2d at 486-93. Although the talks had focused mainly on issues raised by the Senecas, the Treaty's final language included, *inter alia*, an acknowledgment by the federal government that certain lands were reserved to the Cayugas and to the other Iroquois member nations for their "free use and enjoyment." *Id*.

The parties have stipulated that the lands reserved to the Cayugas in the Treaty of Canandaigua encompassed 64,015 acres within the present-day boundaries of Cayuga and Seneca Counties in the State of New York, an area which the parties refer to as the "Cayuga Historic Reservation." Joint Stipulated Facts ("JSF"), Dkt. No. 123 at ¶¶ 4-5.

Unfortunately, though, the Cayuga Historic Reservation did not remain in the Nation's possession for long, since the State of New York continued to aggressively negotiate the purchase of huge chunks of reserved land from the Iroquois without the federal approval

mandated by the Nonintercourse Act.  *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 232 (1985); *Seneca I*, 206 F. Supp. 2d at 540.  While these unauthorized land transfers were initially condemned by federal officials, subsequent administrations became increasingly accepting of New York's unilateral behavior as federal Indian policy shifted toward removing tribes westward.  *See Seneca I*, 206 F. Supp. 2d at 540.

As relevant here, between 1795 and 1807, "the State of New York acquired all of the land encompassed within the Cayuga Historic Reservation."  JSF ¶ 6.[2]  Thereafter, the Cayugas dispersed—some members of the Tribe headed west to join the Senecas on their lands, others sought refuge in Canada, and still others remained behind in the area near Cayuga Lake.  *Cayuga Indian Nation of N.Y. v. Village of Union Springs*, 317 F. Supp. 2d 128, 132 & n.4 (N.D.N.Y. 2004).

### 3.  Indian Reorganization Act

State and federal efforts to displace, disperse, or remove Indian tribes continued in various forms throughout the nineteenth century.  *Oneida Indian Nation of N.Y. v. City of Sherrill, N.Y.*, 337 F.3d 139, 148-49 (2d Cir. 2003).  By the late 1800s, however, the federal government had shifted toward a policy of "allotment."  *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 253-54 (1992).

"The objectives of allotment were simple and clear cut:  to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large."  *County of Yakima*, 502 U.S. at 254.  "In the years in which the allotment policy was followed, Congress also stripped tribes of their authority to govern themselves,

---

[2]  It should go without saying, but the Nation contends these sales were unlawful.  JSF ¶ 6.

instead providing that Indians residing on allotted lands would eventually be subject to state civil and criminal jurisdiction." *Upstate Citizens for Equality, Inc. v. United States*, 841 F.3d 556, 561 (2d Cir. 2016) (citation omitted).

All of this came to an abrupt halt in 1934, with the passage of the Indian Reorganization Act ("IRA"). *Upstate Citizens for Equality, Inc.*, 841 F.3d at 560-61. "The IRA repudiated the allotment policy and aimed to restore to tribes, or replace, the lands and related economic opportunities that had been lost to them under it." *Id*. at 561. "The IRA's implementing regulations, promulgated by the U.S. Department of the Interior, create a process by which tribes and individual Indians can request that the Department take land into trust on their behalf." *Id*. at 562. "Land held by the federal government in trust for Indians under this provision 'is generally not subject to (1) state or local taxation; (2) local zoning and regulatory requirements; or, (3) state criminal and civil jurisdiction [over Indians], unless the tribe consents to such jurisdiction.'" *Id*. at 561 (quoting *Connecticut ex rel. Blumenthal v. U.S. Dep't of the Interior*, 228 F.3d 82, 85-86 (2d Cir. 2000)).

## B. **First Round of Litigation**

The Cayugas remain a federally recognized Indian tribe, with a present-day membership of approximately 400 adult citizens. JSF ¶¶ 1, 7. The parties have stipulated that the federal government recognizes the Nation as the same entity with which it entered into the Treaty of Canandaigua back in 1794. *Id*. ¶¶ 1-2. The parties have further stipulated that "the Cayuga Nation today possesses a federal reservation that has not been disestablished." *Id*. ¶ 3.

### 1. The Cayugas Begin Economic Development

Yet up until the last few decades, "the Nation had no land and very little economic development." Halftown Decl., Dkt. No. 124-3 at ¶ 11. In 2002, by unanimous resolution of the Cayuga Nation Council, Chief Vernon Isaac authorized Clint Halftown ("Halftown"), a Councilmember, to pursue economic development on behalf of the Nation. Pls.' Local Rule Statement ("Pls.' Facts"), Dkt. No. 124-2 at ¶ 2. Under Halftown's guidance, the Cayugas initiated a series of open market purchases of real property in Cayuga and Seneca Counties. JSF ¶ 8.

On April 28, 2003, the Nation purchased 271 Cayuga Street in Union Springs, New York (the "Parcel" or the "Property") in fee simple by indenture deed. JSF ¶ 9. The parties agree that the Parcel's use prior to the Nation's purchase (as the site of an auto parts store) complied with the Village's zoning and land-use laws. Defs.' Local Rule Statement ("Defs.' Facts"), Dkt. No. 131 at ¶ 10.

But the Nation had other plans for the Property, which is situated within the boundaries of the Cayuga Historic Reservation. JSF ¶ 10; Pls.' Facts ¶ 8. In early October 2003, shortly after promulgating a set of tribal ordinances, the Cayugas appointed a tribal code officer and began renovating the Parcel. Defs.' Facts ¶ 15[3]; Pls.' Facts ¶¶ 12-13.

The Village issued a series of Stop Work Orders and other violation notices alleging that the construction activities at the Parcel violated its local laws and ordinances, but the Nation asserted that its inherent tribal sovereignty rendered those laws and ordinances

---

[3] The Village offers up a blow-by-blow account of these construction activities, which began with alterations to the site's parking lot in late August 2003. But as the Nation again correctly points out, some of the Village's purportedly "undisputed" historical facts about this land-use dispute are not properly presented in the record. In any event, the Nation acknowledges that it began work at the Parcel in earnest in October and so the story begins here. *See, e.g.*, Pls.' Response to Defs.' Facts ¶ 15.

inapplicable to the Property.  Defs.' Facts ¶¶ 30, 32, 34.

## 2. The Nation Files Suit

On October 20, 2003, the Nation filed suit in the Northern District of New York in an effort to vindicate this inherent sovereignty argument against Union Springs.[4] *Cayuga Indian Nation of N.Y. v. Village of Union Springs et al.*, 5:03-CV-1270-DNH-DEP (the "First *Cayuga* Litigation") at Dkt. No. 1.  The Village counterclaimed, complaining that the Cayugas had "failed to disclose the nature or type of economic development" they ultimately had in mind for the Parcel.  *Id*. at Dkt. No. 9.

The lawsuit set off a round of preliminary motion practice.  The Nation moved for an emergency restraining order and an injunction that would prevent Union Springs from enforcing its local laws against the Property while the Village, for its part, cross-moved to dismiss the Cayugas' suit in its entirety.  First *Cayuga* Litig. at Dkt. Nos. 2, 10.

On October 21, 2003, the Court granted the Nation's request for a temporary restraining order against the Village's enforcement efforts and *sua sponte* issued a reciprocal order blocking the Cayugas from further construction, renovation, or demolition activities at the Property.  First *Cayuga* Litig. at Dkt. No. 4.  Shortly thereafter, the Court heard oral argument and reserved decision on the pending motions.  *Id*. at Dkt. No. 23.

In the meantime, the Nation moved ahead with its plans.  On November 12, 2003, the Nation's Council adopted a Gaming Ordinance, which among other things created a tribal Gaming Commission and set forth in detail how gaming operations would be conducted on land owned by the Tribe.  JSF ¶ 16; Pls.' Facts ¶ 9; Defs.' Facts ¶ 41.

---

[4]  This litigation also involved the Town of Springport and the County of Cayuga.

On November 14, 2003, the temporary restraining orders dissolved, First *Cayuga* Litig. at Dkt. No. 27, and less than a week later, the Nation received approval from the National Indian Gaming Commission ("NIGC"), an independent federal agency, to conduct Class II Gaming on Nation-owned land.[5]  JSF ¶ 17; Defs.' Facts ¶ 42.

On November 28, 2003, the pending motions in the First *Cayuga* Litigation were denied.  *Cayuga Indian Nation of N.Y. v. Village of Union Springs*, 293 F. Supp. 2d 183 (N.D.N.Y. 2003).  The Nation promptly moved for summary judgment, seeking a declaration that the Parcel qualified as "Indian country" and that, consequently, Union Springs could not apply its local laws to the Property.  First *Cayuga* Litig. at Dkt. No. 37.

On April 23, 2004, the Court awarded summary judgment to the Nation, declaring that the Property qualified as "Indian country" within the meaning of federal law.  *Cayuga Indian Nation of N.Y. v. Village of Union Springs* ("*Union Springs I*"), 317 F. Supp. 2d 128, 143 (N.D.N.Y. 2004).  Accordingly, the Court permanently enjoined the Village "from applying or enforcing" its "zoning and land use laws, or any other laws, ordinances, rules, regulations or other requirements which seek or purport to regulate, control, or otherwise interfere with activities by or on behalf of the plaintiff Cayuga Indian Nation of New York occurring on the Property."  *Id*.

On April 27, 2004, the Village appealed *Union Springs I* and sought to stay the permanent injunction pending resolution of the appeal.  The Village's request was denied by this Court in a published order on May 20, 2004, *Cayuga Indian Nation of N.Y. v. Village of Union Springs*, 317 F. Supp. 2d 152 (N.D.N.Y. 2004), and then by a motions panel of the

---

[5]  Class II Gaming is a term of art defined by federal law, and includes things such as "the game of chance commonly known as bingo."  25 U.S.C. § 2703(7)(A)(I).

Second Circuit on July 15, 2004, *see* First *Cayuga* Litig. at Dkt. No. 72.

### 3. **Lakeside Entertainment Opens for Business**

While the Village's appeal from *Union Springs I* languished at the Circuit, the Nation completed renovations on the Property. The Cayugas' code officer inspected the newly renovated building and concluded that it complied with the Nation's building code and other tribal laws. Pls.' Facts ¶ 15. On May 31, 2004, the Cayugas opened Lakeside Entertainment Facility ("Lakeside Entertainment" or the "Facility"), an electronic bingo hall, where the Tribe began conducting Class II gaming activities in accordance with its tribal Gaming Ordinance. JSF ¶¶ 19, 54.

The story gets more complicated from here. As it turns out, the Cayugas' dispute with Union Springs over the applicability of its local laws to Nation-owned property was not the only tribal land dispute wending its way through the federal appeals process.

Before the First *Cayuga* litigation was even filed in late 2003, this Court had already heard and decided a property tax dispute between the Oneida Nation and several municipal defendants in nearby Oneida County, New York. *Oneida Indian Nation of N.Y. v. City of Sherrill, N.Y.*, 145 F. Supp. 2d 226 (N.D.N.Y. 2001).

In broad terms, the contours of the Oneidas' dispute with the locals was similar to the litigation brought by the Cayugas against Union Springs. There, the Oneidas had purchased fee simple title to certain real property within the boundaries of the tribe's historic reservation, asserted tribal sovereignty over the repurchased land, and refused to recognize state and local municipal authority to assess and collect property taxes on the reacquired parcels. *Oneida Indian Nation of N.Y.*, 145 F. Supp. 2d at 231-34.

As in the First *Cayuga* litigation, this Court had found in favor of the Oneidas, holding

that the repurchased properties were exempt from state and local taxation as "Indian country" within the meaning of federal law. *Oneida Indian Nation of N.Y.*, 145 F. Supp. 2d at 266. And a divided panel of the Second Circuit initially agreed with that bottom-line conclusion. *Oneida Indian Nation of N.Y. v. City of Sherrill, N.Y.*, 337 F.3d 139 (2d Cir. 2003).

### 4. The Supreme Court Decides *Sherrill*

But the Supreme Court granted certiorari and reversed. *City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y.* ("*Sherrill*"), 544 U.S. 197 (2005). With the support of the federal government as *amicus*, the Oneidas had argued that prior Supreme Court precedent already recognized the continued validity of the Tribe's "aboriginal title to their ancient reservation land," even if fee title was in the hands of other, modern landowners. *Id*. at 213.

Building on this favorable precedent, the Oneidas claimed they could revive complete sovereign tribal authority over discrete parcels of their historic reservation land by reunifying the fee title with this existing aboriginal title; *i.e.*, by making open market purchases of fee land situated within the reservation's historic boundaries. *Sherrill*, 544 U.S. at 213.

The Supreme Court rejected this "unification theory," relying on various equitable considerations to conclude that permitting the Oneidas to reestablish "present and future Indian sovereign control, even over land purchased at the market price, would have disruptive practical consequences." *Sherrill*, 544 U.S. at 219.

The Supreme Court then identified a solution to the Oneidas' desire to avoid state and local taxation on the repurchased parcels: the land-into-trust process established by the IRA in 1934, which authorized the Secretary of the Interior to take land into trust for the benefit of an Indian tribe. *Sherrill*, 544 U.S. at 220. And with that helpful observation, the Supreme

Court remanded the Oneidas' tax dispute back to the lower courts. *Id*. at 221.

### 5. **Lakeside Entertainment Closes its Doors**

The Cayugas knew that the outcome of the Oneidas' tax litigation might well impact their ability to continue gaming at Lakeside Entertainment, so the Nation took seriously the Supreme Court's advice about the land-into-trust process established in the IRA.

On April 14, 2005, the Nation applied to the Department of the Interior to have some of its repurchased fee land, including the Parcel, taken into trust. JSF ¶ 15. As of today, the Tribe's application is still pending. *Id*.; Defs.' Facts ¶ 62. Shortly thereafter, the Second Circuit remanded the Village's pending appeal in *Union Springs I* for reconsideration in light of the Supreme Court's decision in *Sherrill*. First *Cayuga* Litig. at Dkt. Nos. 74, 78.

With the benefit of *Sherrill*'s guidance, this Court determined that the Cayugas' attempt to invoke tribal sovereignty over its repurchased fee land as a way to completely avoid the Village's local laws was at least as "disruptive" to modern governance as the Oneidas' parallel effort to invoke tribal sovereignty over its repurchased fee land as a way to completely avoid state and local taxation. *Cayuga Indian Nation of N.Y. v. Village of Union Springs* ("*Union Springs II*"), 390 F. Supp. 2d 203, 206 (N.D.N.Y. 2005). Accordingly, this Court vacated the permanent injunction it had entered in favor of the Nation in *Union Springs I* and granted summary judgment to the Village instead. *Id*.

The Nation did not take an appeal from *Union Springs II*. Defs.' Facts ¶ 64. Instead, either shortly before or just after the litigation ended, the Cayugas shut down Lakeside Entertainment. JSF ¶ 20.

## C. Second Round of Litigation

Understandably, though, the Nation was not ready to scrap all the time and money it had invested in getting Lakeside Entertainment up and running. JSF ¶¶ 24-25. Instead, the Cayugas continued to follow the various tribal land disputes that were working their way through the state and federal court systems, and the Tribe's legal counsel met periodically with representatives from the NIGC. *Id*.

Among other things, the Nation kept a close eye on the Oneidas' ongoing efforts to establish the Turning Stone Casino Resort on historic reservation land in Oneida County. JSF ¶¶ 24-25. And on at least one occasion, the Cayugas sought from NIGC a formal opinion concerning whether the Parcel qualified as "Indian lands" within the meaning of the federal Indian Gaming Regulatory Act ("IGRA"). Defs.' Facts ¶¶ 71-73.

### 1. The Cayugas Get Back into Gaming

Eventually, the Cayugas decided to act. On May 7, 2013, the Nation renewed its Class II gaming license for Lakeside Entertainment in accordance with the federal regulations promulgated by the NIGC. JSF ¶ 26. This license renewal process required the Tribe to submit environmental, public health, and safety attestations for the Facility and to provide background check materials on certain "key employees" and management staff. *Id*. ¶¶ 27, 30-33. The Nation also obtained an architect's report in an effort to determine whether the Facility complied with "applicable codes." *Id*. ¶ 29.

Later that month, the Nation notified the NIGC that the Tribe had completed this gaming license renewal process and intended to reopen Lakeside Entertainment. JSF ¶ 27; Defs.' Facts ¶ 76. Once again, the Cayugas' code officer inspected the Facility and concluded that it remained in compliance with tribal codes and other laws. Pls.' Facts ¶ 15.

On July 3, 2013, the Nation reopened Lakeside Entertainment. JSF ¶ 28. That same day, the Cayugas' legal counsel disseminated a letter to various federal, state, and local officials advising that the Tribe had resumed Class II gaming at the Parcel. *Id*. ¶ 35.

According to the Nation's letter, the gaming activity at the Property was lawful in light of IGRA, which preempted state and local efforts to regulate Class II gaming activity on non-trust, Tribe-owned land. JSF ¶ 35. Indeed, as the letter pointed out, the gaming activity at Lakeside Entertainment looked a whole lot like the Oneidas' gaming activity at the nearby Turning Stone Casino Resort, which at that particular time sat on repurchased fee land not yet taken into trust by the Department of the Interior. Ex. K to JSF ¶ 35; Pls.' Facts ¶ 62.

## 2. **Union Springs Renews Enforcement Efforts**

The Nation's letter did not deter the Village. On July 9, 2013, a Union Springs code enforcement official served an "Order to Remedy Violations" on the Tribe.[6] JSF ¶ 36. According to this Order to Remedy, the Cayugas were "operating bingo without a license" in violation of the Village's "Games of Chance" Ordinance (the "Gaming Ordinance" or the "Games of Chance Ordinance"). Ex. L to JSF ¶ 36; Pls.' Facts ¶ 61.

Enacted by Union Springs in 1958, the Gaming Ordinance prohibits bingo and other games of chance but carves out an exception for fundraising activities by non-profit organizations, which can seek a bingo license or permit from the Union Springs Board of Trustees ("Village Board"). Ex. D to JSF ¶ 22; Defs.' Facts ¶ 25. The Gaming Ordinance was the only alleged violation actually described in this first notice. Ex. L to JSF ¶ 36.

The Order to Remedy touched off a back-and-forth between the parties that

---

[6] Each violation notice warns that noncompliance "may constitute an offense punishable by fine or imprisonment or both." Pls.' Facts ¶ 64.

consumed the rest of 2013 and most of 2014. First, on July 23, 2013, the Nation's counsel sent a letter to Union Springs Attorney Chad Hayden ("Village Attorney Hayden") reiterating the Tribe's view that IGRA preempted state or local efforts to regulate tribal gaming activity on repurchased fee land. JSF ¶ 37. The Cayugas' letter explained that while the Tribe was happy to comply with other local laws, the Games of Chance Ordinance could not be applied to Lakeside Entertainment in light of IGRA's preemptive effect. *Id*.

Thereafter, the Nation attempted to comply with other aspects of the Union Springs zoning code. On August 8, 2013, Lakeside Entertainment Manager Betty Jane Radford ("Radford") submitted a completed application for a Certificate of Occupancy to Union Springs Code Enforcement Officer Howard Tanner ("Code Enforcement Officer Tanner"). Ex. N to JSF ¶ 38. In her accompanying letter, Radford explained that the Nation's architect had determined that the Facility was code compliant, and further stated that the Tribe's own health and safety codes were "at least as stringent as the state and local codes that govern in Union Springs." *Id*.

On August 13, 2013, Code Enforcement Officer Tanner wrote back, instructing Radford to complete a permit application in accordance with certain state regulations. Ex. O to JSF ¶ 39; Pls.' Facts ¶¶ 68-69. Code Enforcement Officer Tanner's letter also asked Radford "to apply for a license to operate a bingo hall in the Village pursuant to the Games of Chance Ordinance dated May 19, 1958." Ex. O to JSF ¶ 39.

On December 19, 2013, Radford submitted to Code Enforcement Officer Tanner a another application for a Certificate of Occupancy for Lakeside Entertainment. Ex. P to JSF ¶ 40. Radford's second submission included a lengthy Code Compliance Review completed by an architect retained by the Nation. *Id*.; Pls.' Facts ¶¶ 70-71.

These submissions did not satisfy the Village. On December 23, 2013, a few days after Radford submitted the second application for a Certificate of Occupancy, the Village served two additional "Orders to Remedy Violations." Ex. Q to JSF ¶ 41; Pls.' Facts ¶ 73.

As before, one notice alleged that the Nation's Class II gaming activities at Lakeside Entertainment violated the Village's Games of Chance Ordinance. Ex. Q to JSF ¶ 41; Pls.' Facts ¶ 74. But this time around, the Village also faulted the Facility for allegedly violating 19 N.Y.C.R.R. § 1202.3, a regulation which prohibits changes "in the nature of the occupan[c]y of an existing building unless a Certificate of Occupancy authorizing the change has been made." JSF ¶ 41; Pls.' Facts ¶ 75.

Although both notices instructed the Nation to achieve compliance by December 28, 2013, Ex. Q to JSF ¶ 41, operations at Lakeside Entertainment seem to have continued unabated. On February 21, 2014, Code Enforcement Officer Tanner inspected the Facility and identified three building code issues that needed to be handled. JSF ¶ 42; Pls.' Facts ¶¶ 77-78. The Nation quickly addressed these problems and, on a March 7 return visit, Code Enforcement Officer Tanner stated that the Facility met building code requirements for "fire/life safety." JSF ¶ 43; Pls.' Facts ¶ 79.

Still, though, Union Springs was not satisfied. On March 24, 2014, Code Enforcement Officer Tanner wrote back to Radford, informing her that he could not grant a Certificate of Occupancy to Lakeside Entertainment because it was "still in violation of the zoning law of the Village of Union Springs and the 1958 games of chance ordinance which prohibits bingo in the Village." Ex. R to JSF ¶ 44; Pls.' Facts ¶¶ 81-82. According to Code Enforcement Officer Tanner, the Nation needed to obtain (1) a use variance from the Village's Zoning Board of Appeals and (2) a bingo permit from the Village Board. *Id*.

On April 2, 2014, the Nation's counsel wrote to Village Attorney Hayden, reiterating that IGRA preempted the Village's attempt to apply the Gaming Ordinance to Lakeside Entertainment. Ex. S to JSF ¶ 45. The letter further explained that, because the Parcel sits within a "Commercial Zoning District" as that term is defined in the Village Zoning Law, no use variance was necessary. *Id*.; Pls.' Facts ¶¶ 86-89. Finally, the letter advised that, to the extent the Village believed the Nation needed to obtain the use variance to avoid the Games of Chance Ordinance, that extra step would also be preempted by IGRA. Ex. S to JSF ¶ 45.

### 3. **This Lawsuit is Filed**

On October 28, 2014, the Nation and John Does 1-20 filed suit against Union Springs, the Village Board, and a group of Village officials. Dkt. No. 1. This time around, the Cayugas sought to vindicate their contention that IGRA preempts the Village's renewed efforts to regulate, block, or restrict the Class II gaming activity at Lakeside Entertainment. *Id*.

The Nation sought an emergency restraining order and an injunction that would prevent Union Springs from enforcing its local laws and ordinances against the Property. Dkt. No. 5. After this Court entered an order temporarily restraining the Village's enforcement efforts, Dkt. No. 7, the parties stipulated to maintain the status quo until the Tribe's application for a preliminary injunction could be decided, Dkt. No. 12, 19.

But the case hit a roadblock almost immediately. On November 13, 2014, the Cayuga Nation Unity Council (the "Unity Council") moved to intervene as a defendant and to dismiss the action. Dkt. No. 27. According to the Unity Council's filings, Halftown—who had led both the initial effort to build Lakeside Entertainment and the renewed effort to reopen it—had been ousted from his leadership position within the Tribe and therefore had no authority to

institute litigation on behalf of the Nation. *Id*. While the parties briefed the leadership dispute with the Unity Council, the Village cross-moved to dismiss the Tribe's suit. Dkt. No. 32.

On December 19, 2014, the Unity Council's motion to intervene was denied. *Cayuga Nation v. Tanner*, 2014 WL 12591881 (N.D.N.Y. Dec. 19, 2014). There, the Court recognized that there was an ongoing leadership dispute within the Tribe that had taken a series of twists and turns, but noted that the Bureau of Indian Affairs ("BIA") had long recognized Halftown as the Nation's federal representative for government-to-government purposes. *Id*. at *2-*3. Accordingly, the Court concluded the Unity Council lacked standing to intervene. *Id*. at *3.

### 4. The Nation is Forced to Appeal

However, on May 19, 2015, the Court granted the Village's cross-motion to dismiss the Nation's suit for lack of standing, vacated the temporary restraining order, and closed the case. *Cayuga Nation v. Tanner*, 2015 WL 2381301 (N.D.N.Y. May 19, 2015). In the Court's view, the tribal leadership dispute first hinted at by the Unity Council's attempt to intervene had become impossible to unravel because it involved disputed issues of tribal law, a matter outside the jurisdictional purview of an Article III court.[7] *Id*.

With the Nation forced to appeal, Dkt. No. 53, the Village took the opportunity to pounce, serving the Tribe with four new Orders to Remedy Violations the very next day, JSF ¶ 46. These new notices alleged the Nation had failed to secure a Certificate of

---

[7] A full account of the leadership dispute can be found in the district court opinion rejecting the Unity Council's challenge to federal administrative decisions recognizing Halftown and his leadership group as the Tribe's federal representative. *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 5-9 (D.D.C. 2019).

Occupancy or a bingo permit for Lakeside Entertainment.[8]  Ex. K to Tanner Decl., Dkt. No. 125-11; Pls.' Facts ¶¶ 91-92.  One of these notices also alleged that the Facility's sprinkler system was inadequate, and cited a violation of New York State's building code.  Pls.' Facts ¶ 93.  The Nation fixed the sprinkler system issue but kept gaming.  *Id*. ¶ 94.

This touched off a round of emergency motion practice:  the Doe plaintiffs sought an opportunity to amend the pleading to identify themselves as Halftown and two of his fellow Councilmembers; the Nation itself sought an injunction pending appeal.  Dkt. Nos. 52, 54.  A second temporary restraining order was entered while those requests were briefed.

On June 11, 2015, the Court granted the Nation's motion for an injunction pending appeal but denied the Does' motion for reconsideration, finding their assertions of harm that might flow from the Village's vague threats of future enforcement activity too speculative to warrant partial reinstatement of the suit.  *Cayuga Nation v. Tanner*, 108 F. Supp. 3d 29 (N.D.N.Y. 2015).  However, the Court observed that amendment of the complaint to identify the Doe plaintiffs might well be warranted if the standing issue were resolved favorably to the Nation on appeal.  *Id*. at 34 & n.5.

On June 2, 2016, a panel of the Second Circuit sided with the Cayugas and vacated the dismissal order.  *Cayuga Nation v. Tanner*, 824 F.3d 321 (2d Cir. 2016).  Although the Circuit acknowledged that "federal courts lack authority to resolve internal disputes about tribal law," the panel concluded that a court faced with such a dispute need only address "whether there is a sufficient basis in the record to conclude, without resolving disputes about

---

[8]  The parties agree that the Village served four additional notices at this time, JSF ¶ 46, but contrary to the parties' joint representation, copies do not appear attached as Exhibit T on CM/ECF.  The Court has referred to the copies it was able to find attached to Code Enforcement Officer Tanner's declaration instead.

tribal law, that the individual may bring a lawsuit on behalf of the tribe." *Id*. at 328.

Tackling this more limited standing inquiry, the Circuit concluded that it could appropriately defer to the BIA's decision to recognize Halftown as the Nation's federal representative, regardless of the limited or interim nature of the BIA's recognition decision. *Cayuga Nation*, 824 F.3d at 330. The panel also concluded that a subset of the Doe plaintiffs, properly identified, had "adequately alleged that they face a credible threat of prosecution" from the Village's enforcement efforts. *Id*. at 331-32. However, the Second Circuit declined to weigh in on the merits of the parties' land-use dispute, including but not limited to the Village's claim that res judicata barred the Nation's suit in light of the final outcome of the First *Cayuga* Litigation all the way back in 2005. *Id*. at 333 & n.10.

### 5. <u>A Return to the Status Quo</u>

On remand, neither player sought to advance the litigation. Instead, on June 23, 2016, the parties entered into a stipulation that kept in place a temporary injunction precluding the Village from "taking any steps to restrict, interfere with, punish, or otherwise penalize any actions taken by the Cayuga Nation, its officer, employees, or other representatives in furtherance of Class II gaming activities at Lakeside Entertainment, including but not limited to any effort to enforce the 1958 'Games of Chance' Ordinance or the Union Springs Zoning Ordinance or to penalize noncompliance with the Orders to Remedy that have been issued." Dkt. No. 73 (citing Dkt. No. 7).

For the next three years, the parties periodically renewed the terms of this initial stipulation and filed with the Court a series of status reports as they continued to "explore ways to resolve their dispute without further litigation." Dkt. Nos. 75, 77, 79, 81, 83, 85, 87, 89, 93, 95. While the parties remained at a standstill, the NIGC announced it would once

again recognize and regulate the Nation's gaming activity at Lakeside Entertainment. Ex. U to JSF ¶ 47; Pls.' Facts ¶¶ 51-60. Since that announcement, the NIGC has approved the Cayugas' Class II Gaming Ordinance. Ex. V to JSF ¶ 53. The Tribe currently pays quarterly fees to NIGC based on its "Assessable Gaming Revenue" in accordance with IGRA and applicable NIGC regulations. JSF ¶ 49.

In short, the Nation has come a long way since 2002, when it first began to pursue economic development efforts. These days, the Tribe owns and manages forty-two housing units for its citizens on Cayuga Historic Reservation land, which it constructed with grant funding from United States Department of Housing and Urban Development. Pls.' Facts ¶¶ 17-18. The Nation provides scholarships to Cayuga citizens, helps arrange health care through the Indian Health Service, and participates in child welfare matters concerning Cayuga children. *Id*. ¶¶ 19-22.

More recently, the Nation has established its own law enforcement apparatus and court system. Pls.' Facts ¶¶ 26-30, 43-48. This Cayuga Nation Police Force patrols Nation-owned properties, including Lakeside Entertainment. *Id*. ¶ 31-38. And although it does not receive federal funding, the Police Force does participate in training events with the federal government. *Id*. ¶¶ 40-41.

Yet even today, the situation at Lakeside Entertainment remains in flux. For one thing, the Village continues to deny that the Nation validly exercises any "government power" over its lands or its citizens. Pls.' Facts ¶ 11. And local municipalities like Seneca and Cayuga County continue to deny the legitimacy of the Nation's law enforcement activities. Defs.' Facts ¶¶ 88-89.

### D. **Ending the Stalemate**

On March 27, 2019, in an effort to finally move this litigation toward a resolution, the Court held a status conference with the parties and then set a date certain on which a bench trial in this matter would begin. Shortly thereafter, the parties agreed to a briefing schedule with a set of stipulated facts that would allow the case to be resolved on the papers alone. Dkt. No. 98.

On May 22, 2019, in accordance with the parties' agreement, the Cayugas, along with a group of tribal officials and employees, filed a three-count amended complaint seeking declaratory and injunctive relief against Union Springs and its officials. Dkt. No. 100.

Thereafter, the parties stipulated to dismiss a counterclaim asserted by the Village, which alleged that the Tribe's federal reservation had been validly disestablished at some point after the Treaty of Canandaigua in 1794. Dkt. No. 112; *see also Cayuga Indian Nation of N.Y. v. Seneca County, N.Y.*, 260 F. Supp. 3d 290, 309-15 (W.D.N.Y. 2017) (dismissing similar counterclaim alleging that the 1838 Treaty of Buffalo Creek disestablished, or terminated, the Cayugas' reservation).

On September 4, 2019, the parties cross-moved for summary judgment on the basis of joint stipulated facts supplemented by additional evidentiary material briefed in the traditional manner. The matter is ripe for decision.

## III. **LEGAL STANDARD**

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment is a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED.

R. CIV. P. 56(c)).  A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a "genuine" dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.

"When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party."  *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Accordingly, summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

"Where, as here, the parties have cross-moved for summary judgment, a reviewing court 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'"  *Ward*, 286 F. Supp. 3d at 327 (quoting *Marcano v. City of Schenectady*, 38 F. Supp. 3d 238, 246 (N.D.N.Y. 2014) (McAvoy, J.)).  "In undertaking this analysis, it bears nothing that 'a district court is not required to grant judgment as matter of law for one side or the other.'"  *Id*.

## IV.  DISCUSSION

The Nation's amended pleading asserts three counts.  Count One alleges that IGRA preempts state and local civil enforcement proceedings that might prohibit the Tribe from conducting Class II gaming at Lakeside Entertainment.  Am. Compl. ¶¶ 80-85.  Count Two alleges that IGRA preempts state and local criminal enforcement proceedings with respect to the Tribe's Class II gaming at the Facility.  *Id*. ¶¶ 86-91.  And Count Three alleges that tribal

sovereign immunity bars state and local enforcement efforts regardless of whether or not IGRA preemption applies. *Id*. ¶¶ 92-96. The Nation seeks declaratory and injunctive relief. *Id*. ¶¶ 85, 91, 96.

### A. <u>Preclusive Effect of Prior Litigation</u>

At the outset, however, Union Springs contends that collateral estoppel and res judicata bar all three of the Nation's claims. Defs.' Mem., Dkt. No. 135 at 10, 13-30. First, the Village argues that estoppel applies because the Tribe already litigated IGRA preemption and tribal sovereignty in the First *Cayuga* Litigation. *Id*. And even if estoppel does not apply, Union Springs insists res judicata should bar this suit, since the Nation "could have" and "should have" raised these IGRA preemption claims in the first round of litigation. *Id*.

"Res judicata and collateral estoppel are related but distinct doctrines that may bar a party from litigating certain claims or issues in a subsequent proceeding." *Flaherty v. Lang*, 199 F.3d 607, 612 (2d Cir. 1999). "Both doctrines have a common objective: the finality of judgments, and they often overlap in a particular case." *Parker v. Corbisiero*, 825 F. Supp. 49, 54 (S.D.N.Y. 1993).

"Under the doctrine of res judicata, or claim preclusion, 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were *or could have been* raised in that action.'" *Flaherty*, 199 F.3d at 612 (quoting *Rivet v. Regions Bank of La.*, 522 U.S. 470, 476 (1998) (emphasis in original)). "In contrast, collateral estoppel, or issue preclusion, 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated by the same parties in a future lawsuit.'" *Id*. (quoting *Schiro v. Farley*, 510 U.S. 222, 232 (1994)).

## 1. **Collateral Estoppel**

First, Union Springs contends that collateral estoppel bars all of the Nation's claims. Defs.' Mem. at 18-25. According to the Village, in *Union Springs I* the Cayugas "raised, and this Court expressly adopted, IGRA preemption as a complete defense to the enforcement of Village laws seeking to regulate the use of the [ ] Parcel." *Id*. at 10. Thus, the Court's later, contrary determination in *Union Springs II*—which went the Village's way in light of the Supreme Court's intervening decision in *Sherrill* and from which the Nation did not take an appeal—means that the Tribe is now estopped from relitigating IGRA here in a second suit. *Id*.

"Under either federal law or New York State law, collateral estoppel, or issue preclusion, bars the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding, regardless of whether the two suits are based on the same cause of action." *Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003). However, "in order for a judgment to be preclusive, the issue in question must have been actually decided, and its determination must have been essential to the judgment." *Id*. In other words, "[i]f an issue was not actually decided in the prior proceeding, or if its resolution was not necessary to the judgment, its litigation in a subsequent proceeding is not barred by collateral estoppel." *Id*.

Collateral estoppel thus "applies when (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *Flaherty*, 199 F.3d at 613 (quoting *United States v. Hussein*, 178 F.3d 125, 129 (2d Cir. 1999)).

Upon review, that test is not met in this case. Union Springs spends pages of its opening brief delivering an exhaustive account of what it clearly believes to have been unfair or deceitful behavior by the Nation in the First *Cayuga* litigation. Defs.' Mem. at 13-16, 18-20. In the Village's view, the Cayugas unfairly "concealed" their plan to eventually conduct gaming activities at the Property. *Id*. at 19. According to the Village, the Tribe knew from the very beginning of its renovations that the Games of Chance Ordinance would be an impediment to the kind of activity the Nation had planned. *Id*. at 19-20.

That may all be true. But in arguing that the Nation should be estopped from litigating IGRA's preemptive effect in this second lawsuit, Union Springs distorts certain elements of the parties' litigation history. As relevant here, the Village rips from context a short quotation from *Union Springs I* to claim that this Court "expressly adopted the Cayugas' IGRA-based preemption argument." Defs.' Mem. at 22 (quoting *Union Springs I*, 317 F. Supp. 2d at 148).

The Court did no such thing. The Nation filed the first suit in October 2003, nearly a full year before Lakeside Entertainment opened in May 2004. Accordingly, the Tribe's claim in the First *Cayuga* Litigation involved a dispute with Union Springs over its attempt to regulate construction and renovation activities at the Parcel, not its present effort to block or restrict the Tribe's gaming activities. Indeed, the pleading filed by the Nation in the first suit alleged that an Indian tribe could revive tribal sovereignty over, or at the very least render state and local laws completely inapplicable to, reacquired fee land situated within the boundaries of a historic reservation. First *Cayuga* Litig., Dkt. No. 1 at ¶¶ 3-4, 25.

*Union Springs I* agreed with that rationale. First, the Court declared that the Property qualified as "Indian country," a status which generally exempted it from the application of state and local regulation. *Union Springs I*, 317 F. Supp. 2d at 148. Second, the Court

rejected an attempt by Union Springs to argue that "exceptional circumstances" warranted the application of state and local law despite the Parcel's newfound status as Indian country. *Id*. at 144-48.

As part of that "exceptional circumstances" argument, the Village had claimed that information about the Nation's "planned use for the Property" was "vital" to making an informed determination about whether its local laws should still apply. *Union Springs I*, 317 F. Supp. 2d at 148. The Village, it turned out, had learned through an anonymous tipster that the Tribe planned to open a gaming operation on the Parcel. *Id*. at 149 & n.21.

*Union Springs I* rejected that assertion. The Court explained that any tribal gaming activity that might take place down the road would be subject to the independent, comprehensive federal regulatory scheme set forth in IGRA. *Union Springs I*, 317 F. Supp. 2d at 148. Thus, *even if* the Tribe eventually planned to use the Property for gaming, that activity would not be the sort of "exceptional circumstances" sufficient to justify the application of the Village's local regulations. *Id*.

*Union Springs I* went on to refuse the Village's request to enjoin the Tribe from gaming at the Property until the Nation could demonstrate so-called IGRA compliance because, *inter alia*, the Cayugas had not even "commenced any gaming activities on the Property that could be considered an IGRA violation." *Union Springs I*, 317 F. Supp. 2d at 150.

Indeed, the Court noted it was arguable whether Union Springs had even provided fair notice to the Nation of this defensive assertion of IGRA, since the issues in dispute in the First *Cayuga* Litigation—in both the Nation's complaint and in the counterclaim interposed by the Village—related to the applicability *vel non* of local laws to Indian country. *Id*. at 149 & n.21. The Cayugas did not raise, and the Court did not address, IGRA's preemptive effect

on those local laws.  *Id.*

Later, in *Union Springs II*, the Court vacated the permanent injunction it had previously entered in favor of the Nation.  390 F. Supp. 2d at 206.  Because *Union Springs I* had relied on "traditional notions of Indian sovereignty" to enjoin the Village from enforcing any of its local laws against the Property, equitable relief on that basis was improper in the wake of *Sherrill*, which held that a tribe cannot revive unilateral sovereign authority over discrete parcels of historic reservation land through open market purchases.  *Id.*  Accordingly, the Court granted summary judgment in favor of the Village.  *Id.*

There is not a single mention of IGRA in *Union Springs II*.  Properly understood, then, Union Springs is wrong to claim that preemption "was actually litigated and actually decided" or even "necessary to support a valid and final judgment on the merits" in either *Union Springs I* or *Union Springs II*.  *See Flaherty*, 199 F.3d at 613.

To the contrary, the First *Cayuga* Litigation was about invoking tribal sovereignty over historic reservation land repurchased in fee as a way to completely avoid the application of any state and local laws.  In *Union Springs I*, the Court held that this strategy was permissible.  The Supreme Court held otherwise in *Sherrill*.  That change in the law is reflected in the unappealed judgment in *Union Springs II*.

This suit asks a different question:  what to do about otherwise applicable local laws that touch on tribal gaming activity?  The Nation alleges that state and local efforts to enforce those laws are preempted by IGRA.  Because that is an entirely different issue than the one that prompted the First *Cayuga* Litigation, collateral estoppel is no bar to these proceedings.

## 2.  Res Judicata

Alternatively, Union Springs contends that res judicata bars the Nation's suit because it involves "the very same parcel of land in the Village and the very same actions by the Cayugas in operating Lakeside Entertainment in violation of local laws."  Defs.' Mem. at 26.

"Under both New York law and federal law, the doctrine of *res judicata*, or claim preclusion, provides that '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'"  *Maharaj v. Bankamerica Corp*, 128 F.3d 94, 97 (2d Cir. 1997) (Cardamone, J.) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)).  Unlike collateral estoppel,"[r]es judicata applies to any claim or defense previously available, whether or not it was actually litigated or determined."  *Oneida Indian Nation of N.Y. v. New York*, 194 F. Supp. 2d 104, 125 (N.D.N.Y. 2002) (Kahn, J.) (citing *Tucker v. Arthur Andersen & Co.*, 646 F.2d 721, 727 (2d Cir. 1981)).

"In determining whether a second suit is barred by this doctrine, the fact that the first and second suits involved the same parties, similar legal issues, similar facts, or essentially the same type of wrongful conduct is not dispositive."  *Maharaj*, 128 F.3d at 97.  "Rather, the first judgment will preclude a second suit only when it involves the same 'transaction' or connected series of transactions as the earlier suit; that is to say, the second cause of action requires the same evidence to support it and is based on facts that were also present in the first."  *Id.*

Union Springs asserts that the First *Cayuga* Litigation and the Nation's current lawsuit "are part of the same, single continuous transaction" because, in the Village's view, "[n]othing changed factually or legally since the Cayugas voluntarily shut down Lakeside Entertainment

in response to *Union Springs II*."  Defs.' Mem. at 27, 29.

But that is the wrong way to think about claim preclusion.  "For the purposes of *res judicata*, the scope of litigation is framed by the complaint at the time it is filed."  *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 369-70 (2d Cir. 1997) (cleaned up).  Thus, "[t]he *res judicata* doctrine does not apply to new rights acquired during the action which might have been, but which were not, litigated."  *Id*.

As explained in significant detail *supra* and as the Nation sets forth in its own brief in opposition, the First *Cayuga* Litigation was about whether the Village's zoning and land-use laws applied to renovation and construction on the Property, a discrete parcel of historic reservation land reacquired in an open market transaction, despite the Tribe's assertion of tribal sovereign authority. Pls.' Response Mem., Dkt. No. 137 at 16-23.

Consequently, the enforcement activity that brought the Nation into federal court in 2003 stemmed from the Tribe's renovation and construction activities.  *Id*. at 17-18; *see also* First *Cayuga* Litig., Dkt. No. 1 at ¶ 28 (describing "Stop Work" Orders and "Orders To Remedy Violations" that asserted "work [at the Parcel] was proceeding without Village zoning and building permits, an asbestos survey[,] or filed architect plans.").

The dispute in this second case is about whether Union Springs can apply otherwise applicable local law(s) to regulate tribal gaming activities despite an assertion of IGRA's preemptive effect over that field.  Pls.' Response Mem. at 19-20.  As one would expect, the enforcement activity that brought the Tribe into federal court this time is based on new (and different) enforcement efforts undertaken by the Village on that score.  *Id*.

To be sure, Lakeside Entertainment had opened by the time the Second Circuit finally remanded the First *Cayuga* Litigation for consideration in light of *Sherrill*.  But the Nation did

not amend its operative complaint to add claims based on IGRA preemption before *Union Springs II* was decided in 2005. And it was under no obligation to do so. *See, e.g.*, *Computer Assocs. Int'l, Inc.*, 126 F.3d at 370.

In reply to this argument, Union Springs emphasizes the sweeping nature of the injunction entered in *Union Springs I* and argues that res judicata precludes a party "from launching a series of lawsuits to challenge different local laws in successive actions—breaking off one law at a time, as each is enforced against it, despite the lawbreaker knowing the full universe of laws that apply to its actions." Defs.' Response Mem., Dkt. No. 138 at 14.

That is certainly one way to caricature the parties' litigation history. A more balanced view, however, is that the adverse judgment left unappealed by the Nation in *Union Springs II* is a post-*Sherrill* confirmation that the Village, notwithstanding tribal sovereignty, retains authority to apply its local laws to historic reservation land reacquired by the Tribe in fee (such as the Parcel) while this litigation is a live dispute over whether a specific federal law preempts that otherwise retained authority in connection with a specific kind of activity. Accordingly, res judicata does not bar these proceedings.

## B. IGRA Preemption

Congress enacted IGRA in 1988 as a "compromise solution to the difficult questions involving Indian gaming." *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1092 (E.D. Cal. 2002). As the Second Circuit has confirmed, the Act was "intended to expressly preempt the field in the governance of gaming activities on Indian lands." *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 469-70 (2d Cir. 2013) (citation and internal quotation marks omitted).

IGRA provides a statutory basis for (1) "the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and (2) "the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences." 25 U.S.C. § 2702(1)–(2).  The Act provides for independent federal regulatory authority and federal standards for gaming on Indian lands.  § 2702(3).  The Act also establishes the NIGC as a commission within the Department of the Interior ("DOI") to monitor tribal gaming and to promulgate the regulations and guidelines necessary to implement the statute.  §§ 2704(a), 2706(b).

"The Act divides gaming on Indian lands into three classes—I, II, and III—and provides a different regulatory scheme for each class."  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 48 (1996).  Lakeside Entertainment is considered Class II, which includes bingo, pull-tabs, punch boards, and other similar games.  25 U.S.C. § 2703(7)(A); *Ysleta del Sur Pueblo v. Texas*, 36 F.3d 1325, 1330 (5th Cir. 1994) ("IGRA defines Class II gaming as bingo and other non-banking card games (i.e., card games in which the casino has no economic interest in the outcome).").

IGRA subjects this intermediate class of gaming to a kind of joint tribal/federal regulation.  25 U.S.C. § 2710(a)(2).  The Act provides that "[a]n Indian tribe may engage in, or license and regulate, class II gaming on Indian lands within such tribe's jurisdiction, if (A) such Indian gaming is located within a State that permits such gaming . . . , and (B) the governing body of the Indian tribe adopts an ordinance or resolution which is approved by the

[NIGC] Chairman." § 2710(b)(1) (emphasis added).[9]

### 1. Civil Enforcement

In Count One, the Nation alleges that IGRA preempts the Village's civil enforcement efforts against the Class II gaming activity at Lakeside Entertainment. Am. Compl. ¶¶ 80-85. The Nation alleges it is therefore entitled to declaratory and injunctive relief from the Village's ongoing refusal to grant the Facility a Certificate of Occupancy, whether this denial is based on the Games of Chance Ordinance or on other aspects of the Village's zoning and land-use laws. *Id*. According to the Cayugas, the broad sweep of IGRA's preemptive effect precludes the Village from directly or indirectly interfering with the Tribe's Class II gaming activities. *Id*.

Union Springs asserts that Lakeside Entertainment cannot receive the benefit of IGRA's preemptive effect because the Property does not qualify as "Indian lands" within the meaning of the statute. Defs.' Mem. at 33-38. The Village also contends that the Parcel does not fall within the Tribe's "jurisdiction" because the Cayugas do not exercise any real "governmental power" over the land. *Id*. According to the Village, the ongoing governance activities described at length in the Nation's briefing—like the tribal police force and courts—are nothing more than a sham. *Id*. at 38 & n.11.

The Village insists that under *Sherrill* and *Union Springs II*, "the Cayugas exercise no sovereign authority whatsoever over the fee lands they own, and instead are subject to state and local taxation and state and local laws including land use and zoning, and otherwise are fully subject to the jurisdiction of New York State and its political subdivisions." Defs.' Mem. at 36. In the Village's view, "[t]his leaves no room for tribal self-governance and no possibility

---

[9] Although the Village attacks the jurisdictional component(s) of this language, it is undisputed that the other requirements for Class II gaming are met. Pls.' Mem. at 22.

of the Cayugas' fee lands qualifying as 'Indian lands' under tribal governmental power." *Id*.

The Nation, on the other hand, lays out a convincing argument for why this zero-sum conception of post-*Sherrill* tribal authority is incorrect. Pls.' Mem. at 19-31. Initially, though, the Cayugas argue that preemption principles render the Village's arguments about the precise nature and extent of tribal governmental power totally irrelevant. *Id*. at 21. The Tribe points out that IGRA sets up an administrative enforcement scheme that vests the NIGC with authority to make determinations about the lawfulness of tribal gaming. *Id*. According to the Nation, "[i]f the Village believes that such gaming is unlawful, its remedy is to ask NIGC and its Chairman to bring an enforcement action." *Id*.

The Nation then goes on to explain that there is no minimum quantum of "governmental power" that a tribe must exercise over a piece of land before it can qualify under the territorial jurisdictional provisions identified by the Village. Pls.' Mem. at 21-23. Rather, a parcel of tribe-owned land satisfies IGRA as long as the tribe "may exercise *some* jurisdiction" over the land, and therefore even concurrent jurisdiction with state and/or local authorities is sufficient to satisfy this requirement. *Id*. at 22-27.

### a. Indian lands

Union Springs' jurisdictional argument actually conflates language found in two different subsections of IGRA. First, the Village argues that the Property does not qualify as "Indian lands" within the meaning of the Act.

IGRA defines "Indian lands" to mean (A) "all lands within the limits of any Indian reservation" and (B) "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises

governmental power." 25 U.S.C. § 2703(4) (emphasis added).

As the Nation points out, Union Springs seems to be suggesting that the additional qualifying language found in subsection (B); that is, the underlined requirement that a tribe "exercise[ ] governmental power" over the land in question, should also apply to the language in subsection (A), which sweeps in "all lands within the limits of any Indian reservation" without any qualifier about the exercise of governmental power.

That is the wrong way to read the "Indian lands" definition. *See* Pls.' Response at 23-25. Where, as here, Congress has included a qualifier in one subsection of a statute but omitted it from another, "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662 (2008).

It is undisputed that the Cayugas, a federally recognized Indian tribe, are the same entity with which the United States entered into the Treaty of Canandaigua. JSF ¶¶ 1-2. It is undisputed that the lands recognized and identified as reserved for the Cayugas in that Treaty constitute the Cayuga Historic Reservation. *Id*. ¶ 4. It is undisputed that the Property is situated within the boundaries of this Cayuga Historic Reservation. *Id*. ¶ 10. And for present purposes, it is also undisputed that the Cayuga Historic Reservation has not been disestablished by subsequent developments. *Id*. ¶ 3.

At first blush, it seems challenging to reconcile that, on the one hand, the Cayugas possess a reservation that has never been disestablished, and on the other, the reality that up until recently the Nation did not hold modern legal title to any of that reservation land. However, in drafting IGRA Congress chose to use expansive definitional language in subsection (A); *i.e.*, it deliberately chose to include "all lands within the limits of any Indian

reservation."  Applying that unrestricted language to the factual landscape of this case, the Property qualifies as "Indian lands."  Accordingly, this argument will be rejected.

### b. <u>Within such tribe's jurisdiction</u>

The other component of the Village's jurisdictional argument rests on the section of IGRA that lays out a so-called "jurisdictional" requirement for Class II gaming.  The contested subsection of the Act provides that "[a]n Indian tribe may engage in, or license and regulate, class II gaming on Indian lands <u>within such tribe's jurisdiction</u>."  25 U.S.C. § 2710(b)(1) (emphasis added).

Union Springs contends that the Nation does not exercise any tribal "jurisdiction" over the repurchased Parcel because the Tribe does not enjoy any "sovereignty" over repurchased fee land after *Sherrill* and *Union Springs II*.  The Village draws a series of contrasts between historical quotes about the unrestricted nature of tribal sovereignty over reservation land and the Supreme Court's alleged restriction of that sovereignty in *Sherrill* to argue that the Cayugas stand in the shoes of an ordinary landowner when it comes to their jurisdictional authority over the Property today.  Defs.' Mem. at 34-35.

For instance, the Village cites to *McClanahan v. State Tax Comm'n of Arizona*, a pre-*Sherrill* opinion in which the Supreme Court observed that Indian reservations were long understood to be "distinct political communities, having territorial boundaries within which their authority is exclusive" and where, consequently, "<u>state law could have no role to play</u>."  411 U.S. 164, 168 (1973) (emphasis added).  According to the Village, language like this shows that the Nation's assertion of tribal "jurisdiction" over the Property did not survive the Supreme Court's holding in *Sherrill*, which rejected the Oneidas' attempt to revive tribal sovereignty over repurchased fee lands.

The Nation responds that rhetoric about the historical nature of tribal sovereignty over reservation land can only take you so far when trying to decide what Congress meant when it wrote this "within such tribe's jurisdiction" phrase into IGRA. The Nation also contends that these general quotes about unrestricted tribal sovereignty certainly do not explain how, if at all, IGRA's jurisdictional requirement is impacted by *Sherrill*'s holding.

To illustrate the point, the Cayugas quote language helpful to their own arguments. In *Solem v. Bartlett*, a pre-IGRA, pre-*Sherrill* case, the Supreme Court set out the general principle that "[o]nce a block of land is set aside for an Indian Reservation and <u>no matter what happens to the title of individual plots within the area</u>, the entire block retains its reservation status until Congress explicitly indicates otherwise." 465 U.S. 463, 470 (1984) (emphasis added).

Beyond a citation to *Solem*, the Cayugas offer other good reasons to reject the Village's all-or-nothing conception of modern tribal authority, as least insofar as it applies to IGRA's "jurisdiction" requirement. For instance, the Nation points out that by the time Congress passed IGRA in 1988, it was well understood that contemporary tribal authority over reservation land varied widely between tribes and across geographic boundaries. After all, Congress had by then explicitly authorized certain states to exercise civil and criminal regulatory authority over tribal activities on reservation land. *See* Pls.' Response at 25-28.

As an example, in 1953 Congress enacted "Public Law 280," which expressly granted six states broad criminal and limited civil jurisdiction on reservations. 18 U.S.C. § 1162; 28 U.S.C. § 1360(a). And as the Tribe correctly explains, these jurisdictional grants were expanded to include additional states in subsequent years. Pls.' Response at 26.

In fact, it was the Supreme Court's 1987 decision in *California v. Cabazon Band of*

*Mission Indians*, which invalidated California's attempt to regulate tribal bingo under Public Law 280, that finally spurred Congress to take action to regulate the field of tribal gaming by enacting IGRA the following year. *Artichoke Joe's*, 216 F. Supp. 2d at 1091-92 (explaining that *"Cabazon* left something of a regulatory vacuum that made the issue of Indian gaming regulation more pressing").

In other words, tribal "jurisdiction" and "sovereign authority" are no longer treated as necessarily binary, yes-or-no concepts. Nevertheless, Union Springs insists "[t]here is no space between *Sherrill*'s total preclusion of sovereignty over the fee lands and IGRA's requirement that the tribe exercise some quantum of governmental power over the [Property]." Defs.' Response at 26. In the Village's view, *Sherrill* held that the Cayugas were barred "from exercising *any* sovereignty over the fee lands in question." *Id.* at 27 (emphasis in original). According to Union Springs, "[t]he decades-long jurisdictional clashes over the right to govern fee lands inside ancient (former) reservations were supposed to be put to rest by *Sherrill*, with restoration of sovereign authority over those fee lands occurring only by the land being taken into trust." *Id.*

To be sure, *Sherrill* is a case that "dramatically altered the legal landscape" of tribal land-use litigation. *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 273 (2d Cir. 2005). But *Sherrill*'s holding is more limited than the Village believes it to be. In *Sherrill*, the Supreme Court held that a tribe could not "revive" its ancient sovereignty to evade state and local taxation on discrete parcels of historic reservation land repurchased from the open market. 544 U.S. at 203. More generally, then, *Sherrill* has been understood to hold "that equitable doctrines, such as laches, acquiescence, and impossibility can, in appropriate circumstances, be applied to Indian land claims, even when such a claim is legally viable and

within the statute of limitations."  *Pataki*, 413 F.3d at 273.

However, *Sherrill*'s advice to the Oneidas about the IRA's land-into-trust process was not a holding in the case.  *Cf. United States v. Warren*, 338 F.3d 258, 266 n.5 (3d Cir. 2003) (explaining general distinction between *ratio decidendi* and *obiter dicta*).  And while the Court clearly hoped that identifying the land-into-trust process as the "proper avenue" for restoring full sovereignty would stem the tide of tribal land-use litigation, *Sherrill* certainly did not go on to hold that this process was the exclusive means for establishing Class II IGRA "jurisdiction" on historic reservation land reacquired in fee.  544 U.S. at 220.

To the contrary, *Sherrill* said nothing about IGRA.  Nor, for that matter, did *Union Springs II*, which relied on *Sherrill*'s guidance about equitable doctrines to conclude that the Cayugas could not invoke tribal sovereignty to completely avoid the application of the Village's state and local laws over the reacquired Parcel.  390 F. Supp. 2d at 206.

The Village's belief that its expansive reading of *Sherrill* has since been explicitly adopted by the Second Circuit is also incorrect.  Union Springs relies on language in *Upstate Citizens for Equality, Inc. v. United States*, 841 F.3d 556 (2d Cir. 2016), to argue that lands subject to *Sherrill* can never satisfy this tribal "jurisdictional" requirement imposed by IGRA's text.  Defs.' Response at 26.

But that case is also distinguishable from this one.  In *Upstate Citizens*, a group of plaintiffs challenged the DOI's decision to take land into trust for the benefit of the Oneidas by alleging that the tribe's operation of the Turning Stone Casino Resort on that land caused, or would cause, various forms of tangible and intangible harm.  *Upstate Citizens for Equality, Inc.*, 841 F.3d at 560.  The Second Circuit cited *Sherrill* for the proposition that "[t]he Supreme Court has already rejected the [Oneidas'] claim that it may exercise <u>tribal</u>

jurisdiction over the Turning Stone land without the Department first taking the land into trust on the Tribe's behalf." *Id*. at 566 (emphasis added).

However, as the Nation points out, this description of *Sherrill*'s holding came in passing, and is part of an Article III standing analysis that might well be dicta. Pls.' Mem. at 29. More importantly, though, the *Upstate Citizens* panel recognized that the Oneidas were actively conducting Class III gaming activities at Turning Stone, an entirely different type of gaming than the gaming at Lakeside Entertainment.

Notably, Class III gaming is "the most heavily regulated and most controversial form of gambling under IGRA." *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 715 (9th Cir. 2003). The Act subjects Class III gaming to a more demanding regulatory regime with slightly different jurisdictional language. *See* 25 U.S.C. § 2710(d)(1)(A)(I); *see also Michigan v. Bay Mills Indian Cmty.* 572 U.S. 782, 785 (2014) (recognizing Class III gaming as "the most closely regulated"). Besides, even *Upstate Citizens* recognized that tribal governance is not an all-or-nothing state of affairs, since states "retain some civil and criminal authority" on federal land even after it is taken into trust. 841 F.3d at 571.

This dispute over IGRA's jurisdictional language boils down to the Village's mistaken insistence that the Nation is "not a self-governing body except on paper." Defs.' Mem. at 38 n.11. But whether Union Springs likes it or not, the Cayugas remain a federally recognized Indian tribe. Federal recognition "institutionalizes the tribe's quasi-sovereign status, along with all the powers accompanying that status such as the power to tax, and to establish a separate judiciary." 1 *Cohen's Handbook of Federal Indian Law* § 3.02 (2019).

The Nation therefore retains at least some degree of "inherent sovereign authority" over the land in its possession. *Michigan*, 572 U.S. at 788; *see also Citizens Against Casino*

*Gambling in Erie County v. Stevens*, 945 F. Supp. 2d 391, 403 (W.D.N.Y. 2013) (rejecting contention that *Sherrill* "signals a *carte blanche* rejection of the long established relationship between 'Indian country' and tribal jurisdiction").

Although *Sherrill* subjected discrete parcels of historic reservation land that a tribe has belatedly repurchased in fee to local regulatory authority and *Union Springs II* applied that holding to the Cayugas' attempt to invoke tribal sovereignty as a way to avoid the application of any local regulatory authority over the Property, it remains an open question whether otherwise applicable local laws that regulate tribal gaming activity on this kind of repurchased fee land are preempted by IGRA.

Upon review of IGRA's text in light of the parties' arguments on this question, the Court concludes that an Indian tribe seeking to conduct Class II gaming under IGRA is not required to exercise some minimum quantum of *exclusive* governmental authority before it can satisfy the "within such tribe's jurisdiction" requirement imposed in § 2710(b)(1).

Rather, this jurisdictional component is satisfied so long as a tribe may exercise *some* jurisdictional authority over the land in question, and even concurrent jurisdiction with state and local authorities satisfies this test. *Cf. Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 701-02 (1st Cir. 1994) (concluding that IGRA's "jurisdictional" language is best understood as an "integral aspect of retained sovereignty," which includes "the power of Indians to make and enforce their own substantive law in internal matters").

Because there is no reasonable dispute that the Nation exercises some degree of concurrent jurisdiction over the Property, this requirement is satisfied as a matter of law. *See* Pls.' Response at 30. This is especially so where, as here, the parties agree that the Nation is a federally recognized Indian tribe in possession of a reservation that has never been

disestablished.  JSF ¶¶ 1-3.  Accordingly, IGRA's broad preemptive effect means that Union Springs cannot rely on local laws and ordinances to regulate the Tribe's Class II gaming activity at Lakeside Entertainment.

### 2.  **Criminal Enforcement**

In Count Two, the Nation alleges that IGRA also precludes the Village's criminal enforcement actions.  Am. Compl. ¶¶ 86-91.  The Nation asserts that any criminal proceedings with respect to Lakeside Entertainment would be unlawful regardless of whether or not the Nation's activities are actually authorized by IGRA.  *Id*. ¶ 87.

Under 18 U.S.C. § 1166, "[t]he United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country, unless an Indian tribe . . . has consented to the transfer to the State of criminal jurisdiction with respect to gambling on the lands of the Indian tribe."  In other words, "Section 1166 makes a State's gambling laws applicable 'in Indian country' as federal law, then gives the Federal Government 'exclusive jurisdiction over criminal prosecutions' for violation those laws."  *Michigan*, 572 U.S. at 793 n.5 (citations omitted).[10]

Union Springs contends that the State of New York retains "concurrent prosecutorial jurisdiction in Indian Country within the state," and asserts that "[t]he state's jurisdiction extends to enforcing local laws that license the operation of games of chance by authorized charitable organizations."  Defs.' Mem. at 39 (citation and internal quotation marks omitted).  In other words, "[t]his express authorization for enforcement of local anti-gaming laws such as the Village Gaming Ordinance renders Section 1166 inapplicable."  *Id*.

_____

[10]  "Indian country" includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government."  18 U.S.C. § 1151(a).

This argument must be rejected.  In support of its argument, Union Springs cites 25 U.S.C. § 232, which gives the State of New York "jurisdiction over offenses committed by or against Indians on Indian reservations within the State of New York to the same extent as the courts of the State have jurisdiction over offenses committed elsewhere within the State as defined by the laws of the State."

But Congress passed § 232 in 1948, forty years before it enacted § 1166.  As the Nation points out, a "later-enacted, more specific, comprehensive statute that targets the specific subject matter at issue in the case controls the construction of a more general statute when there is a potential conflict."  *Nutritional Health All. v. Food & Drug Admin.*, 318 F.3d 92, 102 (2d Cir. 2003).  As the Nation also points out, the opinion cited by the Village in support of this argument says only that Congress did not intend to surrender existing federal jurisdiction at the time it enacted § 232 in 1948.  *See United States v. Cook*, 922 F.3d 1026, 1033 (2d Cir. 1991).

Because *Cook* does not resolve whether § 232 trumps § 1166's broad grant of exclusive federal authority over criminal matters in Indian country, the general rule that a later-enacted, comprehensive statute on the same subject matter controls any potential conflict here.  *Cf. Sycuan Band of Mission Indians v. Roache*, 788 F. Supp. 1498, 1505 (S.D. Cal. 1992) ("The court must assume that when Congress chose to use the words 'exclusive jurisdiction [in § 1166],' Congress meant exactly that."), *aff'd*, 54 F.3d 535 (9th Cir. 1994).  Accordingly, a straightforward application of § 1166 precludes Union Springs from undertaking any criminal enforcement proceedings with respect to the Tribe's Class II gaming activity at Lakeside Entertainment.

## C. <u>Sovereign Immunity</u>

Preemption aside, Count Three asserts that the Nation's sovereign immunity is an independent bar to the Village's civil and criminal enforcement efforts. Am. Compl. ¶¶ 92-96. According to the Nation, "[a]ny court proceedings to punish or restrict gaming at Lakeside Entertainment (including but not limited to proceedings to enforce the Orders to Remedy Violations) would violate the Nation's sovereign immunity." *Id* ¶ 94.

"Indian tribes are 'domestic dependent nations' that exercise 'inherent sovereign authority.'" *Michigan*, 572 U.S. at 788 (quoting *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991)). Although tribes remain "subject to plenary control by Congress," they are also "separate sovereigns pre-existing the Constitution." *Id*. (citation omitted). Accordingly, "unless and until Congress acts, the tribes retain their historic sovereign authority." *Id*.

"Among the core aspects of sovereignty that tribes possess—subject, again, to congressional action—is the 'common-law immunity from suit traditionally enjoyed by sovereign powers.'" *Michigan*, 572 U.S. at 788 (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)). As the Supreme Court has explained, this immunity is "a necessary corollary to Indian sovereignty and self-governance." *Id*. (quoting *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C.*, 476 U.S. 877, 890 (1986)).

Union Springs argues that the "immovable property exception" to foreign sovereign immunity should be applied in this case. Defs.' Mem. at 40. Under that exception, "a foreign state that owns real property outside of its jurisdiction" must "follow the same rules as everyone else." *Id*. According to the Village, the Cayugas' "voluntarily subjected themselves to the regulatory and taxing jurisdiction of the Village" by repurchasing the Property from the

open market. *Id*. at 41.

"At common law, . . . sovereigns enjoyed no immunity from actions involving immovable property located in the territory of another sovereign." *Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649, 1653 (2018); *see also Schooner Exchange v. McFaddon*, 7 Cranch 116, 145 (1812) ("A prince, by acquiring private property in a foreign country, . . . may be considered as so far laying down the prince, and assuming the character of a private individual.").

Upon review, this argument must also be rejected. As the Nation convincingly demonstrates in its own briefing, "immunity doctrines lifted from other contexts do not always neatly apply to Indian tribes." *Upper Skagit Indian Tribe*, 138 S. Ct. at 1654. And despite the fact that the Village supports this argument by citing to the <u>dissenters</u> in *Upper Skagit*, the Supreme Court majority in that case explicitly declined to decide whether the so-called "immovable property" exception might otherwise limit the broad scope of tribal sovereign immunity. *Id*.

Thus, under this "avowedly broad principle" of "settled law," courts must "dismiss[ ] any suit against a tribe absent congressional authorization (or a waiver)." *Cayuga Indian Nation of N.Y. v. Seneca County, N.Y.*, 761 F.3d 218, 220 (2d Cir. 2014) (cleaned up). This remains true "even when a suit arises from off-reservation commercial activity." *Michigan*, 572 U.S. at 785. And it remains true whether the suit involves the tribe or the tribe's property. *Cayuga Indian Nation of N.Y.*, 761 F.3d at 221. Accordingly, tribal sovereign immunity bars the Village from proceeding against the Tribe in this case, too.

Nevertheless, Union Springs argues that it may proceed directly against individual tribal officials "under a theory analogous to *Ex parte Young*." *Gingras v. Think Finance, Inc.*,

922 F.3d 112, 120 (2d Cir. 2019).  As the Nation explains, though, *Gingras* is inapplicable because it involved "conduct outside of Indian lands."  *Id*. at 121.  Thus, the general rule still applies in this case:  Union Springs "cannot circumvent tribal immunity by merely naming officers or employees of the Tribe when the complaint concerns actions taken in defendants' official or representative capacities."  *Chayoon v. Chao*, 355 F.3d 141, 143 (2d Cir. 2004).  Accordingly the Nation is entitled to summary judgment on Count Three.

## V.  CONCLUSION

The Nation has established that Lakeside Entertainment meets the requirements for Class II gaming under IGRA.  The Tribe is therefore entitled to invoke IGRA's "extraordinary preemptive power."  *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 545 (8th Cir. 1996).  Accordingly, the Village will be enjoined from enforcing the Games of Chance Ordinance against the Nation's activities at the Property.

Further, the Court agrees with the Nation that the "use variance" requirement imposed by the Village is also preempted by IGRA.  *See* Pls.' Response at 31-37.  Union Springs argues that "the zoning standards enacted by the Village do not permit [a bingo hall] in the applicable zoning district" where the Property is situated.  Defs.' Response at 16.  But as the Nation points out, that explanation amounts to an indirect regulation of the Nation's Class II gaming activity at the Parcel.  *See* Pls.' Mem. at 31-37.

In sum, the Village will be enjoined from the direct (via the Games of Chance Ordinance or similar means) or indirect (via the use variance or similar means) regulation of the Tribe's Class II gaming activity at Lakeside Entertainment.  *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) (Sotomayor, J.) ("To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if

the relief is not granted."  (cleaned up)).

Therefore, it is

ORDERED that

1.  The Nation's motion for summary judgment is GRANTED;

2.  The Village's motion for summary judgment is DENIED;

3.  The Village of Union Springs' 1958 Games of Chance Ordinance and all other state and local laws prohibiting gambling are preempted by the Indian Gaming Regulatory Act as applied to the nation's Class II gaming activities at Lakeside Entertainment;

4.  The 1958 Games of Chance Ordinance cannot lawfully serve as a basis for denying the Nation a certificate of Occupancy to Lakeside Entertainment;

5.  Federal law prohibits defendants from taking any steps to restrict, interfere with, punish, prosecute, or otherwise penalize actions taken by the Nation, its officers, its employees, or its other representatives in furtherance of Class II gaming activities at the Property;

6.  The Nation enjoys tribal sovereign immunity from any suit by defendants to enforce the Ordinance;

7.  Defendants are enjoined from taking any steps to restrict, interfere with, punish, prosecute, or otherwise penalize actions taken by the Nation, its officers, its employees, or its other representatives in furtherance of Class II gaming activities at Lakeside Entertainment, including but not limited to the enforcement of the 1958 Union Springs Games of Chance Ordinance or other local and state laws concerning gambling, whether independently through a civil or criminal action, or through civil or criminal enforcement of the Village of Union Springs's zoning law, or through a civil or criminal action to enforce the Order to Remedy

Violations dated July 9, 2013 or the Order to Remedy Violations dated December 30, 2013; and

      8.  The Clerk of the Court is directed to enter a judgment accordingly and close the file.

      IT IS SO ORDERED.

United States District Judge

Dated: March 24, 2020
        Utica, New York.